**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Michael Carrabes,<br><br>            Plaintiff,<br><br>    v.<br><br>Expeditors International of<br>Washington, Inc.,<br><br>            Defendant. | No.  1:24-CV-12142<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      This case arises from the Defendant's unlawful employment actions, including discriminatorily targeting the Plaintiff, a male, based on his sex. As further described below, the Plaintiff asserts that the Defendant demoted him and then terminated his employment in violation of Title VII of the Civil Rights Act without cause after 20 years of exemplary service with the Defendant.

2.      A central aspect of the Plaintiff's claim is that the Defendant devised and implemented a covert program designed to clandestinely reduce headcount without resorting to layoffs. Through this scheme, spelled out in an internal email, the Defendant terminated employees by claiming supposed

"performance deficiencies" or misconduct while strategically pressuring resignations. However, these stated reasons were merely pretextual justifications to cloak the Defendant's true aim of clandestinely cutting over 2,000 positions in violation of the company's explicit no-layoff policy and workers' legitimate expectations of continued employment.

3.      The Plaintiff asserts that this covert program effectively dismantled essential safeguards and protocols designed to prevent discriminatory practices and ensure due process in employment decisions. By placing undue pressure on managers to rapidly reduce staff without proper regard for established procedures and anti-discrimination policies, the secret program created a perverse incentive structure that prioritized workforce reduction over fairness and legal compliance.

4.      The Plaintiff alleges that the Defendant targeted him for adverse employment action and, ultimately, termination based on his sex and in accordance with the covert termination program.

5.     The Defendant's discriminatory actions have wrongfully ended the Plaintiff's approximately 20-year career with the Defendant, breaching contractual obligations without just cause. As a result, the Defendant has inflicted substantial economic and non-economic damages upon the Plaintiff.

6.     Through this action, the Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964 for the harms caused by the Defendant's discriminatory and unlawful conduct. Furthermore, the Plaintiff seeks redress for the Defendant's breach of contract and wrongful termination of him and asks that this Honorable Court order that certain records be expunged from his personnel file pursuant to M.G.L. ch. 149, § 52C.

## JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, and over the state law claims pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs, and is between citizens of different states.

8.      Supplemental jurisdiction also exists for the non-federal question jurisdiction claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal question claims that they form part of the same case or controversy.

9.      Pursuant to 28 U.S.C. § 1391(b), venue is appropriate in this district as a substantial portion of the events or omissions that form the basis of the claim occurred herein. Additionally, in accordance with 42 U.S.C. § 2000e-5(f)(3), venue is further justified as records pertinent to the alleged unlawful employment practices are maintained and administered within the State of Massachusetts and unlawful employment practices occurred within its borders. Moreover, but for the said alleged unlawful employment practices, the Plaintiff would have been employed in this district, thereby establishing a significant connection to this forum for the purposes of adjudicating the present claims.

**PARTIES**

10.    The Plaintiff, Michael Carrabes, is a Massachusetts
       resident residing in Peabody, Massachusetts.

11.    The    Defendant,    Expeditors    International    of
       Washington, Inc. (**"Expeditors"**), is a corporation
       organized under the laws of the State of Washington
       and having a principal place of business of 1015
       Third    Avenue,    Seattle,    Washington.    Expeditors
       conducts business throughout the United States,
       including    within    Massachusetts,    and
       internationally.

12.    Expeditors    offers    a    wide    array    of    services,
       including but not limited to air and ocean freight
       forwarding, vendor consolidation, cargo insurance,
       distribution, and an extensive suite of value-added
       logistics solutions designed to meet the complex
       demands of global trade.

13.    As a testament to its standing in the industry,
       Expeditors is not only publicly traded on the New
       York Stock Exchange under the ticker symbol "EXPD",
       but    also    a    distinguished    Fortune    500    company,

reflecting its significant market share and influence in the logistics sector.

14.    Expeditors is legally accountable for the actions and inactions of its personnel, specifically those executed, verified, enacted, and authorized within their official capacities.

**FACTS**

15.    The Plaintiff's tenure with Expeditors spanned approximately two decades, having initiated his career with Expeditors in the year 2003 as an at-will employee.

16.    At the inception of his employment with Expeditors, the Plaintiff resided in Massachusetts, and worked full-time at the Expeditors facility located in Centennial Business Park in Peabody, Massachusetts as a sales executive.

**<u>The Code of Conduct</u>**

17.    Subsequent to being employed as an at-will employee by Expeditors, the Plaintiff was presented with Expeditors' Code of Business Conduct ("**Code**").

18.     The Code applies to every employee, director, and officer of Expeditors worldwide. The Code, which emphasizes honesty and integrity, functions as a sort of constitution for Expeditors.

19.     All Expeditors employees, including the Plaintiff, were required to do regular training on a variety of general topics, as well as job-specific topics.

20.     All employees of Expeditors, including the Plaintiff, were required to review the Code and be tested on it on an annual basis.

21.     As part of this training, the Plaintiff, like all other Expeditors' employees, was required to certify that he (a) complies with the Code, (b) understands that he has multiple sources for additional guidance regarding the Code, and (c) acknowledges that violation of the Code may result in termination of his employment.

22.     The Plaintiff understood that further employment with Expeditors was dependent on him accepting the terms of the Code.

23.     The Plaintiff reasonably believed that Expeditors
        agreed to be bound by the Code and Expeditors treats
        the Code as a binding contract between it and its
        employees.

24.     There were no disclaimers in the Code that
        indicated it was not legally binding on Expeditors.

25.     The Code indicated that the fundamental principles
        of ethical, compliant conduct were: (a) be honest
        & accurate; (2) be good; (3) be loyal; (4) be fair
        & objective; and (5) be respectful & considerate.

26.     The Code provided, "Expeditors is absolutely
        committed to abiding by these fundamental values
        and to exceptional performance with integrity."

27.     The Code also stated that Expeditors did not permit
        retaliation against anyone who filed a good-faith
        report of a potential violation of the Code and
        that any waiver of the Code could only be made by
        the Board of Directors.

28.     The Code imposed an obligation on employees to
        report any known or suspected violations of the
        Code.

29.    The Code also provided that while employees were
       entitled to manage their own personal relationships
       and financial investments, employees must avoid
       conduct and situations that may conflict, or appear
       to conflict, with the exercise of independent
       judgment in the course of their work as an employee
       of the company.

30.    The Code further indicated that all employees were
       entitled to work in an environment that was free
       from favoritism, harassment and intimidation.

**Plaintiff's Promotion to District Sales Manager**

31.    In July of 2010, the Plaintiff was promoted to
       District Sales Manager.

32.    As the District Sales Manager, the Plaintiff was
       responsible for leading and overseeing the District
       Sales Program, ensuring its consistency and
       effectiveness across all offices within the
       district.

33.    The Plaintiff's duties included developing and managing the District Sales team, recruiting and training sales executives at both entry and senior levels, and maintaining a pipeline of candidates. The Plaintiff was tasked with creating and implementing the vision and strategy for the District Sales Program, assessing market trends, and communicating them to the District and Regional leadership teams. He was also responsible for actively engaging in closing large opportunities with the Sales executive team, managing the Sales Department budget, facilitating weekly Sales meetings, coaching the Sales team, and creating career development plans for Sales Operations and Sales Executives.

## Historical Exemplary Job Performance

34.    Ms. Tracy Peveri was appointed a District Manager at Expeditors in 2008 and was the Plaintiff's upper-level supervisor from 2008 until his termination from Expeditors on February 5, 2024.

35.    From 2011 until 2022, the Defendant, through Ms. Peveri conducted yearly evaluations of the Plaintiff's job performance that were placed in his

personnel file after being reviewed with the
Plaintiff and providing him with an opportunity to
comment upon the information contained therein.

36.     From 2011 until 2021, Ms. Peveri consistently gave
the Plaintiff positive reviews, including with
respect to his performance as a team builder and
leader.

37.     In the Effort and Teamwork section of the
Plaintiff's March 21, 2011 performance review, Ms.
Peveri stated, "Michael is very willing to do
anything asked of him and works very well with all
staff," and rated his job performance as meeting
expectations in all areas.

38.     On March 20, 2012, Ms. Peveri rated the Plaintiff's
job performance as meeting expectations with
respect to effort and teamwork.

39.     In the Effort and Teamwork section of the
Plaintiff's performance review dated July 2, 2013,
Ms. Peveri wrote, "Michael understands the
responsibilities and works well with his peer group.
He has developed a great working relationship with
the CRD and T&I groups, they are one cohesive team."

The Plaintiff was also rated as meeting all expectations in all areas of his job performance.

40.    In the Plaintiff's performance review of June 2015, Ms. Peveri rated the Plaintiff's job performance as meeting expectations in all areas.

41.    In the Plaintiff's June 27, 2016 performance review, Ms. Peveri stated, Michael works well with his fellow co-workers and is always willing to help," and said his job performance met expectations in all areas.

42.    In the Plaintiff's September 22, 2017, performance review, Ms. Peveri reported, "Michael works well with his fellow co-workers and is always willing to help." Ms. Peveri also rated the Plaintiff's job performance as meeting expectations in all areas.

43.    In the Plaintiff's September 27, 2018, performance review, Ms. Peveri stated, "Michael meets goals in written job description and drives his team to develop business" and that he was "always willing to assist anyone in the district." Ms. Peveri also rated the Plaintiff's job performance as meeting

expectations in all areas.

44.     Ms. Peveri wrote in the Plaintiff's performance review of May 10, 2019, that, "Michael has done a great job building his sales team and CRD team to understand the importance of exceptional customer service, building trust with customers and the art of relationship building." Once again, Ms. Peveri rated the Plaintiff's job performance as meeting or exceeding expectations in all areas.

45.     In the Plaintiff's November 29, 2019, performance review, Ms. Peveri wrote, "Michael has built a very solid team and nominated Jen to the leadership platform workshop to develop her leadership skills" and rated his performance in team development as exceeding expectations.

46.     In the Plaintiff's performance review of December 31, 2020, Ms. Peveri noted, "Michael works well with his peer (sic) and team," and that he had "built a solid sales team." Ms. Peveri again rated the Plaintiff's job performance as meeting or exceeding expectations in all areas.

47.    In the Plaintiff's December 21, 2021, performance
       review, Ms. Peveri stated that when it came to
       collaboration, "Michael works well with his
       peers/customers and team." Ms. Peveri also rated
       his job performance as meeting or exceeding
       expectations in all areas.

48.    The Plaintiff was never disciplined by Expeditors
       for misconduct.

49.    As District Sales Manager, the Plaintiff had
       numerous team members win the President Club Award.
       The President's Club Award is awarded to those
       salespeople that meet very strict criteria and is
       the highest accolade that a salesperson could
       obtain in the company.

## The Covert Termination Program

50.    Prior to the Plaintiff's termination and throughout
       his employment with the company, Expeditors
       publicly and prolifically promoted its steadfast
       commitment to a no lay-off policy branding itself
       as a paragon of employee job security, particularly
       in economic downturns.

51.    Expeditors' external communications, including its
       website and annual proxy statements for 2020 and
       2021, consistently reinforced the company's no lay-
       off policy. These documents served as a testament
       to the company's pledge to its employees and
       shareholders.

52.    Expeditors management also proclaimed this no-
       layoff policy on social media. For example, Megan
       Knight, a Senior Program Manager at Expeditors,
       posted on LinkedIn in 2023 the following, "[t]ough
       to see all the layoffs in the tech space right now.
       Good people doing great work, and just getting the
       short end of the stick. I'm proud to work for a
       company that has never laid off anyone, and in fact
       has a no layoff policy that has been TESTED. Two
       economic downturns and a pandemic, along with many
       changes in the market – no one lost their job. Not
       one."

53.    The Plaintiff later discovered that the CEO of
       Expeditors, Mr. Jeffrey Musser, had secretly
       developed a plan to reduce the workforce by 2,000
       or more, a stark deviation from the company's
       stated no lay-off policy, which casts doubt on the
       authenticity of Expeditors' public stance on

layoffs.

54.     In an email dated January 24, 2023, distributed only to senior leadership and prominently marked not for further dissemination, the CEO of Expeditors, Mr. Jeffrey Musser, stated:

**STRICTLY CONFIDENTIAL - FOR INTERNAL USE ONLY - DO NOT FORWARD OR DISSEMINATE**

Let me start this email by saying that it was great seeing each of you at the DM Meetings in London, Seattle or Singapore. As I said in the DM Meetings, you and your teams have done an incredible job over the last couple of years navigating the pandemic and while still going through impacts from the pandemic and managing through our cyber-attack. We've never faced a more challenging time in our history, and I am extremely proud of how we responded. We protected our employees and at the same time protect our business.

As I also said in the DM Meetings, we are now enter a year of new challenges. Rates are returning to pre-pandemic levels and demand is dropping as a result of the global economic environment. This is all happening much faster than we ever expected so it is imperative that we respond quickly. Even though we have discussed the changes taking place, I am not confident that everyone truly understands the impact this will have on our business. The purpose of my email is to draw additional attention to this situation and spur immediate action.

Our two larges expenses are direct transportation and personnel costs. Our direct transportation costs are being reduced simply based on the declining market. Our personnel costs do not and will not decline without action by you.

During the past two years we added roughly 2,000 new staff to our headcount. We did this not because our volumes grew but because our business changed. Certain locations were handling significantly more business than they had done previously (think key gateway locations) and all

locations were required to devote more time, effort and work to handle our current business. This was the first time in our history that we hired people not because our volumes increased but instead because of the complexity of our business increased. We were able to do this based on the increased rates and profitability. Unfortunately, the rates have now declined, and we can no longer support the expense of the additional headcount.

In a normal period, we could simply deal with the additional headcount through attrition and not hiring additional staff. We are NOT in a normal period.  As stated above, rates have dropped significantly which has had a large impact on our profitability and at the same time, volumes are dropping quickly.  It is likely that we are overstaffed by more than the growth in staff over the last two years based on current volumes.

I continue to hear people say that we are a company that does not do layoffs. This is a true statement based on our history, but we've never been in a period where we were overstaffed by 2,000 employees and then experienced a significant drop in volumes. In all previous circumstances, we were dealing with a situation where we were staffed appropriately for our current business and then experienced a drop in volumes due to economic conditions.  In the past, we were dealing with an overstaffing of approximately 10% whereas now it could be as high as 20%.

Many companies, including a large number of our customers are or have implemented layoffs.  Details on some of the largest layoffs are listed below:

Microsoft:  10,000
Google:  12,000
Meta:     11,000
Amazon:  18,000
Salesforce: 8,000

These companies are terminated staff as they have seen a large downturn in business and do not expect things to correct themselves in the short term.

My message to you as District Manager or leader in this company is this: while we have never had a layoff in our company to date, we do not have a policy that states we will not do layoffs. We are

significantly overstaffed based on our current
volumes. We all know how we got here but we are
all responsible for getting us back to a manageable
level.

We will not hire any additional staff. If a person
leaves, and their role is critical, you must back
fill with an employee that is already on staff.
Any other exceptions to this policy will be made
by me or one of my direct staff members.

Additionally, you must begin the process of
trimming your current underperforming staff. If
you have team members who are not performing, do
not meet our culture, or simply do not want to be
part of our team, it is time to let them go. Of
course, this must all be backed up with appropriate
reviews and documentation showing that we have been
working with these staff members.

Your job is to protect our employees. As difficult
as it might be, letting poor performers go is in
the best interest of protecting our employees. Our
model only works when we are staffed with employees
who believe in how we are and what we do and, at
the same time, our revenues and expenses are in-
line with one another.

I do not want to see a change in our history of
layoffs but I simply can't make the necessary
changes on my own. You have the ability to prevent
a layoff and I am confident you will do the work
to get our expenses/headcount/revenues back in-
line. Time is of the essence and this needs
immediate attention and action.

55.    While the content of the District Manager meetings

mentioned in the CEO's email is unclear, the

Plaintiff believes these meetings involved

discussions about the covert termination plan.

Furthermore, the information known to the Plaintiff

suggests that Ms. Peveri was aware that Expeditors

intended to reduce its workforce by 2,000 or more employees in 2023 at the time she conducted the Plaintiff's performance evaluation dated December 31, 2022.

56.    Buried in the Form 10-Q filed by Expeditors with the United States Securities and Exchange Commission for the quarter ending 30 September 2023, was the following statement, "salaries and related costs decreased 17% for both the three and nine months ended September 30, 2023, as compared with the same periods in 2022, principally due to decreases in commissions and bonuses earned from lower revenues and operating income. While headcount decreased 8% in 2023, base salaries and benefits remained flat primarily due to inflationary conditions."

57.    Expeditors' 2022 Annual Report disclosed a workforce totalling approximately 20,000 employees as of December 31, 2022. Thus, an 8% reduction in its workforce would amount to a cut of 1,600 employees.

58.    The Plaintiff, based upon information and belief, maintains that the total workforce reduction at

Expeditors from the date of the CEO's email until now exceeds 10 percent (2,000 employees).

59.     For context, historical data dating back to 1995 indicates that the Expeditor's most significant previous reduction occurred in 2009, involving 570 employees—less than a 5% decrease from the workforce at that time. This comparison underscores the exceptional scale of the workforce reduction accomplished in just 9 months.

60.     Corroborating the internal email, a Glassdoor.com post of 9 March 2023, by an individual claiming to be a current manager at Expeditors in Seattle, Washington, declared that the company was conducting layoffs covertly. The post's mention of an overstaffing issue by 2,000 employees—identical to the figure cited by the CEO in the confidential email—lends additional weight to the allegations.

61.     Expeditors and its CEO never disclosed to its shareholders that it intended to reduce its workforce by 10 percent via 'performance based' terminations and forced resignations, as described more fully below.

62.     Expeditors also orchestrated a scheme to
        effectively reduce its workforce by means of
        engineered resignations, thereby circumventing the
        traditional and public process of layoffs. Certain
        employees were deliberately targeted and informed
        about their purported underperformance, with the
        subsequent threat of impending termination by the
        month's end. These employees were presented with
        an ostensibly benevolent alternative: resign
        voluntarily and receive a favourable reference,
        along with a suggestion of potential rehire in the
        future.

63.     Based upon information and belief, managers were
        told that they needed to implement the scheme to
        keep Expeditors' stock price up to prevent it from
        becoming a takeover target.

64.     The Plaintiff alleges that through the
        implementation of the CEO's clandestine workforce
        reduction program, as outlined in the January 2023
        email, Expeditors terminated employees or pressured
        resignations across various operations and
        subsidiaries, including those located within
        Massachusetts.

65.    The CEO's confidential communication and subsequent
       policy  shifts  regarding  Expeditors  no  lay-off
       policy effectively dismantled critical safeguards
       within the company's disciplinary and termination
       procedures,  creating  an  environment  ripe  for
       discriminatory practices.

66.    The  emphasis  on  rapid  staff  reduction,  combined
       with  directives  that  placed  undue  pressure  on
       managers to identify and dismiss 'underperforming'
       employees,  incentivized  the  elimination  of
       positions without regard for due process or anti-
       discrimination laws.

67.    Based  upon  information  and  belief,  the  Plaintiff
       was  targeted  for  termination  as  a  result  of  the
       covert termination program.

**Plaintiff Receives Negative Reviews**

68.    In December of 2022, Ms. Peveri began telling the
       Plaintiff that she had been receiving complaints
       about his ability to work with others as a team.
       Ms.  Peveri  did  not  give  any  specifics  about  the
       complaints and the Plaintiff never received notice

that negative information was placed in his personnel file referencing the alleged complaints or detailing his allegedly poor performance.

69.    In the Plaintiff's December 31, 2022 performance review, Ms. Peveri stated that she would like to see the Plaintiff build "better communication with the sales team." Ms. Peveri gave the Plaintiff a rating of 2/5 for communication which indicates he did not meet his job expectations in that category.

70.    Ms. Peveri also gave the Plaintiff a 2/5 in the reliability category stating, "Michael needs to work on district engagement and organizing the weekly sales meeting." In all other categories, the Plaintiff met expectations.

71.    The December 31, 2022 performance review did not include any specifics on how his communications were deficient or describe the issues Ms. Peveri had with his district engagement or organization of weekly sales meetings.

72.    This was the first official notice that the Plaintiff received regarding his purported poor performance.

23

73.     It was the practice and policy of Expeditors that
        when    Expeditor's    identified    significant
        deficiencies in an employee's performance, the
        employee was placed on a Performance Improvement
        Plan, which identified the performance issues, set
        out specific goals, provided a plan for rectifying
        performance issues and set a time frame in which
        the deficiencies must be corrected and the negative
        consequences the employee would face should they
        not meet the identified goals.

74.     The Plaintiff was never placed on a Performance
        Improvement Plan.

75.     The Plaintiff is unaware of any similarly situated
        female employee at Expeditors who, despite having
        a  comparable  history  of  consistently  positive
        performance reviews, was demoted or removed from
        their position based solely on alleged deficiencies
        in two performance categories mentioned in a single
        annual evaluation, without first being placed on a
        Performance  Improvement  Plan  or  afforded  an
        opportunity to address the purported issues.

76.     The Plaintiff, through his attorney, requested his
        complete personnel file on July 30, 2024 and the
        Defendant produced the file on August 6, 2024.

77.     The Plaintiff's personnel file did not contain any
        reference to the complaints allegedly received by
        Ms. Peveri.

78.     The Plaintiff asserts that the low ratings in his
        December 31, 2022 performance review were a
        pretext, deliberately included by Ms. Peveri to
        establish a false narrative of underperformance.

79.     The Plaintiff further asserts that these ratings
        were not a genuine reflection of his work but rather
        a calculated move to create a paper trail
        justifying the impending adverse employment actions
        Ms. Peveri planned to take against him based upon
        his sex and to mask the discriminatory motives
        behind the Plaintiff's demotion and ultimate
        termination.

80.     Furthermore, the fact that these negative ratings
        occurred just before the CEO's email regarding the
        covert termination program further supports the

inference of a discriminatory motive and that the
Plaintiff was targeted as part of the program.

## The Plaintiff's Demotion and Termination

81.    The Plaintiff was generally aware that Ms. Nancy
Bowie, a female who had joined his team in February
of 2017, had been making complaints about him to
other employees and Ms. Peveri.  However, these
complaints were never formally brought to his
attention or addressed with him.

82.    Moreover, until 2022, Expeditors gave no indication
to the Plaintiff that he was failing to communicate
effectively with his sales team. To the contrary,
the Plaintiff always met or exceeded expectations
in this regard.

83.    Ms. Bowie had no relevant experience in the
industry when she joined Expeditors as a District
Sales Representative, at which time she was
appointed to the Plaintiff's sales team.

84.    Despite the Plaintiff's prior exceptional job
performance and failing to put the Plaintiff on a

Performance Improvement Plan, Ms. Peveri told the Plaintiff in late December of 2022 that as a result of the complaints she received, he would lose his position as District Sales Manager.

85.    There is no documentation contained in the Plaintiff's personnel file indicating why Expeditors demoted the Plaintiff from his position as District Sales Manager or, for that matter, that he was ever demoted from District Sales Manager.

86.    In January of 2023, the Plaintiff's share of the bonus pool which was 2 percent was reduced to 1 percent. The bonus pool forms a significant part of a manager's compensation and, often, significantly exceeds their base salary.

87.    In January of 2023, Ms. Peveri also instructed the Plaintiff to look for another job internally.

88.    Plaintiff was tasked with training his replacement, Ms. Bowie, to assume the position of District Sales Manager.

89.     Throughout 2023, the Plaintiff, despite the unfairness to him, diligently trained Ms. Bowie to replace him as District Sales Manager.

90.     Ms. Peveri told the Plaintiff that the reason for his removal from his position as District Sales Manager was the complaints she had received about his poor performance and that, in her opinion, having a female in that role would improve team collaboration and communication or words to that effect.

91.     Ms. Peveri also told the Plaintiff that he could try to find another position within the company.

92.     Despite Ms. Peveri's assurances that the Plaintiff could apply for another position within Expeditors, the covert nature of the company-wide termination program rendered such a transition highly improbable, if not impossible.

93.     Additionally, although the Plaintiff's base compensation did not change, there was a significant reduction in the other compensation the Plaintiff received as a result of Ms. Peveri's actions, such as that from the bonus pool in which

employees of the branch were awarded a percentage of that branch's operating income.

94.     There is no documentation in the Plaintiff's personnel file regarding the compensation he received above his base salary or the other monetary benefits he received as a result of his employment.

95.     In December 2023 or January 2024, Ms. Bowie formally assumed the role as District Sales Manager and Ms. Peveri assigned the Plaintiff to work at the warehouse located at Peabody, Massachusetts.

96.     At the warehouse, the Plaintiff was required to do manual labour such as lifting heavy boxes.

97.     To the Plaintiff's knowledge, no female District Sales Manager at Expeditors has ever been subjected to the same adverse treatment as the Plaintiff, namely being abruptly removed from a managerial position after years of exemplary performance and then reassigned to perform manual labor in a warehouse, resulting in a significant reduction in compensation and professional status.

98.     It was the policy and practice of Expeditors to require a District Manager to complete a Personal Action Form and place it in an employee's personnel file whenever there was a pay change, title change, department change, schedule change or worksite change.

99.     There are no Personal Action Forms or other documents in the Plaintiff's personnel file referencing the loss of his position as District Sales Manager, his reassignment to the warehouse or the further decrease in the Plaintiff's compensation.

100.    Based upon information and belief, no female at Expeditors has been demoted for poor performance without first being given the reasons for the demotion and given an opportunity to improve their performance by being put on a Performance Improvement Plan.

101.    As a result the unfair treatment by Ms. Peveri and suffering the indignity of being assigned to work

in the warehouse despite his two decades of exceptional performance, the Plaintiff asked to meet with her and the Regional Vice President, Mr. Brian Carrabes, who is also the Plaintiff's brother.

102.    The Plaintiff was obligated to report his concerns about Ms. Peveri to her supervisor as she was engaging in behavior prohibited by the Code, including, but not limited to, acting in a dishonest manner, discriminating against the Plaintiff based upon his sex and treating her close friends more favorably.

103.    On February 5, 2024, the Plaintiff met with Ms. Peveri and Mr. Brian Carrabes in his office to discuss these matters.

104.    Notably, requiring the Plaintiff to report his concerns to his brother represented a conflict of interest under the Code.

105.    At the meeting, the Plaintiff first asked about an interview for a different role within the company that he had applied for as a result of Ms. Peveri's instructions. The Plaintiff did so in a calm and

professional manner.

106.    Ms. Peveri immediately became defensive, crossed her arms and said in a sarcastic tone why don't you tell us. Mr. Brian Carrabes told the Plaintiff in a calm tone that he had not heard anything.

107.    The Plaintiff asked Ms. Peveri and Mr. Brian Carrabes why he was being treated so poorly and asked why he had been demoted, again in a calm tone.

108.    At that time, Ms. Peveri got up, said she was leaving the meeting and exited the room.  The Plaintiff did not yell or threaten her at any time.

109.    Shocked, the Plaintiff asked Mr. Brian Carrabes what was going on here and repeatedly asked what he did to justify this treatment and complained that Ms. Peveri was violating company policy and the Code, as he had not received anything in writing detailing Expeditors' justifications.

110.    At some point, Mr. Brian Carrabes became extremely angry and said you no longer have a job at

Expeditors and yelled get the fuck out of my office.

111.    The lack of documentation regarding the purported reasons in the Plaintiff's personnel file that Expeditor's relied upon to justify demoting the Plaintiff indicate the Plaintiff was discriminated against because of his sex as such information is required to be contained in his personnel file in accordance with M.G.L. ch. 149, § 52C and Expeditors' practices and procedures.

112.    Moreover, in his email of January 24, 2023, the CEO of Expeditors, Mr. Jeffrey Musser, stressed the importance of properly documentating that Expeditors had been working with poorly performing staff members prior to terminating them.

113.    The Plaintiff's experiences of discrimination and retaliation are not isolated incidents, but rather part of a larger pattern of favoritism, discrimination, hostility, and improper conduct by Expeditors management.

114.    Other employees, including Ms. Christina Boudreau, have also observed and experienced this toxic

culture. In a resignation email dated July 24, 2024, Ms. Boudreau detailed instances of favoritism by Ms. Peveri and Mr. Brian Carrabes based on personal relationships rather than qualifications, retaliation against those who spoke up or fell out of favor, and efforts by upper management to hide misconduct.

115.    Ms. Boudreau also indicated that Mr. Brian Carrabes had an inappropriate relationship with Ms. Peveri.

116.    These allegations further support the Plaintiff's claims that the reasons given for his demotion and termination were pretextual and that he was subjected to unlawful discrimination and retaliation.

117.    The Defendant denies that Mr. Brian Carrabes terminated the Plaintiff on February 5, 2024. Thus, the Plaintiff alleges, in the alternative, that as a result of the conduct of Ms. Peveri and Mr. Brian Carrabes he was constructively discharged on that date.

118.    Subsequently, Ms. Peveri inserted a letter dated February 6, 2024 into the Plaintiff's personnel

file in which she claimed that the Plaintiff violated section 4.1(5) and section 4.1(9) of the employee handbook by yelling and using obscene and threatening language toward her during the meeting of February 5, 2024. These statements were false.

119.    The letter also claimed that Mr. Brian Carrabes only told the Plaintiff to leave his office and that he did not tell the Plaintiff he no longer had a job here. These statements were false.

120.    The letter further went on to state that because of his conduct the Plaintiff was terminated immediately. This statement was false as the Plaintiff was terminated by Mr. Brian Carrabes on February 5, 2024.

121.    Finally, the letter stated that a copy of it was handed to the Plaintiff during a meeting on February 6, 2024. The statement is false as the Plaintiff never met with Ms. Peveri subsequent to the meeting with her on February 5, 2024.

122.    Expeditors sent the letter containing the false statements through the U.S. mail to the Plaintiff.

35

## **Equal Opportunity Commission**

123.  On August 12, 2024, the Plaintiff filed a Charge
      with the United States Equal Employment Opportunity
      Commission ("**EEOC**") based in Boston, Massachusetts.

124.  The Charge asserted that Expeditors engaged in
      discriminatory practices against the Plaintiff on
      the grounds of sex, which constitutes a direct
      violation of Title VII of the Civil Rights Act of
      1964. This action was initiated to address the
      alleged inequities and seek recourse for the
      Plaintiff's grievances under federal anti-
      discrimination laws.

125.  The EEOC issued the Plaintiff a Notice of Right to
      Sue, which the Plaintiff received on August 20,
      2024. A copy of the Charge and Notice of Right to
      Sue have been attached to this document as Exhibit
      1.

126.  This Complaint is being filed within 90 days of the
      Plaintiff's receipt of the EEOC Notice of Right to
      Sue.

**FIRST CAUSE OF ACTION**
**(Violation of Title VII of the Civil Rights Act of 1964**
**(42 U.S.C. §§ 2000e to 2000e-17 sex discrimination)**

127.   The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

128.   The Plaintiff, Michael Carrabes, suffered adverse employment action and was ultimately terminated from his employment due to his sex in violation of Title VII of the Civil Rights Act of 1964.

129.   The explanation Expeditors provided for his removal from his position as District Sales Manager was false and there is no documentation contained in the Plaintiff's personnel file pertaining to his removal from said position or the reasons for said action.

130.   Similarly situated individuals outside the Plaintiff's sex were treated more favourably by the Defendant, including Ms. Bowie, who replaced the Plaintiff as District Sales Manager even though she was less qualified for the role, and Ms. Jenna Conners.

131.    As a direct and proximate result of the Defendants'
        actions, the Plaintiff has suffered damages,
        including but not limited to lost wages, lost
        employment benefits, emotional distress, and other
        non-pecuniary losses.

### SECOND CAUSE OF ACTION
### (Breach of Contract)

132.    The Plaintiff hereby realleges and incorporates by
        reference all preceding paragraphs of this
        Complaint.

133.    Defendant Expeditors and the Plaintiff, Michael
        Carrabes, entered into a written contract (the
        Code) and/or an implied-in-fact contract that
        altered the terms of his at-will employment.

134.    The Code incorporated other company policies by
        reference, making them part of the agreement.

135.    Expeditors' no layoff policy was a well-
        established, and widely publicized policy of
        Expeditors.

38

136.    Employees, including the Plaintiff, relied on the no layoff policy as a term of their employment and that this reliance served as consideration for the contract. Employees made decisions to join and remain with the Company based in part on the assurance of job security provided by the no layoff policy.

137.    The Code contained an implied covenant of good faith and fair dealing.

138.    Expeditors, through its statements, policies, practices, and course of conduct, including those outlined in the Code of Business Conduct, created an express contract and/or implied-in-fact contract that modified the Plaintiff's at-will employment status. This contract obligated Expeditors to follow its established discipline policies, including the use of Performance Improvement Plans, to terminate employees only for good cause, to conduct thorough and impartial investigations into alleged employee misconduct, and to maintain accurate records of disciplinary actions.

139.    Defendant Expeditors' conduct constituted a material breach of the implied covenant of good

faith and fair dealing and the letter and spirit
of the Code, including those provisions requiring:
(1) honesty, accuracy and loyalty; (2) fairness and
objectivity; (3) respect and consideration; (4)
following the law and Expeditors policies; (5)
avoiding conflicts of interest'; (6) providing
equal employment opportunity; (7) not harassing,
intimidating or discriminating; (8) maintaining
honest and accurate records; and (9) not
retaliating for good faith complaints.

140.   By secretly implementing a layoff program in direct
violation of its well-established no layoff policy,
Expeditors materially breached the contractual
obligations created by the Code and the
incorporated policies. This breach not only
violated the specific no layoff policy but also the
overarching principles of honesty, loyalty, and
good faith that the Code mandates.

141.   The Defendant committed a material breach of the
terms of the Code and the implied covenant of good
faith and fair dealing by, among other things,
targeting the Plaintiff as part of its covert
termination program, which was designed to
circumvent worker protection laws and the company's

own publicly touted no-layoff policy, and arbitrarily assigning the Plaintiff's job to Ms. Bowie, transferring him to work in a warehouse and decreasing a significant portion of his compensation based upon negative allegations that it knew or should have known to be false without providing the Plaintiff any opportunity to address the allegations.

142.    The Defendant committed a material breach of the implied covenant of good faith and fair dealing and the terms of the Code by, among other things, terminating him without any fair or impartial investigation or hearing and by allowing his brother and/or his accuser to make the decision to terminate him, which constituted a conflict of interest, without following the normal disciplinary process.

143.    As a direct consequence of Expeditors' breach of the Code and the violation of the implied covenant of good faith and fair dealing, the Plaintiff has suffered loss and damages, including but not limited to loss of income, loss of employment benefits and other consequential damages.

**THIRD CAUSE OF ACTION**
**(Breach of Oral Contract)**

144.    The Plaintiff hereby realleges and incorporates by
        reference   all   preceding   paragraphs   of   this
        Complaint.

145.    The Plaintiff alleges in the alternative that he
        and Defendant Expeditors entered into an oral
        agreement under which the Plaintiff was hired as
        an at-will employee.

146.    The oral agreement contained an implied covenant
        of good faith and fair dealing.

147.    The Defendant breached the implied covenant of good
        faith and fair dealing by targeting the Plaintiff
        as part of its covert termination program, which
        was designed to circumvent worker protection laws
        and the company's own publicly touted no-layoff
        policy, and arbitrarily assigning the Plaintiff's
        job to Ms. Bowie, transferring him to work in a
        warehouse and decreasing a significant portion of
        his compensation based upon negative allegations
        that it knew or should have known to be false.

42

148.     In citing pretextual reasons for the Plaintiff's
         demotion and, ultimately, his termination, in
         furtherance of the covert termination program, the
         Defendant unlawfully sought to deprive the
         Plaintiff of benefits he was rightfully entitled
         to, such as unemployment compensation and other
         benefits he would be entitled to in the future
         based partially upon performance rendered
         previously.

149.     Expeditor's conduct was contrary to public policy
         as it was fraudulent, unlawful and designed to
         avoid laws enacted for the protection of employees
         and, thus, represented a breach of the implied
         covenant of good faith and fair dealing.

150.     As a direct consequence of Expeditors' breach of
         the oral agreement and the violation of the implied
         covenant of good faith and fair dealing, the
         Plaintiff has suffered loss and damages, including
         but not limited to loss of income, loss of
         employment benefits and other consequential
         damages.

**FOURTH CAUSE OF ACTION**
**(Wrongful Termination)**

151.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

152.    In failing to place in the Plaintiff's personnel file any record of the alleged negative complaints it received regarding his job performance that it subsequently used to demote him, the Defendant violated the provisions of M.G.L. ch. 149, § 52C.

153.    In failing to place in the Plaintiff's personnel file records accurately documenting the Plaintiff's compensation, demotion and transfer to a lesser paying position, the Defendant violated the provisions of M.G.L. ch. 149, § 52C.

154.    The Plaintiff exercised his statutory rights under M.G.L. ch. 149, § 52C by requesting documentation of the alleged complaints and reasons relied on for his demotion, reduction in compensation and reassignment. He sought this information to understand the basis for the adverse actions and to have a meaningful opportunity to rebut the

allegations, as provided by the statute. However, rather than comply with its legal obligations under § 52C, the Defendant wrongfully terminated the Plaintiff on February 5, 2024, in direct retaliation for asserting his rights.

155.    The Plaintiff further alleges that his termination was, in part, the result the of a covert termination program designed to reduce Expeditor's workforce by over 2000 employees by providing pretextual reasons for such terminations with the motive to deprive its employees, including the Plaintiff, of the ability to collect unemployment benefits as well as well other benefits for which they were rightfully entitled, by characterizing their separations as voluntary or for-cause.

156.    Expeditor's conduct was contrary to public policy as it was fraudulent, unlawful and designed to avoid laws enacted for the protection of employees.

157.    As a direct consequence of Expeditor's conduct, the Plaintiff has suffered loss and damages, including but not limited to loss of income, loss of employment benefits and other consequential damages.

**FIFTH CAUSE OF ACTION**
**(M.G.L. ch. 149, § 52C)**

158.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

159.    Ms. Peveri caused a letter dated February 6, 2024, to be placed in the Plaintiff's personnel file that contains a number of inaccurate and false statements.

160.    Ms. Peveri knew that the information contained therein was false.

161.    M.G.L. ch. 149, § 52C provides a plaintiff a personal right of action to apply to a Court to have a record that the employer knows or should have known to be false to be expunged from his or her personnel file. *Kessler v. Cambridge Health Alliance*, 62 Mass.App.Ct. 589.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Plaintiff, Michael Carrabes, respectfully requests that this Court:

A.  Award back pay, including but not limited to, salary, wages, bonuses, and other compensation, plus interest, that the Plaintiff would have received but for the discrimination;

B.  Award front pay, in lieu of reinstatement, if reinstatement is not feasible, including compensation for loss of future earnings and benefits, plus interest, due to the discriminatory acts;

C.  Order the reinstatement of the Plaintiff to his former position, or a substantially equivalent position, at Expeditors International of Washington, Inc. with all appropriate seniority, benefits, pension rights, and other terms and conditions of employment, if such reinstatement is found to be appropriate;

D.  Award compensatory damages for past and future non-economic losses, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

E.  Award punitive damages against the Defendants for their malicious and reckless conduct that led to the violation of the Plaintiff's rights under Title VII of the Civil Rights Act of 1964;

F.  Order the Defendant to pay the Plaintiff's reasonable attorneys' fees and costs incurred in this action as provided by 42 U.S.C. § 2000e-5(k);

G.  For the breach of contract claims and wrongful termination claim award damages including but not limited to, compensatory damages for lost wages and benefits;

H.  Order that the letter dated February 6, 2024 be expunged from the Plaintiff's personnel file;

I.    Award all other damages to which the Plaintiff is entitled to, along with pre-judgment and post-judgment interest and costs; and

J.    Grant such other and further legal and equitable relief as this Court deems just and proper to fully compensate the Plaintiff for his losses and to deter such conduct in the future.

**The Plaintiff demands a trial by jury on all issues.**

Michael Carrabes, Plaintiff
By his attorney,

_____
Adam Clermont, Esq.
6 Liberty Square
PMB 226
Boston, MA 02109
Tel: (413) 841-1270(Massachusetts)
Tel: +852 9086 3191(Hong Kong)
E-mail: aclermont@attorneyapc.com
BBO No.: 639769