# EXHIBIT 1

| | |
|---|---|
| Michael Carrabes, | |
| Plaintiff, | No. 1:24-CV-12142 |
| v. | |
| Expeditors International of Washington, Inc., Tracy Peveri & Brian Carrabes | **DRAFT FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

**INTRODUCTION**

1.      This case arises from Expeditors International of Washington, Inc.'s ("**Expeditors**") unlawful employment actions, including discriminatorily targeting the Plaintiff, a male, based on his sex, and participating in and conducting a fraudulent enterprise designed to terminate thousands of employees while evading legal obligations and maintaining the facade of a no-layoff policy.

2.      A central aspect of the Plaintiff's claim is that Expeditors devised and implemented a covert scheme designed to clandestinely reduce headcount without resorting to layoffs. Through this scheme, spelled out in an internal email, Expeditors terminated employees, as well as participated in and conducted

a fraudulent enterprise that justified terminating employees, by alleging fictitious "performance deficiencies" or misconduct while strategically pressuring resignations. However, these stated reasons were merely pretextual justifications to cloak Expeditors' true aim of clandestinely cutting over 2,000 employees in violation of the company's explicit no-layoff policy and workers' legitimate expectations of continued employment.

3.      The Plaintiff asserts that this covert scheme effectively dismantled essential safeguards and protocols designed to prevent discriminatory practices and ensure due process in employment decisions. By placing undue pressure on managers to rapidly reduce staff without proper regard for established procedures and anti-discrimination policies, the secret scheme created a perverse incentive structure that prioritized workforce reduction over fairness and legal compliance.

4.      In carrying out the scheme, Expeditors and other participants in the enterprise engaged in a pattern of racketeering activity through the repeated use of interstate and international wires to perpetrate and conceal their fraudulent conduct, causing

direct harm to Expeditors' employees, the employees of its subsidiaries and the Plaintiff.

5.    The Plaintiff alleges that Expeditors targeted him for adverse employment action and, ultimately, termination based on his sex in furtherance of the covert termination scheme.

6.    Expeditors' discriminatory actions wrongfully ended the Plaintiff's approximately 20-year career with the company, breaching contractual obligations without just cause. As a result, Expeditors inflicted substantial economic and non-economic damages upon the Plaintiff.

7.    Through this action, the Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**") 18 U.S.C. §§ 1961-1968 and Title VII of the Civil Rights Act of 1964 for the harms caused by the Expeditor's discriminatory and unlawful conduct. Furthermore, the Plaintiff seeks redress under state law for Expeditors' breach of contract and wrongful termination of him and asks that this Honorable Court order that certain records be expunged from his personnel file pursuant to M.G.L. ch. 149, § 52C.

8.    In the alternative, the Plaintiff alleges that
      Tracy Peveri and Brian Carrabes intentionally and
      maliciously interfered with his employment
      relationship with Expeditors.

**JURISDICTION AND VENUE**

9.    This Court has federal question jurisdiction over
      the subject matter of this action pursuant to 28
      U.S.C. § 1331 because it arises under the laws of
      the United States, including RICO and Title VII of
      the Civil Rights Act of 1964.

10.   Supplemental jurisdiction also exists for the non-
      federal question jurisdiction claims pursuant to
      28 U.S.C. § 1367 because they are so related to the
      federal question claims that they form part of the
      same case or controversy.

11.   Pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. §
      1965(a), venue is appropriate in this district as
      a substantial portion of the events or omissions
      that form the basis of the claim occurred herein
      and Expeditors transacts affairs and maintains an
      agent within the district. Additionally, in

accordance with 42 U.S.C. § 2000e-5(f)(3), venue is further justified as records pertinent to the alleged unlawful employment practices are maintained and administered within the State of Massachusetts and unlawful employment practices occurred within its borders. Moreover, but for the said alleged unlawful employment practices, the Plaintiff would have been employed in this district, thereby establishing a significant connection to this forum for the purposes of adjudicating the present claims.

## PARTIES

12.   The Plaintiff, Michael Carrabes, is a Massachusetts resident residing in Peabody, Massachusetts.

13.   The Defendant, Expeditors, is a corporation organized under the laws of the State of Washington and having a principal place of business of 1015 Third Avenue, Seattle, Washington. Expeditors conducts business throughout the United States, including within Massachusetts, and internationally.

14.    The Defendant, Tracy Peveri, is a Massachusetts resident residing in Reading, Massachusetts.

15.    The Defendant, Brain Carrabes, is a Massachusetts resident residing in Andover, Massachusetts.

16.    Expeditors offers a wide array of services, including but not limited to air and ocean freight forwarding, vendor consolidation, cargo insurance, distribution, and an extensive suite of value-added logistics solutions designed to meet the complex demands of global trade.

17.    As a testament to its standing in the industry, Expeditors is not only publicly traded on the New York Stock Exchange under the ticker symbol "EXPD", but also a distinguished Fortune 500 company, reflecting its significant market share and influence in the logistics sector.

18.    Expeditors is legally accountable for the actions and inactions of its personnel, specifically those executed, verified, enacted, and authorized within their official capacities.

**FACTS**

19.   The Plaintiff's tenure with Expeditors spanned approximately two decades, having initiated his career with Expeditors in the year 2003 as an at-will employee.

20.   At the inception of his employment with Expeditors, the Plaintiff resided in Massachusetts, and worked full-time at the Expeditors facility located in Centennial Business Park in Peabody, Massachusetts as a sales executive.

## The Code of Conduct

21.   Subsequent to being employed as an at-will employee by Expeditors, the Plaintiff was presented with Expeditors' Code of Business Conduct (the **"Code"**).

22.   The Code applies to every employee, director, and officer of Expeditors and its subsidiaries worldwide.  The Code, which emphasizes honesty and integrity, functions as a sort of constitution for Expeditors.

23.   All Expeditors employees, including the Plaintiff, were required to do regular training on a variety of general topics, as well as job-specific topics.

24.   All employees of Expeditors, including the Plaintiff, were required to review the Code and be tested on it on an annual basis.

25.   As part of this training, the Plaintiff, like all other Expeditors' employees, was required to certify that he (a) complies with the Code, (b) understands that he has multiple sources for additional guidance regarding the Code, and (c) acknowledges that violation of the Code may result in termination of his employment.

26.   The Plaintiff understood that further employment with Expeditors was dependent on him accepting the terms of the Code.

27.   The Plaintiff reasonably believed that Expeditors agreed to be bound by the Code and Expeditors treats the Code as a binding contract between it and its employees.

28.     There were no disclaimers in the Code that
        indicated it was not legally binding on Expeditors.

29.     The Code indicated that the fundamental principles
        of ethical, compliant conduct were: (a) be honest
        & accurate; (2) be good; (3) be loyal; (4) be fair
        & objective; and (5) be respectful & considerate.

30.     The Code provided, "Expeditors is absolutely
        committed to abiding by these fundamental values
        and to exceptional performance with integrity."

31.     The Code also stated that Expeditors did not permit
        retaliation against anyone who filed a good-faith
        report of a potential violation of the Code and
        that any waiver of the Code could only be made by
        the Board of Directors.

32.     The Code imposed an obligation on employees to
        report any known or suspected violations of the
        Code.

33.     The Code also provided that while employees were
        entitled to manage their own personal relationships
        and financial investments, employees must avoid

conduct and situations that may conflict, or appear to conflict, with the exercise of independent judgment in the course of their work as an employee of the company.

34.     The Code further indicated that all employees were entitled to work in an environment that was free from favoritism, harassment and intimidation.

35.     In the matter of *Expeditors International of Washington, Inc. v. Armando Cadena Santillana*, No. 2:20-cv-00349-RAJ-BAT (W.D. Wash. 2021), Expeditors maintained that the Code was a binding contract that applied to all of its employees, as well as the employees of its subsidiaries.

36.     Mr. Kevin Osborn, Vice President, Associate General Counsel, and Chief Ethics & Compliance Officer for Expeditors, submitted a Declaration, dated April 10, 2023, in the *Cadena* action in which he stated, "Expeditors has an established Code of Business Conduct ("Code") that applies to *every* employee, director and officer worldwide. The Code, which emphasizes honesty and integrity, functions as a sort of constitution for Expeditors."

## Plaintiff's Promotion to District Sales Manager

37.     In July of 2010, the Plaintiff was promoted to District Sales Manager.

38.     As the District Sales Manager, the Plaintiff was responsible for leading and overseeing the District Sales Program, ensuring its consistency and effectiveness across all offices within the district.

39.     The Plaintiff's duties included developing and managing the District Sales team, recruiting and training sales executives at both entry and senior levels, and maintaining a pipeline of candidates. The Plaintiff was tasked with creating and implementing the vision and strategy for the District Sales Program, assessing market trends, and communicating them to the District and Regional leadership teams. He was also responsible for actively engaging in closing large opportunities with the Sales executive team, managing the Sales Department budget, facilitating weekly Sales meetings, coaching the Sales team, and creating career development plans for Sales Operations and

Sales Executives.

## Historical Exemplary Job Performance

40.    Ms. Tracy Peveri was appointed a District Manager
       at Expeditors in 2008 and was the Plaintiff's
       supervisor from 2008 until his termination from
       Expeditors on February 5, 2024.

41.    From 2011 until 2022, Expeditors, through Ms.
       Peveri conducted yearly evaluations of the
       Plaintiff's job performance that were placed in his
       personnel file after being reviewed with the
       Plaintiff and providing him with an opportunity to
       comment upon the information contained therein.

42.    From 2011 until 2021, Ms. Peveri consistently gave
       the Plaintiff positive reviews, including with
       respect to his performance as a team builder and
       leader.

43.    In the Effort and Teamwork section of the
       Plaintiff's March 21, 2011 performance review, Ms.
       Peveri stated, "Michael is very willing to do
       anything asked of him and works very well with all
       staff," and rated his job performance as meeting

expectations in all areas.

44.     On March 20, 2012, Ms. Peveri rated the Plaintiff's job performance as meeting expectations with respect to effort and teamwork.

45.     In the Effort and Teamwork section of the Plaintiff's performance review dated July 2, 2013, Ms. Peveri wrote, "Michael understands the responsibilities and works well with his peer group. He has developed a great working relationship with the CRD and T&I groups, they are one cohesive team." The Plaintiff was also rated as meeting all expectations in all areas of his job performance.

46.     In the Plaintiff's performance review of June 2015, Ms. Peveri rated the Plaintiff's job performance as meeting expectations in all areas.

47.     In the Plaintiff's June 27, 2016 performance review, Ms. Peveri stated, Michael works well with his fellow co-workers and is always willing to help," and said his job performance met expectations in all areas.

48. In the Plaintiff's September 22, 2017, performance review, Ms. Peveri reported, "Michael works well with his fellow co-workers and is always willing to help." Ms. Peveri also rated the Plaintiff's job performance as meeting expectations in all areas.

49. In the Plaintiff's September 27, 2018, performance review, Ms. Peveri stated, "Michael meets goals in written job description and drives his team to develop business" and that he was "always willing to assist anyone in the district." Ms. Peveri also rated the Plaintiff's job performance as meeting expectations in all areas.

50. Ms. Peveri wrote in the Plaintiff's performance review of May 10, 2019, that, "Michael has done a great job building his sales team and CRD team to understand the importance of exceptional customer service, building trust with customers and the art of relationship building." Once again, Ms. Peveri rated the Plaintiff's job performance as meeting or exceeding expectations in all areas.

51.     In the Plaintiff's November 29, 2019, performance review, Ms. Peveri wrote, "Michael has built a very solid team and nominated Jen to the leadership platform workshop to develop her leadership skills" and rated his performance in team development as exceeding expectations.

52.     In the Plaintiff's performance review of December 31, 2020, Ms. Peveri noted, "Michael works well with his peer (sic) and team," and that he had "built a solid sales team." Ms. Peveri again rated the Plaintiff's job performance as meeting or exceeding expectations in all areas.

53.     In the Plaintiff's December 21, 2021, performance review, Ms. Peveri stated that when it came to collaboration, "Michael works well with his peers/customers and team." Ms. Peveri also rated his job performance as meeting or exceeding expectations in all areas.

54.     The Plaintiff was never disciplined by Expeditors for misconduct.

55.     As District Sales Manager, the Plaintiff had numerous team members win the President Club Award.

The President's Club Award is awarded to those salespeople that meet very strict criteria and is the highest accolade that a salesperson could obtain in the company.

## The Enterprise

56.   Expeditors has a number of subsidiaries located throughout the world, including Expeditors Hong Kong Limited ("**Expeditors HK**") and Expeditors Singapore Pte Ltd ("**Expeditors SG**"), some of which are not wholly owned by Expeditors.

57.   Each subsidiary of Expeditors operated autonomously, with its own independent board of directors, separate financial statements, authority to hire and fire employees, direct management of customer relationships, and full discretion over operational decision-making.

58.   As noted by Mr. Kaiser Lam, Regional Vice President for Expeditors HK in his affidavit filed in the matter of *David Keane v. Expeditors International of Washington, Inc.*, No. 1:24-cv-10399-PBS (D. Mass 2023), Expeditors HK is independent from Expeditors and "maintains its own ledgers and accounting

books, prepares its own business plans, payroll, budget and financial statements; administers and controls its own health plan and related benefits, and controls the decisions regarding the hiring and firing of its employees."

59. In his affidavit, Mr. Lam also noted that he was not an employee of Expeditors and that Expeditors HK did not transact business in Massachusetts.

60. Each subsidiary of Expeditors tailored its services specifically to the local market, regulation and/or customer needs within the jurisdiction where it was legally established. For example, Expeditors HK provides local transportation services.

61. Also, the Court in the *Cadena* matter rejected Expeditors' claim that it and its subsidiaries conduct themselves as a single integrated enterprise, which, incidentally, was a claim that was diametrically opposed to the claim Expeditors made in the *Keane* case. *Cadena*, No. 2:20-cv-00349-LK-BAT, (W.D. Wash. Jan. 24, 2022).

62. Expeditors and its subsidiaries, including Expeditors HK and Expeditors SG, operated and

operate as an enterprise under 18 U.S.C. § 1961(4) (the **"Enterprise"**) for the distinct purpose of covertly terminating employees while concealing this unlawful action from shareholders, employees, and the public, as well as to engage in questionable billing practices. These purposes were separate from Expeditors' legitimate business activities of providing logistics services. The Enterprise was formed to execute fraudulent schemes that violated Expeditors' own public commitments, such as its professed no-layoff policy, and circumvented legal obligations under federal and state laws.

63. The Enterprise also consisted of an unidentified third party or third parties who was/were retained by Expeditors to train its employees on how to carry out terminations in furtherance of the covert termination scheme.

64. While Expeditors, its branches and its subsidiaries normally operated independently in providing logistics services, the Enterprise created a parallel structure specifically designed to implement the covert termination scheme.

65. Each entity within the Enterprise performed distinct functions essential to the scheme.

66. Expeditors issued directives through internal communications, monitored headcount reduction progress, managed public relations to maintain a no-layoff policy facade and coordinated with certain financial companies in Massachusetts regarding benefit forfeitures.

67. Expeditors' subsidiaries, used pretextual reasons to terminate employees, managed regional terminations through distinct HR systems, kept separate financial records relating to the terminations and independently drafted and executed separation agreements.

68. The Enterprise deliberately structured its operations to exploit Massachusetts-based trust arrangements, requiring regular international and interstate communications with certain financial services companies in Boston, Massachusetts regarding the status of employee equity awards, processing of termination-triggered forfeitures and coordination of benefit reversions.

## Expeditors' Employee Benefits

69.     Expeditors provides certain benefits to its employees, as well as employees of its subsidiaries, including Expeditors HK and Expeditors SG, through its 2017 Omnibus Incentive Plan (the **"Plan"**), which was amended in 2020.

70.     The Plan allows eligible employees to receive the following types of awards: stock options with a maximum term of 10 years, stock appreciation rights (SARs), restricted stock, restricted stock units (RSUs) that vest over time, performance stock units (PSUs) tied to company goals, dividend equivalents, cash awards, and other stock-based awards.

71.     Fidelity Stock Plan Services, LLC ("**Fidelity**") administers or administered the stock based awards on behalf of Expeditors through a trust or trusts whose situs is in Massachusetts. The trustee of the aforementioned trust or trusts is, Fidelity Personal Trust Company, FSB, which is a federal stock savings association based in Boston, Massachusetts.

72.     Awards under the Plan are subject to forfeiture and recoupment conditions. If an employee is terminated or resigns prior to the awards vesting, their unvested awards are typically forfeited unless otherwise specified in their award agreement or in cases of retirement, death, or disability. Additionally, all awards are subject to the Company's clawback policy allowing recovery of awards in certain circumstances.

73.     Expeditors also has an employee stock purchase program ("**ESPP**") where employees are able to purchase shares of the company at a 15% discount.

74.     Upon information and belief, the ESPP is also administered or was administered by Fidelity and its proceeds are or were held in a trust whose situs is in Massachusetts.

75.     The ESPP provides that eligible employees may enroll for an Offering Period by filing an enrollment form during the enrollment period. After initial enrollment in the ESPP, employees are automatically re-enrolled in the ESPP for subsequent Offering Periods unless they file a notice of withdrawal before a new Offering Period

begins, terminate employment, or otherwise become ineligible to participate.

76.     Upon termination from Expeditors, an employee is deemed to have elected to withdraw from the ESPP and their payroll deductions credited during the Offering Period (which is 1 year) but not yet used to purchase shares, which are purchased at the close of the period, are returned to the participant or, in the case of death, to the person or persons entitled thereto.

77.     Expeditors maintains a highly distinctive compensation system featuring significantly lower base salaries than its competitors, offset by a large variable compensation component distributed through two separate bonus pools: the branch bonus pool and the executive bonus pool.

78.     According to Expeditors, base salaries are low, to the point of being non-competitive, by design and no bonus plan participant expects to receive an increase in their base salary.

79.     For example, Mr. Jeffrey Musser, the CEO of Expeditors, makes a base salary of $100,000, which

is far below the industry average.

80.      Expeditors operates multiple branch offices with each maintained as a separate financial entity with their own profit and loss (P&L) statements.

81.      Pursuant to Expeditors' established policy, after deducting a 10% management fee, 25% of each branch's operating income is allocated to that branch's bonus pool, with the total available bonus dollars directly correlating to operating income performance.

82.      The branch bonus pool distribution is structured such that one-fifth (20%) is allocated to regional management, while four-fifths (80%) remains at the branch level for distribution by District Managers according to their "mentored" discretion.

83.      There is no prescribed formula about how a District Manager must distribute branch bonus pool awards.

84.      Expeditors requires District Managers to distribute the bonus pool equitably to reward employees that generate profits for the company.

85.  The executive bonus pool is used to compensate Expeditors' executive team as well as other employees based out of its corporate headquarters in Seattle, Washington.

86.  The executive bonus pool is funded with up to 10% of Expeditors pre-tax operating income, with total available bonus dollars fluctuating in direct correlation with operating income performance.

87.  The 10% was established as the maximum limit, meaning that no more than 10% of pre-tax operating income may be paid out of the executive bonus pool.

88.  However, Expeditors is not required to pay out the full 10% from the executive bonus pool. The compensation committee of Expeditors' Board of Directors approves all bonus amounts paid to senior managers from the executive bonus pool and any unused portion of the pool reduces its total compensation expense and increases its operating income.

89.  As the number of participants in either the branch or executive bonus pool decreases, the potential individual share available to each remaining

participant in the respective bonus pools increases proportionally.

90. Thus, when operating income drops significantly, as it did in 2023 for reasons more fully described below, compensation for those participating in the respective bonus pools drops accordingly unless the number of employees participating in the bonus pools decreases.

91. Expeditors also offers its employees a 401K plan which is administered by T. Rowe Price, presumably from Baltimore, Maryland.

92. For every dollar an employee contributed to his or her 401K plan, Expeditors would contribute $1 up to a maximum of $3,000.00 per year.

93. Expeditors contributions to 401K plans vested at 20% per year. Thus, if an employee was terminated, unvested contributions revert to Expeditors.

94. A key objective and outcome of the covert termination scheme was to protect bonus compensation for remaining employees despite declining revenue. Specifically:

a. Expeditors' operating income decreased from $1.82 billion in 2022 to $940 million in 2023 (-48.4%);

b. Without reducing headcount, the available funds in the bonus pools would have declined proportionally, resulting in significantly lower bonuses for all employees;

c. By eliminating approximately 2,000 positions, Expeditors was able to reduce total salary and related costs by 17.3% (from $2.06B to $1.70B) while maintaining higher per-employee bonus potential;

d. The termination of 2,000 employees also reduced expenses associated with base salary, which would have further reduced the bonus pool if those position were maintained; and

e. The strategic targeting of higher compensated employees, like the Plaintiff, had an outsized impact on preserving the bonus pool by removing participants who historically received larger bonus allocations.

95.     Another key objective and outcome of the covert termination scheme was also to trigger the forfeiture of unvested awards under the Plan, the forfeiture of unvested contributions to employees' 401K plans and to cause the withdrawal of employees from the ESPP so Expeditors would not have to provide discounted shares in exchange for payroll contributions employees made during the Offering Period, thereby depriving employees of significant compensation they had earned through their service to the company.

96.     Another strategy of the Enterprise was to systematically defraud its customers through deceptive billing practices. This involved not only passing off costs, for which Expeditors and its subsidiaries were responsible, onto unsuspecting customers but also by cunningly disguising these expenses as legitimate charges. Moreover, the Enterprise inflated labor charges for work that was beyond the scope of agreed services, thereby exploiting customers with inflated bills under the guise of necessary expenses.

97.     The Enterprise also refused to allow correction of
        discrepancies between recorded and physical
        inventory, resulting in hundreds of thousands of
        dollars in erroneous storage fees being billed to
        the Enterprise's clients.

**COVID-19 Pandemic**

98.     Expeditors, like many other logistics companies,
        experienced significant impact from the COVID-19
        pandemic. The pandemic, which lasted from early
        2020 to late 2021, caused widespread disruptions
        to global supply chains, leading to increased
        demands for logistic services.

99.     This surge in demand, coupled with limited
        capacity, led to significant increases in ocean and
        air freight rates. Expeditors, with its extensive
        network and established relationships with
        carriers, was well-positioned to capitalize on this
        opportunity.

100.    To address the increased workload and complexity
        during the pandemic, Expeditors hired approximately
        2,000 additional employees.

101.    In 2020, Expeditors had revenue of $9.83 billion. As a result of the pandemic, Expeditor's revenue increased 68.08% to $16.52 billion in 2021. This trend continued through 2022, with Expeditors reporting revenue of $17.07 billion.

102.    Expeditors net income exhibited a similar trend increasing from $696 million in 2020 to $1,415 billion in 2021.

103.    However, in 2022, Expeditors net income began to decrease as the pandemic came to an end.

104.    By 2023, Expeditors revenue had dropped to $9.30 billion, a 45.52% decrease from 2022.

**The Ransomware Attack**

105.    As Expeditors' net income began to decrease, it experienced a devastating ransomware attack in February of 2022, that crippled its operations.

106.    Ransomware is a subset of malware in which the data on a victim's computer, or network, is locked, typically by encryption, and where payment is

demanded as a condition of providing the decryption key to unlock the encrypted data and once again make that data available to the victim.

107. When attacked, Expeditors refused to pay the ransomware demand and, instead, chose to completely shut down its IT systems and certain services.

108. As a result, Expeditors' customers had a great deal of difficulty accessing or recovering their inventory in Expeditors' warehouse or processing orders through Expeditors in order to service their customers.

109. Approximately 3 months passed before Expeditors began to resume normal services.

110. As a result of the COVID-19 pandemic ending and the ransomware attack, Expeditors net revenue decreased to 9.30B in 2023, a 45.52% decrease from the year prior. It's net income decreased to $753 million, a 44.53% decline.

111. Adding to its problems, customers began to leave Expeditors at alarming rates. For example, in the first 6 months of 2023, customers, including Delta

Airlines and 3M, accounting for 73% of Expeditors'
revenue at its Ellenwood, Georgia warehouse ceased
doing business with the company.

112.     Additionally, six of the customers who had issues
with the Ellenwood warehouse submitted claims
valued at $5.85 million, for, among other things,
variances between recorded and physical stock.

113.     Other companies, such as iRobot Corporation and POC
USA LLC, also made claims and/or brought lawsuits
against Expeditors as a result of the damages they
sustained as a result of Expeditors' shutting down
its global operating systems.

114.     As a result of the unprecedented drop in income and
the inability to properly serve its customers, as
it entered the beginning of 2023, Expeditors found
itself in a difficult financial situation.

115.     Given that employees at Expeditors and its
subsidiaries only received a modest salary and a
significant portion of their income was tied to the
branch and executive bonus pools, the decrease in
income resulted in a severe misalignment between
Expeditors' revenue and its headcount. As a result,

Expeditors could no longer pay its employees equitably via its bonus pools.

116. Long-time employees of Expeditors and its subsidiaries that were accustomed to substantial awards from the bonus pools saw their awards decline precipitously, resulting in a significant risk that key and/or long-term employees would leave the company, and worse yet, have Expeditors' customers follow them to a new logistics provider.

117. As a result of the unprecedented situation Expeditors found itself in, Expeditors' executives drew up a covert termination plan to immediately eliminate over 2,000 positions using unethical and illegal means.

118. Expeditors' leadership did not announce publicly the planned workforce reduction, as it was required to given the information was material and certain to have a negative impact on its share price, or perform layoffs, as would be the normal and ethical practice, in order to prevent the public and its shareholders from discovering the company's poor financial condition and/or the extent of the damage caused by the ransomware attack.

**The Covert Termination Scheme**

119. Prior to the Plaintiff's termination and throughout his employment with the company, Expeditors publicly and prolifically promoted its steadfast commitment to a no lay-off policy branding itself as a paragon of employee job security, particularly in economic downturns.

120. Expeditors' external communications, including its website, which was accessible via international and interstate wires, and annual proxy statements for 2020 and 2021, which were also available on its website, consistently reinforced the company's no lay-off policy. These documents served as a testament to the company's pledge to its employees and shareholders.

121. Expeditors management also proclaimed this no-layoff policy on social media. For example, Megan Knight, a Senior Program Manager at Expeditors, posted on LinkedIn in 2023 the following, "[t]ough to see all the layoffs in the tech space right now. Good people doing great work, and just getting the short end of the stick. I'm proud to work for a

company that has never laid off anyone, and in fact has a no layoff policy that has been TESTED. Two economic downturns and a pandemic, along with many changes in the market – no one lost their job. Not one."

122. The Plaintiff later discovered that the CEO of Expeditors, Mr. Jeffrey Musser, in coordination with other senior leaders, including Ms. McCray Pettway, Vice President and Associate General Counsel at Expeditors, and its subsidiaries, devised and implemented the covert termination scheme to unlawfully reduce the workforce of Expeditors and its subsidiaries by 2,000 employees or more.

123. The covert termination scheme relied on fraudulent practices, including falsified performance reviews, backdated documents, pretextual disciplinary actions, and targeted pressure to force resignations, all of which were designed to evade legal obligations under federal and state employment laws. These illegal activities formed the core of the Enterprise's operations, which were distinct from Expeditors' lawful logistics and freight forwarding business.

124.    The Enterprise functioned over a significant period, beginning in December 2022 or earlier, and involved coordinated actions across Expeditors' subsidiaries, including Expeditors HK and Expeditors SG, to implement the workforce reduction plan. The Enterprise used a series of communications, including interstate emails and directives from senior leadership to pressure District Managers and other leaders into targeting employees for termination under the pretext of performance management.

125.    In an email dated January 24, 2023, distributed only to the senior leadership of Expeditors and its subsidiaries and prominently marked as strictly confidential, Mr. Musser, stated:

**STRICTLY CONFIDENTIAL - FOR INTERNAL USE ONLY - DO NOT FORWARD OR DISSEMINATE**

Let me start this email by saying that it was great seeing each of you at the DM Meetings in London, Seattle or Singapore. As I said in the DM Meetings, you and your teams have done an incredible job over the last couple of years navigating the pandemic and while still going through impacts from the pandemic and managing through our cyber-attack. We've never faced a more challenging time in our history, and I am extremely proud of how we responded. We protected our employees and at the same time protect our business.

As I also said in the DM Meetings, we are now entering a year of new challenges. Rates are returning to pre-pandemic levels and demand is dropping as a result of the global economic environment. This is all happening much faster than we ever expected so it is imperative that we respond quickly. Even though we have discussed the changes taking place, I am not confident that everyone truly understands the impact this will have on our business. The purpose of my email is to draw additional attention to this situation and spur immediate action.

Our two larges expenses are direct transportation and personnel costs. Our direct transportation costs are being reduced simply based on the declining market. Our personnel costs do not and will not decline without action by you.

During the past two years we added roughly 2,000 new staff to our headcount. We did this not because our volumes grew but because our business changed. Certain locations were handling significantly more business than they had done previously (think key gateway locations) and all locations were required to devote more time, effort and work to handle our current business. This was the first time in our history that we hired people not because our volumes increased but instead because of the complexity of our business increased. We were able to do this based on the increased rates and profitability. Unfortunately, the rates have now declined, and we can no longer support the expense of the additional headcount.

In a normal period, we could simply deal with the additional headcount through attrition and not hiring additional staff. We are NOT in a normal period. As stated above, rates have dropped significantly which has had a large impact on our profitability and at the same time, volumes are dropping quickly. It is likely that we are overstaffed by more than the growth in staff over the last two years based on current volumes.

I continue to hear people say that we are a company that does not do layoffs. This is a true statement based on our history, but we've never been in a period where we were overstaffed by 2,000 employees and then experienced a significant drop in volumes. In all previous circumstances, we were dealing with

a situation where we were staffed appropriately for our current business and then experienced a drop in volumes due to economic conditions. In the past, we were dealing with an overstaffing of approximately 10% whereas now it could be as high as 20%.

Many companies, including a large number of our customers are or have implemented layoffs. Details on some of the largest layoffs are listed below:

Microsoft: 10,000
Google: 12,000
Meta: 11,000
Amazon: 18,000
Salesforce: 8,000

These companies are terminated staff as they have seen a large downturn in business and do not expect things to correct themselves in the short term.

My message to you as District Manager or leader in this company is this: while we have never had a layoff in our company to date, we do not have a policy that states we will not do layoffs. We are significantly overstaffed based on our current volumes. We all know how we got here but we are all responsible for getting us back to a manageable level.

We will not hire any additional staff. If a person leaves, and their role is critical, you must back fill with an employee that is already on staff. Any other exceptions to this policy will be made by me or one of my direct staff members.

Additionally, you must begin the process of trimming your current underperforming staff. If you have team members who are not performing, do not meet our culture, or simply do not want to be part of our team, it is time to let them go. Of course, this must all be backed up with appropriate reviews and documentation showing that we have been working with these staff members.

Your job is to protect our employees. As difficult as it might be, letting poor performers go is in the best interest of protecting our employees. Our model only works when we are staffed with employees who believe in how we are and what we do and, at the same time, our revenues and expenses are in-

line with one another.

I do not want to see a change in our history of layoffs but I simply can't make the necessary changes on my own. You have the ability to prevent a layoff and I am confident you will do the work to get our expenses/headcount/revenues back in-line. Time is of the essence and this needs immediate attention and action.

126.    Subsequently, Mr. Musser, in a press release issued on May 2, 2023, and accessible via Expeditors' website, stated that Expeditors was actively working to reduce headcount and payroll expenses in response to declining revenues and soft demand, while continuing to avoid public layoffs.

127.    Specifically, Mr. Musser stated, "[o]perating conditions during the first quarter of 2023 were very similar to what we experienced in the fourth quarter of 2022, when shippers swiftly adapted to increased consumer caution and slowing demand for their products, while also battling inflation and tighter financing. Our business continued to be impacted by the comparatively soft demand, along with significantly reduced buy and sell rates relative to what we experienced during the pandemic. We are adapting and working diligently to bring expenses in line with lower revenue by lowering headcount and payroll expenses *without*

*resorting to layoffs.*"

128.    Mr. Musser's January 24th, 2023 email and May 2,
        2023 press release are examples of how Expeditors'
        used  interstate and international wires to advance
        the    fraudulent    scheme.    Both  communications
        demonstrate that the company prioritized reducing
        headcount and payroll costs while maintaining the
        facade   of   a   no-layoff   policy.   Further,   the
        Plaintiff  believes  that  additional  emails  and
        communications   were   sent   between   Expeditors'
        leadership   and   its   subsidiaries,   including
        Expeditors HK and Expeditors SG, to coordinate the
        scheme globally. These emails, which led managers
        to create pretextual performance reviews, fabricate
        documentation   and   false   misconduct   allegations,
        constitute  predicate  acts  of  wire  fraud  pursuant
        to 18 U.S.C. § 1343.

129.    While the content of the District Manager meetings
        mentioned  in  the  CEO's  email  is  unclear,  upon
        information  and  belief,  these  meetings  involved
        discussions  about  the  covert  termination  scheme.
        Furthermore, the information known to the Plaintiff
        suggests that Ms. Peveri was aware that Expeditors

intended to reduce its workforce by 2,000 or more employees in 2023 at the time she conducted the Plaintiff's performance evaluation dated December 31, 2022.

130.    Buried in the Form 10-Q filed by Expeditors with the United States Securities and Exchange Commission for the quarter ending 30 September 2023, was the following statement, "salaries and related costs decreased 17% for both the three and nine months ended September 30, 2023, as compared with the same periods in 2022, principally due to decreases in commissions and bonuses earned from lower revenues and operating income. While headcount decreased 8% in 2023, base salaries and benefits remained flat primarily due to inflationary conditions." This characterization was misleading and incomplete given the covert termination program.

131.    Expeditors' 2022 Annual Report disclosed a workforce totalling approximately 20,000 employees as of December 31, 2022. Thus, an 8 percent reduction of its workforce in just 9 months would amount to 1,600 employees.

132.    Expeditors 2023 Annual Report disclosed a workforce totalling approximately 18,000 employees. Thus, Expeditors reduced its headcount by roughly 10% (2,000 employees) during the year following Mr. Musser's January 24, 2023 email.

133.    While Expeditors reduced its workforce by approximately 2,000 employees (10%) between December 31, 2022 and December 31, 2023, the company's salary and related costs decreased disproportionately by 17.3%, from $2,056 billion to $1.701 billion.

134.    The Plaintiff, based upon information and belief, maintains that the total amount of employees Expeditors terminated or coerced to resign from the date of the CEO's email until now exceeds 10 percent (2,000 employees).

135.    For context, historical data dating back to 1995 indicates that the Expeditor's most significant previous reduction occurred in 2009, involving 570 employees—less than a 5% decrease from the workforce at that time. This comparison underscores the exceptional scale of the workforce reduction

accomplished in just 12 months.

136.   Corroborating the internal email, a Glassdoor.com post of 9 March 2023, by an individual claiming to be a current manager at Expeditors in Seattle, Washington, declared that the company was conducting layoffs covertly. The post's mention of an overstaffing issue by 2,000 employees—identical to the figure cited by the CEO in the confidential email—lends additional weight to the allegations.

137.   Expeditors and Mr. Musser failed to disclose to Expeditors' shareholders that the company intended to reduce its workforce by 10 percent via 'performance based' terminations, coerced resignations and manufactured misconduct allegations, as described more fully below.

138.   Expeditors and its subsidiaries also orchestrated a scheme to effectively reduce its workforce by means of engineered resignations, thereby circumventing the traditional and public process of layoffs. Certain employees were deliberately targeted and informed about their purported underperformance, with the subsequent threat of impending termination by the month's end. These

employees were presented with an ostensibly benevolent alternative: resign voluntarily and receive a favourable reference, along with a suggestion of potential rehire in the future.

139. Upon information and belief, managers were told that they needed to implement the scheme to keep Expeditors' stock price up to prevent it from becoming a takeover target.

140. The Plaintiff alleges that through the implementation of the CEO's clandestine covert termination scheme, as outlined in the January 2023 email, Expeditors terminated employees or pressured resignations across various operations and subsidiaries, including those located within Massachusetts.

141. The CEO's confidential communication and subsequent secret internal policy shifts regarding Expeditors no lay-off policy effectively dismantled critical safeguards within the company's disciplinary and termination procedures, creating an environment ripe for discriminatory practices.

142. The emphasis on rapid staff reduction, combined with directives that placed undue pressure on managers to identify and dismiss 'underperforming' employees, incentivized the elimination of positions without regard for due process or anti-discrimination laws.

143. Expeditors' covert termination scheme not only targeted long-tenured employees like the Plaintiff but also disproportionately affected employees and their families in ways that contradicted the company's professed commitment to fairness, respect, and equal opportunity.

144. The Enterprise has systematically adopted the practice of using these tactics when terminating employees which is continuing to this day, thereby establishing a pattern of racketeering activity that has become an integral and regular component of its business operations.

145. The Enterprise's racketeering activities pose a real threat of continuing indefinitely.

146. The Plaintiff was targeted for termination as a result of the covert termination scheme.

147.    In December of 2022, Ms. Peveri began telling the Plaintiff that she had been receiving complaints about his ability to work with others as a team. Ms. Peveri did not give any specifics about the complaints and the Plaintiff never received notice that negative information was placed in his personnel file referencing the alleged complaints or detailing his allegedly poor performance.

148.    In the Plaintiff's December 31, 2022 performance review, Ms. Peveri stated that she would like to see the Plaintiff build "better communication with the sales team." Ms. Peveri gave the Plaintiff a rating of 2/5 for communication which indicates he did not meet his job expectations in that category.

149.    Ms. Peveri also gave the Plaintiff a 2/5 in the reliability category stating, "Michael needs to work on district engagement and organizing the weekly sales meeting." In all other categories, the Plaintiff met expectations.

150.    The December 31, 2022 performance review did not
        include any specifics on how his communications
        were deficient or describe the issues Ms. Peveri
        had with his district engagement or organization
        of weekly sales meetings.

151.    This was the first official notice that the
        Plaintiff received regarding his purported poor
        performance.

152.    It was ostensibly the practice and policy of
        Expeditors that when Expeditor's identified
        significant deficiencies in an employee's
        performance, the employee was placed on a
        Performance Improvement Plan (**"PIP"**), which
        identified the performance issues, set out specific
        goals, provided a plan for rectifying performance
        issues and set a time frame in which the
        deficiencies must be corrected and the negative
        consequences the employee would face should they
        not meet the identified goals.

153.    Upon information and belief, prior to the
        initiation of the covert termination scheme, PIPs
        were seldom used by Expeditors and its
        subsidiaries. However, after the initiation of the

covert termination scheme, the use of PIPs by Expeditors and its subsidiaries increased dramatically.

154.    The Plaintiff was never placed on a PIP.

155.    The Plaintiff is unaware of any similarly situated female employee at Expeditors who, despite having a comparable history of consistently positive performance reviews, was demoted or removed from their position based solely on alleged deficiencies in two performance categories mentioned in a single annual evaluation, without first being placed on a PIP or afforded an opportunity to address the purported issues.

156.    The Plaintiff, through his attorney, requested his complete personnel file on July 30, 2024 and the Expeditors produced the file on August 6, 2024.

157.    The Plaintiff's personnel file did not contain any reference to the complaints allegedly received by Ms. Peveri.

158.    The Plaintiff asserts that the low ratings in his December 31, 2022 performance review were a

pretext, deliberately included by Ms. Peveri to establish a false narrative of underperformance.

159.   These ratings were false and not a genuine reflection of the Plaintiff's work but rather a calculated move to create a paper trail justifying the impending adverse employment actions Ms. Peveri planned to take against him based upon his sex and to mask the discriminatory motives behind the Plaintiff's demotion and ultimate termination.

160.   All of the above performance reviews were placed in the Plaintiff's personnel file that was maintained by Expeditors.

161.   The timing of these negative ratings, which occurred just before the Mr. Musser's email about the covert termination scheme, supports the inference of a discriminatory motive and that the Plaintiff was specifically targeted as part of the covert termination scheme.

## The Plaintiff's Demotion and Termination

162.   The Plaintiff was generally aware that Ms. Nancy Bowie, a female who had joined his team in February

of 2017, had been making complaints about him to other employees and Ms. Peveri. However, these complaints were never formally brought to his attention or addressed with him.

163.    Moreover, until 2022, Expeditors gave no indication to the Plaintiff that he was failing to communicate effectively with his sales team. To the contrary, the Plaintiff always met or exceeded expectations in this regard.

164.    Ms. Bowie had no relevant experience in the industry when she joined Expeditors as a District Sales Representative, at which time she was appointed to the Plaintiff's sales team.

165.    Despite the Plaintiff's prior exceptional job performance and failing to put the Plaintiff on a Performance Improvement Plan, Ms. Peveri told the Plaintiff in late December of 2022 that as a result of the complaints she received, he would lose his position as District Sales Manager.

166.    Concomitantly, Ms. Peveri began telling members of the Plaintiff's former team that he would be transferred to Expeditors' headquarters.

167. There is no documentation contained in the Plaintiff's personnel file indicating why Expeditors demoted the Plaintiff from his position as District Sales Manager or, for that matter, that he was ever demoted from District Sales Manager.

168. In a deliberate move that advanced the goals of the covert termination scheme, the Plaintiff's branch bonus pool percentage was abruptly cut in half from 2% to 1% in January 2023, effectively diverting a significant portion of his bonus allocation to other recipients.

169. Given the Plaintiff's position and the length of his employment, it is understood that he received a much larger allocation of the branch bonus pool than most, if not all, employees that had a lower position and/or had not been employed by Expeditors for an equal amount of time at that branch.

170. Moreover, as the reduction of the Plaintiff's bonus pool allocation coincided with the kick off of the covert termination scheme outlined in Mr. Musser's email, it appears as though the scheme targeted higher-compensated employees and those with

significant bonus pool participation.

171.    In January of 2023, Ms. Peveri instructed the
        Plaintiff to look for another job internally.

172.    Plaintiff was also tasked with training his
        replacement, Ms. Bowie, to assume the position of
        District Sales Manager.

173.    Throughout 2023, the Plaintiff, despite the
        unfairness to him, diligently trained Ms. Bowie to
        replace him as District Sales Manager.

174.    Ms. Peveri told the Plaintiff that the reason for
        his removal from his position as District Sales
        Manager related to the complaints she had received
        about his poor performance and that, in her
        opinion, having a female in that role would improve
        team collaboration and communication or words to
        that effect.

175.    Ms. Peveri also told the Plaintiff that he could
        try to find another position within the company.

176.    Despite Ms. Peveri's assurances that the Plaintiff
        could apply for another position within Expeditors,

the covert nature of the company-wide termination scheme rendered such a transition highly improbable, if not impossible.

177. Additionally, although the Plaintiff's base compensation did not change, there was a significant reduction in the other compensation the Plaintiff received as a result of Ms. Peveri's actions, such as that from the bonus pool in which employees of the branch were awarded a percentage of that branch's operating income.

178. There is no documentation in the Plaintiff's personnel file regarding the compensation he received above his base salary or the other monetary benefits he received as a result of his employment.

179. In December 2023 or January 2024, Ms. Bowie formally assumed the role as District Sales Manager and Ms. Peveri assigned the Plaintiff to work at the warehouse located at Peabody, Massachusetts.

180. At the warehouse, the Plaintiff was required to do manual labour such as lifting heavy boxes.

181.    To the Plaintiff's knowledge, no female District
        Sales Manager at Expeditors has ever been subjected
        to the same adverse treatment as the Plaintiff,
        namely being abruptly removed from a managerial
        position after years of exemplary performance and
        then reassigned to perform manual labor in a
        warehouse, resulting in a significant reduction in
        compensation and professional status.

182.    It was the policy and practice of Expeditors to
        require a District Manager to complete a Personal
        Action Form and place it in an employee's personnel
        file whenever there was a pay change, title change,
        department change, schedule change or worksite
        change.

183.    There are no Personal Action Forms or other
        documents in the Plaintiff's personnel file
        referencing the loss of his position as District
        Sales Manager, his reassignment to the warehouse
        or the further decrease in the Plaintiff's
        compensation.

184.    Based upon information and belief, no female at
        Expeditors has been demoted for poor performance
        without first being given the reasons for the

demotion and given an opportunity to improve their performance by being put on a Performance Improvement Plan.

185.   As a result the unfair treatment by Ms. Peveri and suffering the indignity of being assigned to work in the warehouse despite his two decades of exceptional performance, the Plaintiff asked to meet with her and the Regional Vice President, Mr. Brian Carrabes, who is also the Plaintiff's brother.

186.   The Plaintiff was obligated to report his concerns about Ms. Peveri to her supervisor as she was engaging in behavior prohibited by the Code, including, but not limited to, acting in a dishonest manner, discriminating against the Plaintiff based upon his sex and treating her close friends more favorably.

187.   On February 5, 2024, the Plaintiff met with Ms. Peveri and Mr. Brian Carrabes in his office to discuss these matters.

188.   Notably, requiring the Plaintiff to report his concerns to his brother represented a conflict of

interest under the Code.

189.    At the meeting, the Plaintiff first asked about an
        interview for a different role within the company
        that he had applied for as a result of Ms. Peveri's
        instructions. The Plaintiff did so in a calm and
        professional manner.

190.    Ms. Peveri immediately became defensive, crossed
        her arms and said in a sarcastic tone why don't you
        tell us. Mr. Brian Carrabes told the Plaintiff in
        a calm tone that he had not heard anything.

191.    The Plaintiff asked Ms. Peveri and Mr. Brian
        Carrabes why he was being treated so poorly and
        asked why he had been demoted, again in a calm
        tone.

192.    At that time, Ms. Peveri got up, said she was
        leaving the meeting and exited the room.   The
        Plaintiff did not yell or threaten her at any time.

193.    Shocked, the Plaintiff asked Mr. Brian Carrabes
        what was going on here and repeatedly asked what
        he did to justify this treatment and complained
        that Ms. Peveri was violating company policy and

the Code, as he had not received anything in writing detailing Expeditors' justifications.

194.    At some point, Mr. Brian Carrabes became extremely angry and said you no longer have a job at Expeditors and yelled get the fuck out of my office.

195.    The lack of documentation regarding the purported reasons in the Plaintiff's personnel file that Expeditor's relied upon to justify demoting the Plaintiff indicate the Plaintiff was discriminated against because of his sex as such information is required to be contained in his personnel file in accordance with M.G.L. ch. 149, § 52C and Expeditors' practices and procedures.

196.    Moreover, in his email of January 24, 2023, the CEO of Expeditors, Mr. Musser, stressed the importance of properly documentating that Expeditors had been working with poorly performing staff members prior to terminating them.

197.    The Plaintiff's experiences of discrimination and retaliation are not isolated incidents, but rather part of a larger pattern of favoritism, discrimination, hostility, and improper and

unethical conduct by Expeditors' management.

198. Other employees, including Ms. Christina Boudreau, also observed and experienced this toxic culture. In a resignation email dated July 24, 2024, Ms. Boudreau detailed instances of favoritism by Ms. Peveri and Mr. Brian Carrabes based on personal relationships rather than qualifications, retaliation against those who spoke up or fell out of favor, and efforts by upper management to hide misconduct.

199. Ms. Boudreau also indicated that Mr. Brian Carrabes had an inappropriate relationship with Ms. Peveri.

200. These allegations further support the Plaintiff's claims that the reasons given for his demotion and termination were false and that he was terminated in furtherance with the covert termination scheme, as well as subjected to unlawful discrimination and retaliation.

201. Expeditors' denies that Mr. Brian Carrabes terminated the Plaintiff on February 5, 2024. Thus, the Plaintiff alleges, in the alternative, that as a result of the conduct of Ms. Peveri and Mr. Brian

Carrabes he was constructively discharged on that date.

202.    Subsequently, Ms. Peveri inserted a letter dated February 6, 2024 into the Plaintiff's personnel file in which she claimed that the Plaintiff violated section 4.1(5) and section 4.1(9) of the employee handbook by yelling and using obscene and threatening language toward her during the meeting of February 5, 2024.  These statements were false.

203.    The letter also claimed that Mr. Brian Carrabes only told the Plaintiff to leave his office and that he did not tell the Plaintiff he no longer had a job here.  These statements were false.

204.    The letter further went on to state that because of his conduct the Plaintiff was terminated immediately.  This statement was false as the Plaintiff was terminated by Mr. Brian Carrabes on February 5, 2024.

205.    Finally, the letter stated that a copy of it was handed to the Plaintiff during a meeting on February 6, 2024.  The statement is false as the Plaintiff never met with Ms. Peveri subsequent to

the meeting with her on February 5, 2024.

206. Expeditors sent a copy of the Plaintiff's personnel file, including the letter containing the false statements, upon his the Plaintiff's request, to the Plaintiff's attorney, via email from its lawyers, Littler Mendelson P.C. ("**Littler**"), on August 7, 2024. Based upon information and belief, the email originated from Littler's Boston, Massachusetts office.

207. The Plaintiff's personnel file failed to contain all documents related to the Plaintiff's compensation, in particular documents related to compensation he received from the branch bonus pool, as required by M.G.L. c. 149, § 59C.

**Further Predicate Acts of Wire Fraud**

208. The further predicate acts detailed below constitute part of Expeditors' pattern of racketeering activity, involving multiple, related acts of wire fraud in violation of 18 U.S.C. § 1343. These acts were carried out through interstate and international wire communications, directly affecting interstate and foreign commerce.

209.     The multiple acts of wire fraud establish a
         "pattern" of racketeering activity under 18 U.S.C.
         § 1961(5) as they share the same or similar
         purposes, results, participants, victims, and
         methods of commission, with activities persisting
         over a year and likely continuing, establishing
         open-ended continuity.

210.     From its headquarters in Seattle, Washington,
         Expeditors controls and administers the
         expeditors.com email domain, which facilitates all
         corporate email communications, including those
         used by Mr. Musser and other employees of
         Expeditors and its subsidiaries globally.

211.     As noted previously, on January 24, 2023, Mr.
         Musser, CEO of Expeditors, based in Seattle,
         Washington, sent an email marked "**STRICTLY
         CONFIDENTIAL — FOR INTERNAL USE ONLY — DO NOT
         FORWARD OR DISSEMINATE**" using interstate and
         international wires to District Managers of
         Expeditors and its subsidiaries worldwide. This
         email outlined a covert termination scheme,
         directing managers to reduce headcount while
         maintaining the facade of a no-layoff policy. This

email included non-public information about the planned termination of approximately 2,000 employees, thereby formally initiating the fraudulent scheme.

212. In carrying out this scheme, Expeditors and the Enterprise utilized interstate and foreign wire communications extensively, including but not limited to: a) Electronic communications containing manufactured negative performance reviews designed to create pretextual justifications for terminations; b) Electronic communications regarding contrived misconduct allegations and related disciplinary proceedings; c) Electronic and telephonic communications coercing employees into signing oppressive separation agreements waiving their rights in exchange for favorable references; d) Interstate communications coordinating the implementation of the termination scheme across different offices and regions.

213. Each of these communications was made in furtherance of the covert termination scheme and with the intent to defraud employees of Expeditors and its subsidiaries of their rights, benefits, and property through false and fraudulent pretences and

representations. Expeditors knowingly devised and conducted this scheme to obtain money and property by depriving employees of: a) Continued employment and associated compensation; b) Long-term severance benefits; c) Unvested stock grants and other equity compensation; d) to prevent the issuance of shares under the ESPP; e) Unemployment benefits through false characterization of terminations; and f) Other employment benefits and rights.

## Mr. Evan Cunningham's Case

214.    In March 2023, Expeditors and Expeditors HK used telephone communications in furtherance of the covert termination scheme to falsely inform Mr. Evan Cunningham, an African American employee of Expeditors HK, of his underperformance, coercing him into resigning under the pretense of poor performance despite his history of strong performance.

215.    After pressuring Mr. Cunningham to resign for cause, Ms. Wang Ping Yap, Director of Account Management for Expeditors HK, provided Mr. Cunningham with a letter of reference that

contradicted the proffered reason for his termination, stating, among other things, that she recommended him for employment without reservation.

216. The proffered reason for Mr. Cunningham's termination was false and a mere pretext to terminate Mr. Cunningham in accordance with the covert termination scheme.

## **Ms. Karim Jamie's Case**

217. Ms. Jamie, a Latina woman, had worked for Expeditors for 23 years prior to her termination on March 13, 2023, which was shortly after the start of the covert termination program.

218. In the months leading up to December of 2022, Ms. Jamie had taken medical leave and time off due to medical issues she was suffering from, as well as to take her minor son to medical appointments.

219. In December of 2022, Ms. Jamie complained to her Accounting Operations Manager, Jason Biller, of the retaliatory conduct she was experiencing at the hands of Nancy Becerra, who was an Accounting

Supervisor, due to her medical issues and time off.

220.    Two days later, Ms. Jamie received an email from Shared Services Manager & Accounts Payable Supervisor, Lyla Husky, stating her complaints were unsubstantiated. However, it appears that Expeditors did not investigate Ms. Jamie's complaints.

221.    A few days later, Ms. Jamie received a letter of reprimand from Ms. Beccara for supposed performance issues.

222.    On January 5, 2023, concomitantly with the start of the covert termination program, Ms. Jamie received another letter of reprimand for violation of company police and was placed on a PIP after she tested positive for COVID-19.

223.    At the time Ms. Jamie was placed on a PIP, Expeditors had already determined that she would be terminated as part of the covert termination program.

224. On or about March 13, 2023, Ms. Jamie was terminated under the false pretext of performance issues.

225. Expeditors used interstate wire communications to coordinate its actions against Ms. Jamie, including the transmit the documentation used to justify her termination.

## Mr. Hiroyuki Takemura's Case

226. On or about March 7, 2023 and in furtherance of the covert termination scheme, Mr. Peter Dale, Director of Sales and Marketing at Expeditors, conducted a Zoom video conference in which he gave Mr. Hiroyuki Takemura, who was then a Regional Business Development Manager with Expeditors and residing in Hoschton, Georgia, two options: (1) accept a 30-day PIP or (2) resign and sign a severance agreement. Mr. Takemura was not presented with any documents at that time.

227. On or about March 13, 2023 and in furtherance of the covert termination scheme, Mr. Kanny Satar, a Senior Vice President at Expeditors, and Mr. Dale,

held a Zoom video conference and presented Mr. Takemura with the PIP form and severance agreement. Mr. Dale insisted that Mr. Takemura sign one of the two documents by March 20, 2023.

228. In furtherance of the covert termination scheme, the PIP form falsely claimed that Mr. Takemura fell short in the "new logo" category. In sales or marketing "new logo", typically refers to acquiring a new customer.

229. In reality, Mr. Takemura was fully on track to achieve the 5% new logo expectation by year end and had advised Mr. Dale of upcoming new revenue posting in the near future.

230. Mr. Takemura's new logo numbers were also better than or equal to at least two of the other four associates on his team.

231. On March 20, 2023, Mr. Takemura asked Mr. Dale if he could receive a two-week extension to the consideration period for deciding whether to accept the bogus PIP or accept a forced resignation.

232.    Mr. Dale refused Mr. Takemura's request for an extension without providing any reasons for his decision.

233.    When Mr. Takemura emailed Mr. Dale and asked him why he was not entitled to a 21-day consideration period under applicable law to consider the proposed severance agreement, Mr. Dale, in furtherance of the covert termination scheme, left Mr. Takemura a voicemail stating he was terminated effectively immediately and provided him with a separation notice that stated he was terminated for "nonperformance," which was false and a mere pretext to terminate Mr. Takemura in accordance with the covert termination scheme.

234.    Upon information and belief, as a result of being terminated under the plan unvested awards under the plan and/or unvested contributions to his 401k plan reverted to Expeditors.

### Mr. David Keane's Case

235.    On November 2, 2023 and in furtherance of the covert termination scheme, Ms. Hai Yiu Cheung, who, at the time, was an employee of Expeditors SG, sent Mr.

David Keane, who was a Global Account Manager of Expeditors HK and/or Expeditors, an email from an expeditors.com address in which she alleged that Mr. Keane, during a president's club dinner event, grabbed the arm of Ms. Bonbon Lau and kissed her exposed shoulder several times in quick succession.

236. On November 3, 2023 and in furtherance of the covert termination scheme, a disciplinary hearing was held that was attended via videoconference by Ms. Cheung, who was located in Singapore. Mr. Kaiser Lam and Mr. Keane attended the videoconference from Hong Kong.

237. During the hearing, Ms. Cheung claimed that the incident involving Ms. Lau occurred mid-way through the dinner and that Ms. Lau immediately fled the room and reported the incident to Mr. Paul Lau, who was an employee of Expeditors HK and of no relation to Ms. Lau.

238. This allegation was false and a mere pretext to terminate Mr. Keane in accordance with the covert termination scheme.

239.   Upon information and belief, the videoconference was conducted through Expeditors servers, which are located in Seattle, Washington.

240.   On December 11, 2023 and in furtherance of the covert termination scheme, Mr. Keane was summoned to attend another videoconference meeting. Ms. Cheung attended from Singapore, Ms. Wang attended from Mainland China, and Mr. Keane and Mr. Lam attended the meeting from Hong Kong.

241.   During the meeting, Ms. Wang read a termination letter containing manufactured allegations of misconduct to create a pretextual basis for his dismissal, concealing that his termination was actually part of the larger covert termination scheme.

242.   The decision to terminate Mr. Keane was made by Mr. Musser, who was based in Seattle, Washington, and transmitted by international wires to Expeditors HK and/or Expeditors SG employees.

243.   On December 18, 2023 and in furtherance of the covert termination scheme, Ms. Angel Tam, who was a regional manager for Expeditors at the time, Mr.

Keane an email to his Google email address that contained a proposed separation agreement that had been signed by Mr. Lam. The email was sent from an expeditors.com address and also indicated that the proposed separation agreement was sent through the mail to Mr. Keane's address in Hong Kong.

244.    The proposed separation agreement provided that the parties, Expeditors HK and Mr. Keane, agreed to terminate his employment contract with effect from December 11, 2023.

245.    This statement was false as Mr. Keane was summarily dismissed and his separation was involuntary in nature. The false claim that Mr. Keane's separation was mutually agreed upon was made in a calculated effort to conceal the covert termination scheme.

246.    As a result of his termination, Mr. Keane's unvested restricted and/or performance share units that had been awarded to him in accordance with the Plan and which were held on trust by Fidelity in Massachusetts reverted to Expeditors. The forfeited restricted or performance share units were worth approximately $50,000.

247.    Upon information and belief, Expeditors and
        Expeditors HK, in furtherance of the covert
        termination scheme, communicated with Fidelity
        regarding Mr. Keane's termination via interstate
        wires and/or mail.

### Mr. Chris Moore's Case

248.    Expeditors hired Mr. Moore as an operations manager
        in December of 2022 and assigned him to work in the
        warehouse located at 2429 Old Anvil Block Road,
        Ellenwood, Georgia.

249.    In December of 2022, Mr. Moore received his yearly
        performance review in which he was rated above
        average in every category.

250.    In late January or Early February of 2023, managers
        in Ellenwood, including Mr. Moore, were told they
        needed to reduce headcount by 20% and to target the
        new employees and those who they felt could be
        labelled "troubled" employees.

251.    In February of 2023, Mr. Matt Littleton, a District
        Manager at Expeditors, in furtherance of the covert
        termination scheme, informed Mr. Hal Hutcheson, who

was then a manager at Expeditors, that Expeditors needed to reduce its global headcount by 10% due to overstaffing, compressed margins, and reduced volumes that were a result of the ransomware attack.

252.    Mr. Littleton stressed to Mr. Hutcheson that Expeditors never conducted layoffs due to its no-layoff policy and that, therefore, the terminations needed to appear to be performance based.

253.    Mr. Littleton also informed Mr. Hutcheson that the terminations needed to be adequately documented in case of legal challenges, and directed Mr. Hutcheson to identify old incidents that were not documented and create written documentation that was backdated to ensure the files of the targeted employees contained adequate documentation to thwart any legal claims made as a result of the terminations.

254.    On February 27, 2023, Mr. Littleton met with Mr. Hutcheson and informed him that they needed to select two employees from each department in to terminate as part of the 10% global reduction.

255.    Mr. Hutcheson selected Mr. James Dean, a supervisor of 10 years, and Mr. Dexter Howard as his lowest performers.

256.    Mr. Littleton reiterated that backdated reprimands needed to be included in their files to provide documentary support in case of legal challenges.

257.    Mr. Littleton subsequently informed Mr. Hutcheson that Mr. Chris Moore, who was an operations manager for Expeditors based in Atlanta, should be terminated instead of Mr. Dean and Mr. Howard.

258.    Mr. Littleton began pressuring Mr. Hutcheson to place Mr. Moore on a PIP.

259.    Mr. Moore's monthly branch bonus greatly exceeded Mr. Dean's, even though they earned the same base salary, thus targeting Mr. Moore would result in the District Manager being able to reallocate a larger portion of the branch bonus pool.

260.    Specifically, Mr. Littleton instructed Mr. Hutcheson to identify old incidents that were not documented and create written documentation that was backdated that would be used to justify Mr.

Moore's termination.

261.     On February 22, 2023 and in furtherance of the
         Covert Termination Scheme, Mr. Littleton sent Mr.
         Hutcheson an email which contained a PIP form and
         instructed him that it needed to be laid out for
         Mr. Moore and ready by the following week. There
         was no legitimate reason for Mr. Hutcheson to
         complete a PIP form as Mr. Moore had already been
         targeted for termination.

262.     On March 1, 2023 and in furtherance of the covert
         termination scheme, Mr. Littleton sent Mr.
         Hutcheson an email in which he inquired whether he
         put the PIP in place for Mr. Moore. Mr. Littleton
         also stated that he needed more information on the
         writeups he asked Mr. Hutcheson to create.
         Finally, Mr. Littleton stated that we need to move
         forward on this (Mr. Moore's termination) faster.

263.     Because Mr. Hutcheson did not believe that Mr.
         Moore was an underperformer or that he deserved to
         be terminated, he resisted providing Mr. Littleton
         with a PIP form to support Mr. Moore's termination
         and, ultimately, he did not complete the requested
         PIP form.

264.	Mr. Moore was terminated by Expeditors in March of 2023.

265.	Approximately $6,000 to $10,000 of Expeditors' matching contributions to Mr. Moore's 401K account were also forfeited as a result of his termination and reverted back to the company.

266.	Upon information and belief, Expeditors, in furtherance of the covert termination scheme, communicated with T. Rowe price regarding Mr. Moore's termination via interstate wires and/or mail.

267.	Mr. Moore's unvested options that had been awarded to him by Expeditors under the Plan and were administered by Fidelity from Boston, Massachusetts also reverted to Expeditors.

268.	Upon information and belief, Expeditors, in furtherance of the covert termination scheme, communicated with Fidelity, regarding Mr. Moore's termination via interstate wires and/or mail.

**Mr. Lewis Benjamin Magnes' Case**

269.    Mr. Magnes' worked for Expeditors as a Warehouse Agent at its facility in Atlanta Georgia.

270.    Mr. Magnes was responsible for managing Expeditors' largest account at that time, Delta Airlines, and successfully turned around the account's performance over a 6-12 month period.

271.    During and following the ransomware attack, Mr. Magnes and his team maintained exceptional service levels for Delta Airlines, despite severely compromised systems, using only month-old printed inventory records and Excel spreadsheets.

272.    As a result of his efforts, Mr. Magnes received multiple recognitions for his performance, including:

    a. Employee of the month award for the entire district;

    b. Multiple bonuses for improving product

performance; and

    c. Written commendations from customers for his dedication and communication skills.

273. Despite Mr. Magnes' demonstrated excellence, Expeditors replaced his supervisor, Mr. Hal Hutcheson, with Ms. Cassandra Ford, who by her own admission had no experience running a distribution product.

274. Delta Airlines, along with a number of other companies, subsequently removed inventory from the warehouse and ceased doing business with Expeditors as a result of the aftermath of the cyberattack.

275. However, despite terminating its business with Expeditors, Delta Airlines commended Mr. Magnes as well as his co-workers for the exceptional service and communication they provided. Delta Airline assured Mr. Magnes that the decision to leave had nothing to do with his performance.

276. In September of 2023, Mr. Magnes purportedly left several warehouse doors unlocked. The warehouse was located in a gated facility with 24 hour security.

277. It should be noted, that, in the past, other employees had left the warehouse door or doors unlocked. These employees were either not formally disciplined, received a written warning or suspended.

278. The following day, Mr. Clayton Nichols, Mr. Magnes' immediate supervisor, informed him that he was terminated for leaving the warehouse unsecured and that the decision came from higher management, specifically Ms. Jennifer Williams and Mr. Matt Littleton. Mr. Nichols further disclosed that his recommendation for a temporary suspension was overruled.

279. The explanation offered for Mr. Magnes' termination was a pretext and Mr. Magnes was targeted for termination as part of the covert termination scheme, as evidenced by:

   a. The disproportionate punishment for a first-time offense;

   b. The deviation from established disciplinary

procedures;

   c. The overruling of the immediate supervisor's recommendation for lesser discipline; and

   d. The replacement of experienced management with inexperienced personnel who would facilitate the covert termination scheme.

280.   Approximately $4,000 to $5,000 of Expeditors' matching contributions to Mr. Magnes' 401k account administered by T. Rowe Price were forfeited as a result of Mr. Magnes' termination and reverted to Expeditors.

281.   Upon information and belief, Expeditors, in furtherance of the covert termination scheme, communicated with T. Roe Price regarding Mr. Magnes' termination via interstate wires and/or mail.

## Pattern of Disproportionate Impact on Minorities

282.   Upon information and belief, minorities appear to have been disproportionately targeted and impacted

by Expeditors' covert termination scheme. Several of the terminated individuals identified thus far, including Ms. Jaime, Mr. Cunningham, an African American employee, and Mr. Hiroyuki, of Japanese descent, are members of protected racial or ethnic groups.

283. While the covert termination program was underway, Expeditors resisted reporting to shareholders on the effectiveness of the company's diversity, equity, and inclusion efforts.

284. In 2023, according to Schedule 14A filed with the United States Securities and Exchange Commission on 21 March 2023, shareholders proposed that Expeditors report to shareholders on the effectiveness of the company's diversity, equity, and inclusion (**"DEI"**) Efforts.

285. Specifically, the shareholders requested that a report be done at reasonable expense, exclude proprietary information, and provide transparency on outcomes, using quantitative metrics for hiring, retention, and promotion of employees, including date by gender, race, and ethnicity.

286.    In its statement of opposition to the resolution, the Board stated that: "… a 'DEI Initiatives' report would not reflect nor do justice to how our business operates: it alone would not be illuminating; it would require resources to develop; and it would not advance an understanding of risk or opportunity."

287.    Upon information and belief, discovery will reveal that minority employees were terminated at disproportionately higher rates compared to their non-minority counterparts during the covert termination program.

### Fraudulent Billing Practices

288.    As noted earlier, on February 20, 2022, Expeditors experienced a ransomware attack.

289.    After the ransomware attack, Expeditors refused to pay the ransomware demand, and, instead, chose to completely shut down its IT systems.

290.    As a result of the ransomware attack, Expeditors'

global operations, including operations at the Ellenwood warehouse, were thrown into disarray and, ultimately, a number of Expeditors' customers, including Delta airlines and 3M, representing 73% of the revenue generated from the Ellenwood warehouse, ceased doing business with Expeditors.

291. As employee income was largely dependent on the branch bonus pool, managers at the Ellenwood location began pressuring employees to engage in fraudulent billing practices to counter the precipitous financial decline the location suffered as a result of the end of the COVID-19 pandemic and the ransomware attack.

292. Based upon information and belief, Expeditors and its subsidiaries have engaged in a pattern of improper billing practices for clients, including for services purportedly rendered at the Ellenwood location. These practices included, but are not limited to, the addition of false or improper charges to invoices.

293. Following the ransomware attack, the frequency and/or magnitude of these fraudulent activities notably increased, potentially as an attempt to

mitigate the attack's devastating financial impact on the company.

294. Expeditors has been accused by a number of its customers of engaging in improper billing and business practices. For example, in a lawsuit Expeditors filed against Kohler, Co. ("**Kohler**") and/or its subsidiaries, for allegedly unpaid invoices, in 2023, Kohler claimed that they had found "billing and invoice discrepancies" and, as a result, withheld payment of $20 million and demanded a full audit of the suspect invoices due to an overbill rate of 28.9%.

295. By email dated September 22, 2022, 3M notified Expeditors that the accuracy of its billing was unacceptable with 37 out of 70 invoices being questionable. 3M further claimed that it was constantly being billed for costs Expeditors agreed to bear.

296. On February 28, 2023, Bridgestone Golf sent an email to Expeditors identifying a significant overbilling issue that had persisted since April 2022. The email specifically alleged that many of

the invoices contained multiple instances of double billing, among other improper charges.

297.    By letter dated July 31, 2023, LumiStella notified Expeditors of a myriad of issues it had with the company, including chargebacks, billing the wrong parties, sending late and inaccurate invoices and the lack of transparency and responsiveness in addressing billing concerns.

298.    In a lawsuit filed by POC USA, LLC ("**POC**") against Expeditors in November of 2023, POC claimed, among other things, that Expeditors made false statements to induce it to do business with it and engaged in unfair and deceptive business practices that resulted in it being unjustly enriched.

299.    Upon information and belief, other major companies were the victim of these fraudulent billing practices.

300.    Invoices containing the fraudulent and improper charges were transmitted via interstate wires and/or mail. The use of interstate wires to transmit fraudulent invoices and supporting

communications constitutes predicate acts of wire fraud under 18 U.S.C. § 1343.

301.    Although not directly related to the covert termination scheme, the fraudulent billing scheme furthered the goals of the Enterprise in that it generated desperately needed revenue for Expeditors and its subsidiaries.

## The Collapse of Internal Controls and the Role of the Ethics Officer and Board of Directors

302.    Mr. Kevin Osborn, in his role as Vice President, Associate General Counsel and Chief Ethics & Compliance Officer, was specifically tasked under Expeditors' Code of Business Conduct with investigating reports of misconduct and ensuring the company operated with "uncompromising integrity."

303.    The Code is accessible over international and interstate wires via Expeditors' website located at www.expeditors.com and explicitly states that "Expeditors takes all reports of potential violations seriously and investigates all reported violations" and that "Expeditors does not permit retaliation against anyone who files a good-faith

report of a potential violation." These statements are false.

304. Mr. Osborn, based in Seattle, Washington, was the recipient of complaints delivered through international and interstate wire communications. These complaints originated from Mr. Keane's solicitors based in Hong Kong and from Mr. Hutcheson in Georgia.

305. Mr. Hutcheson went so far as to provide Mr. Osborn with an overview of how the covert termination scheme was being carried out by supervisors in his chain of command. Despite this, Mr. Osborn took no action to remedy this situation, alert authorities or the board of Directors of Expeditors.

306. Upon information and belief, Mr. Osborn received other complaints related to the covert termination scheme and fraudulent billing that he also ignored.

307. Upon information and belief, Mr. Osborn was not merely a recipient of complaints regarding the covert termination scheme, but an active participant in the scheme since its inception and had agreed with the participants to help conceal

the scheme.

308.     Rather than taking the reports of unethical conduct seriously and investigating these complaints as required by the Code and his position as Chief Ethics & Compliance Officer, Mr. Osborn was derelict in his duties and instead allowed the misconduct to continue with impunity.

309.     Upon information and belief, Mr. Osborn also took active steps to stymie others, such as Mr. Keane's solicitors in Hong Kong, from discovering the covert termination scheme.

310.     Mr. Osborn's failure to conduct a proper investigation, coupled with his exploitation of the internal complaint system, constitutes a stark dereliction of his duties. This abuse not only corrupted Expeditors' internal compliance mechanisms but also facilitated the broader fraudulent scheme, providing compelling evidence of the Enterprise's pervasive racketeering activities and the complete breakdown of internal controls designed to detect and stop such conduct.

311.    The failure of internal controls at Expeditors extended to the Company's Board of Directors. As confirmed in a letter dated January 8, 2025, from Stephen C. Willey, counsel for Expeditors, the Board of Directors was 'fully briefed' on the allegations of the covert termination scheme, fraudulent billing practices, and retaliatory actions against the employees, including the Plaintiff. Despite being aware of these serious allegations, the Board failed to investigate the claims or take any corrective action to prevent or address the unlawful conduct described herein.

312.    Based on information and belief, the Board failed to notify its company auditors, KPMG, of serious issues requiring disclosure. These included allegations of fraud related to the covert termination scheme, which involved falsified performance reviews, backdated documents, and pretextual terminations to bypass the company's no-layoff policy. The Board also failed to disclose inadequate financial controls, manipulation of employee compensation, and fraudulent billing practices that led to customer complaints and

lawsuits.

313.    Additionally, the Board did not report potential
        inaccuracies in SEC filings concerning headcount
        reductions, employee compensation, and the
        company's financial condition. By withholding this
        information, the Board breached its fiduciary
        duties and undermined the integrity of the
        company's financial reporting and internal
        controls.

314.    McCray Pettway, Vice President and Associate
        General Counsel, practiced law in Seattle,
        Washington without the required license for
        approximately five years while employed by
        Expeditors. Despite her lack of licensure, Ms.
        Pettway was one of the principal individuals
        responsible for designing and implementing the
        covert termination program, which involved
        falsified performance reviews, pretextual
        terminations, and other fraudulent activities.

315.    Based upon information and belief, the Board failed
        to notify the company's auditors, KPMG, of this
        serious issue, which raises significant legal,

compliance, and ethical concerns. Practicing law without a valid license could invalidate legal advice, contracts, and regulatory filings that Ms. Pettway oversaw, exposing the company to substantial legal, financial, and reputational risks.

316. The Board's failure to act despite being fully briefed demonstrates either complicity in or willful blindness to the unlawful conduct carried out by senior leadership. This inaction allowed the covert termination scheme and associated racketeering activities to proceed unchecked, resulting in significant harm to employees, such as the Plaintiff, and a complete breakdown of the Company's governance structure.

317. By failing to exercise oversight or intervene in the covert termination scheme, the Board enabled the Enterprise's fraudulent activities to persist, including the use of falsified performance reviews, contrived misconduct allegations, and pretextual terminations. This failure further underscores the systemic nature of the racketeering activities alleged herein, as the Board's inaction provided senior leadership with the authority and protection

to carry out these schemes with impunity.

318.    As a result of the covert termination scheme,
        Expeditors' Executive Officers, including Mr.
        Osborn, received enhanced compensation from the
        executive bonus pool as well as the their
        performance shares and other equity compensation,
        which are all tied to Expeditors' pre-tax operating
        income, translating to a significant financial
        windfall for these senior executives.

319.    Given that the covert termination scheme was
        launched and directed from Expeditors' headquarters
        in Seattle, Washington and implemented across its
        global operations, Expeditors maintains possession
        of substantial interstate and international wire
        communications made in furtherance of the
        fraudulent scheme that are not currently accessible
        to the Plaintiff. Discovery is expected to reveal
        numerous additional predicate acts of wire fraud
        conducted through Expeditors' corporate email
        system and other communication channels to
        coordinate and execute the covert termination
        scheme while maintaining the facade of performance-
        based separations.

**<u>Equal Opportunity Commission</u>**

320.     On August 12, 2024, the Plaintiff filed a Charge
         with the United States Equal Employment Opportunity
         Commission ("**EEOC**") based in Boston, Massachusetts.

321.     The Charge asserted that Expeditors engaged in
         discriminatory practices against the Plaintiff on
         the grounds of sex, which constitutes a direct
         violation of Title VII of the Civil Rights Act of
         1964. This action was initiated to address the
         alleged inequities and seek recourse for the
         Plaintiff's grievances under federal anti-
         discrimination laws.

322.     The EEOC issued the Plaintiff a Notice of Right to
         Sue, which the Plaintiff received on August 20,
         2024.

323.     The original Complaint in this matter was filed
         within 90 days of the Plaintiff's receipt of the
         EEOC Notice of Right to Sue.

**FIRST CAUSE OF ACTION**
**(Violation of Title VII of the Civil Rights Act of 1964**
**(42 U.S.C. §§ 2000e to 2000e-17 sex discrimination)**
**(v. Expeditors)**

324.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

325.    The Plaintiff, Michael Carrabes, suffered adverse employment action and was ultimately terminated from his employment due to his sex in violation of Title VII of the Civil Rights Act of 1964.

326.    The explanation Expeditors provided for his removal from his position as District Sales Manager was false and there is no documentation contained in the Plaintiff's personnel file pertaining to his removal from said position or the reasons for said action.

327.    Similarly situated individuals outside the Plaintiff's sex were treated more favorably by the Expeditors, including Ms. Bowie, who replaced the Plaintiff as District Sales Manager even though she was less qualified for the role, and Ms. Jenna Conners.

328. As a direct and proximate result of Expeditors'
actions, the Plaintiff has suffered damages,
including but not limited to lost wages, lost
employment benefits, emotional distress, and other
non-pecuniary losses.

## SECOND CAUSE OF ACTION
### (Breach of Contract)
### (v. Expeditors)

329. The Plaintiff hereby realleges and incorporates by
reference all preceding paragraphs of this
Complaint.

330. Expeditors and the Plaintiff, Michael Carrabes,
entered into a written contract (the Code) and/or
an implied-in-fact contract that altered the terms
of his at-will employment.

331. The Code incorporated other company policies by
reference making them part of the agreement.

332. Expeditors' no layoff policy was a well-
established, and widely publicized policy of
Expeditors.

333.   Employees, including the Plaintiff, relied on the no layoff policy as a term of their employment and that this reliance served as consideration for the contract. Employees made decisions to join and remain with the Company based in part on the assurance of job security provided by the no layoff policy.

334.   The Code contained an implied covenant of good faith and fair dealing.

335.   Expeditors, through its statements, policies, practices, and course of conduct, including those outlined in the Code of Business Conduct, created an express contract and/or implied-in-fact contract that modified the Plaintiff's at-will employment status. This contract obligated Expeditors to follow its established discipline policies, including the use of Performance Improvement Plans, to terminate employees only for good cause, to conduct thorough and impartial investigations into alleged employee misconduct, and to maintain accurate records of disciplinary actions.

336. Expeditors' conduct constituted a material breach of the implied covenant of good faith and fair dealing and the letter and spirit of the Code, including those provisions requiring: (1) honesty, accuracy and loyalty; (2) fairness and objectivity; (3) respect and consideration; (4) following the law and Expeditors policies; (5) avoiding conflicts of interest'; (6) providing equal employment opportunity; (7) not harassing, intimidating or discriminating; (8) maintaining honest and accurate records; and (9) not retaliating for good faith complaints.

337. By secretly implementing a layoff scheme in direct violation of its well-established no layoff policy, Expeditors materially breached the contractual obligations created by the Code and the incorporated policies. This breach not only violated the specific no layoff policy but also the overarching principles of honesty, loyalty, and good faith that the Code mandates.

338. Expeditors committed a material breach of the terms of the Code and the implied covenant of good faith and fair dealing by, among other things, targeting the Plaintiff as part of its covert termination

scheme, which was designed to circumvent worker protection laws and the company's own publicly touted no-layoff policy, and arbitrarily assigning the Plaintiff's job to Ms. Bowie, transferring him to work in a warehouse and decreasing a significant portion of his compensation based upon negative allegations that it knew or should have known to be false without providing the Plaintiff any opportunity to address the allegations.

339. Expeditors committed a material breach of the implied covenant of good faith and fair dealing and the terms of the Code by, among other things, terminating him without any fair or impartial investigation or hearing and by allowing his brother and/or his accuser to make the decision to terminate him, which constituted a conflict of interest, without following the normal disciplinary process.

340. As a direct consequence of Expeditors' breach of the Code and the violation of the implied covenant of good faith and fair dealing, the Plaintiff has suffered loss and damages, including but not limited to loss of income, loss of employment benefits and other consequential damages.

**THIRD CAUSE OF ACTION**
**(Breach of Oral Contract)**
**(v. Expeditors)**

341.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

342.    The Plaintiff alleges in the alternative that he and Expeditors entered into an oral agreement under which the Plaintiff was hired as an at-will employee.

343.    The oral agreement contained an implied covenant of good faith and fair dealing.

344.    Expeditors breached the implied covenant of good faith and fair dealing by targeting the Plaintiff as part of its covert termination scheme, which was designed to circumvent worker protection laws and the company's own publicly touted no-layoff policy, and arbitrarily assigning the Plaintiff's job to Ms. Bowie, transferring him to work in a warehouse and decreasing a significant portion of his compensation based upon negative allegations that

it knew or should have known to be false.

345.   In citing pretextual reasons for the Plaintiff's
       demotion and, ultimately, his termination, in
       furtherance of the covert termination scheme,
       Expeditors unlawfully sought to deprive the
       Plaintiff of benefits he was rightfully entitled
       to, such as unemployment compensation and other
       benefits he would be entitled to in the future
       based partially upon performance rendered
       previously.

346.   Expeditor's conduct was contrary to public policy
       as it was fraudulent, unlawful and designed to
       avoid laws enacted for the protection of employees
       and, thus, represented a breach of the implied
       covenant of good faith and fair dealing.

347.   As a direct consequence of Expeditors' breach of
       the oral agreement and the violation of the implied
       covenant of good faith and fair dealing, the
       Plaintiff has suffered loss and damages, including
       but not limited to loss of income, loss of
       employment benefits and other consequential
       damages.

**FOURTH CAUSE OF ACTION**
**(Wrongful Termination)**
**(v. Expeditors)**

348.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

349.    In failing to place in the Plaintiff's personnel file any record of the alleged negative complaints it received regarding his job performance that it subsequently used to demote him, Expeditors violated the provisions of M.G.L. ch. 149, § 52C.

350.    In failing to place in the Plaintiff's personnel file records accurately documenting the Plaintiff's compensation, demotion and transfer to a lesser paying position, Expeditors violated the provisions of M.G.L. ch. 149, § 52C.

351.    The Plaintiff exercised his statutory rights under M.G.L. ch. 149, § 52C by requesting documentation of the alleged complaints and reasons relied on for his demotion, reduction in compensation and reassignment. He sought this information to understand the basis for the adverse actions and

to have a meaningful opportunity to rebut the allegations, as provided by the statute. However, rather than comply with its legal obligations under § 52C, Expeditors wrongfully terminated the Plaintiff on February 5, 2024, in direct retaliation for asserting his rights.

352.    The Plaintiff further alleges that his termination was, in part, the result the of a covert termination scheme designed to reduce Expeditors' workforce by over 2000 employees by providing pretextual reasons for such terminations with the motive to deprive its employees, including the Plaintiff, of the ability to collect unemployment benefits as well as other benefits for which they were rightfully entitled, by characterizing their separations as voluntary or for-cause.

353.    Expeditors' conduct was contrary to public policy as it was fraudulent, unlawful and designed to avoid laws enacted for the protection of employees.

354.    As a direct consequence of Expeditors' conduct, the Plaintiff has suffered loss and damages, including but not limited to loss of income, loss of employment benefits and other consequential

damages.

**FIFTH CAUSE OF ACTION**
**(Promissory Estoppel)**
**(v. Expeditors)**

355. The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this complaint.

356. In the alternative to the Plaintiff's contractual claims, he alleges that Expeditors, through its policies, practices, public statements, and conduct, including but not limited to its widely publicized "no-layoff" policy, made clear and definite promises to the Plaintiff and other employees that:

   a. Expeditors would not engage in layoffs, even during economic downturns;

   b. Expeditors would provide fair and equal treatment to all employees, including following its disciplinary procedures such as Performance Improvement Plans (PIPs) before terminating any employee for performance reasons; and

    c. Expeditors would act in accordance with its Code of Business Conduct, which emphasizes honesty, integrity, and fairness in its dealings with employees.

357.    The Plaintiff reasonably and foreseeably relied on these promises, including but not limited to:

    a. Accepting and remaining in his position with Expeditors for approximately 20 years, even when other employment opportunities have been available;

    b. Continuing to perform his duties diligently and in good faith, with the expectation that his employment would not be unjustly terminated; and

    c. Declining to take steps to protect himself financially or professionally, such as seeking alternative employment, because he reasonably believed his job was secure.

358.    The Plaintiff's reliance on Expeditors; promises was to his detriment, as Expeditors:

a. Covertly implemented a termination scheme designed to circumvent its no-layoff policy, which directly contradicted its prior promises;

b. Fabricated performance deficiencies and pretextual reasons to justify the Plaintiff's demotion and termination;

c. Deprived the Plaintiff of his position, compensation, and professional reputation without following its promised procedures or providing him a meaningful opportunity to address the alleged deficiencies; and

d. Failed to uphold the promises made in its policies and Code, including its commitment to honesty, fairness, and respect for employees.

359.    Expeditors knew or should have known that the Plaintiff would reasonably rely on its promises to his detriment, and the Plaintiff's reliance on these promises was justified given Expeditors' repeated public statements, policies, and conduct over the course of his employment.

360.    As a direct and proximate result of the Plaintiff's detrimental reliance on Expeditors' promises, the Plaintiff has suffered substantial damages, including, but not limited to loss of income, loss of employment benefits and other consequential damages.

**SIXTH CAUSE OF ACTION**
**(M.G.L. ch. 149, § 52C)**
**(v. Expeditors)**

361.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

362.    Ms. Peveri caused a letter dated February 6, 2024, to be placed in the Plaintiff's personnel file that contains a number of inaccurate and false statements.

363.    Ms. Peveri knew that the information contained therein was false.

364.    M.G.L. ch. 149, § 52C provides a plaintiff a personal right of action to apply to a Court to have a record that the employer knows or should have known to be false to be expunged from his or

her personnel file. *Kessler v. Cambridge Health Alliance*, 62 Mass.App.Ct. 589.

**SEVENTH CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. § 1962(c))**
**(v. Expeditors)**

365.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of this Complaint.

366.    This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate of foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

367.    Expeditors and its subsidiaries, including Expeditors HK and Expeditors SG, Mr. Musser, other executives and employees of Expeditors and its subsidiaries, as well as an unidentified trainer or trainers brought in to provide guidance on how covert terminations should be carried out formed an enterprise within the meaning of 18 U.S.C. §§

1961(4) and 1962(c). The Enterprise is an association in fact of corporate entities and agents engaged in, and whose activities affect, interstate and foreign commerce.

368. Expeditors' conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of numerous acts of wire fraud in violation of 18 U.S.C. § 1343, including but not limited to:

   a. The January 24, 2023 email from Mr. Musser directing the implementation of the covert termination scheme;

   b. Interstate and international electronic communications containing manufactured negative performance reviews and disciplinary actions designed to create pretextual justifications for terminations;

   c. Interstate and international electronic communications coordinating the implementation of the termination scheme across different offices and regions;

    d. Electronic communications coercing employees into signing separation agreements under false pretenses; and

    e. Electronic communications containing false statements about the nature and circumstances of employee separations.

369. The predicate acts of wire fraud share the common purpose of executing the fraudulent scheme to terminate employees while maintaining the facade of performance based separations and the company's no-layoff policy, as well as engaging in fraudulent billing practices. These acts form a pattern of racketeering activity as defined in 18. U.S.C. § 1961(5).

370. Through this pattern of racketeering activity, Expeditors sought to defraud its employees, employees of its subsidiaries and the Plaintiff of their property interests in:

    a. Continued employment and associated compensation;

    b. Long-term severance benefits;

c. Unvested stock grants and other equity compensation;

d. Unemployment benefits through false characterization of terminations; and

e. Other employments and rights.

371.    Expeditors' racketeering activities directly and proximately caused injury to the Plaintiff's business and property interests, including but not limited to:

a. Loss of employment and wages;

b. Loss of unvested stock awards and other equity compensation;

c. Loss of bonus pool compensation and other incentive payments;

d. Damage to professional reputation and career prospects; and

e. Other economic losses.

## EIGHTH CAUSE OF ACTION
### (Violation of RICO, 18 U.S.C. § 1962(d))
### (v. Expeditors)

372.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of the this Complaint.

373.    The claim arises under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate the provisions of subsection (a), (b) or (c) of this section."

374.    Expeditors, its subsidiaries, Mr. Jeffrey Musser, Mr. Allen Wang, Mr. Kaiser Lam, Mr. Matt Littleton, Ms. McCray Pettway, Ms. Wang Ping Yap, Mr. Kanny Satar, Ms. Jennifer Williams, Mr. Kevin Osborn, Mr. Peter Dale, Mr. Patrick Duffy and other unidentified individuals and/or entities conspired to violate 18 U.S.C. § 1962(c) by agreeing to conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

375.    The conspirators shared the common purpose of implementing, executing and concealing the covert

termination scheme to fraudulently terminate employees while maintaining the facade of performance-based separations and the company's no-layoff policy. Each conspirator agreed to commit at least two acts of racketeering activity in furtherance of the scheme.

376. The conspiracy included, but was not limited to, agreements to:

    a. Create and distribute false performance reviews and disciplinary documentation;

    b. Create and backdate negative performance records;

    c. Fabricate misconduct allegations;

    d. Coerce employees into signing separation agreements under false pretenses;

    e. Make false statements about the nature and circumstances of employee separations; and

    f. Coordinate the implementation of the termination scheme across different offices

and regions through interstate and international wire communications.

377. Specific overt acts in furtherance of the conspiracy included:

   a. Mr. Musser's January 24, 2023 email directing implementation of the covert termination scheme;

   b. Mr. Littleton's directives to create backdated negative performance documentation for Mr. Moore;

   c. Mr. Lam's participation in attempting to have Mr. Keane sign a separation agreement that falsely characterized Mr. Keane's termination as mutual and voluntary;

   d. Ms. Pettway's role in developing and implementing the framework to execute the terminations while maintaining apparent compliance with employment laws;

   e. Ms. Wang's provision of a false letter of reference to Mr. Cunningham that contradicted

the pretextual reasons for pressuring his resignation, demonstrating the fraudulent nature of the termination scheme;

f. Mr. Satar's presentation of a false and pretextual PIP form to Mr. Takemura as part of the coordinated effort to create artificial documentation supporting termination; and

g. The coordination between conspirators to execute terminations while concealing the true nature of the workforce reduction plan.

378. Expeditors and its co-conspirators knew the general nature of the conspiracy and their role in it. Each agreed to further its purpose by committing predicate acts of wire fraud and coordinating the implementation of the fraudulent scheme.

379. As a direct and proximate result of the conspiracy, the Plaintiff suffered injuries to his business and property, included but not limited to:

a. Loss of employment and wages;

b. Loss of bonus pool compensation and other

incentive awards;

c. Damage to professional reputation and career prospects; and

d. Other economic losses.

### NINTH CAUSE OF ACTION
#### (Intentional Interference with Contractual Relations)
#### (v. Tracy Peveri & Brian Carrabes)

380.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of the this Complaint.

381.    The Plaintiff does not rely upon gender discrimination to establish the claims in this cause of action.

382.    The Plaintiff had a valid and enforceable relationship with Expeditors.

383.    Tracy Peveri and Brian Carrabes were aware of the Plaintiff's contractual relationship with Expeditors and the benefits of that relationship, including his long standing employment, professional reputation, and compensation.

384.    The Code imposed duties on all Expeditors Employees, including Tracy Peveri and Brian Carrabes, to act in good faith, with honesty, integrity, fairness, and objectivity in their dealings with other employees. The Code further prohibited retaliation, favoritism, and discriminatory behavior, and required employees be treated with respect and dignity.

385.    In light of Expeditors' denial of a covert termination program and assertion that all adverse employment actions were based on legitimate performance-related reasons, the Plaintiff alleges, in the alternative, that Tracy Peveri and Brian Carrabes acted with malice, outside the scope of their employment, and in violation of the Code, thereby interfering with the Plaintiff's contractual relationship with Expeditors.

386.    Specifically, if Expeditors' assertion that all terminations were performance based is true, then Tracy Peveri and Brain Carrabes acted with actual malice and violated the duties imposed by the code by:

a. Fabricating performance deficiencies and exaggerating complaints about the Plaintiff's communication and reliability, without providing specifics, documentation, or an opportunity for improvement, as required by the Code;

b. Stripping the Plaintiff of his managerial responsibilities and reassigning his duties to Nancy Bowie, a less qualified employee based on favortism and discriminatory intent, in violation of the Code's requirement to treat employees fairly and without bias;

c. Abruptly reducing the Plaintiff's branch bonus pool allocation by 50%, diverting a significant portion of earned compensation to other employees without cause or justification, in violation of the Code's principles of fairness and integrity;

d. Reassigning the Plaintiff to a manual labor position in the warehouse, despite his two decades of service as a manager, thereby humiliating him and violating the Code's

requirement to treat employees with respect and dignity;

e. Falsely accusing the Plaintiff of misconduct and fabricating a disciplinary letter containing false statements about his behavior, in violation of the Code's prohibition against dishonesty and retaliation;

f. Acting with discriminatory animus and personal hostility by targeting the Plaintiff for adverse actions and retaliating against him for raising concerns about violations of the Code; and

g. Deliberately engaging in conduct designed to provoke Plaintiff into committing an infraction that could be used as a pretext for his termination.

387.    Even if the Plaintiff exhibited emotional distress during the February 5, 2024 meeting, such conduct was a direct and foreseeable result of the Tracy Peveri and Brain Carrabes' calculated and malicious

provocation, which was designed to create a pretext for his termination

388. Tracy Peveri and Brian Carrabes' actions were motivated by actual malice and improper purposes unrelated to Expeditors' legitimate corporate interests. Specifically:

   a. Tracy Peveri's conduct was driven by favortism towards Ms. Bowie, discriminatory bias against the Plaintiff, and retaliation for the Plaintiff's objections to her discriminatory and retaliatory behavior;

   b. Brian Carrabes acted to shield Tracy Peveri from scrutiny, despite his conflict of interest as the Plaintiff's brother, and retaliated against the Plaintiff for raising legitimate concerns; and

   c. Both Tracy Peveri and Brian Carrabes acted to undermine the Plaintiff's employment relationship with expeditors in violation of the Code, for reasons unrelated to the company's legitimate business interests.

389. The conduct of Tracy Peveri and Brian Carrabes mirrors the malicious and retaliatory behavior described in *O'Brien v. New England Telephone and Telegraph Co.*, 422 Mass. 686 (1996), where the court upheld a finding of intentional interference against the employee's supervisor where the supervisor harassed the employee, fabricated performance deficiencies, and intentionally provoked an infraction to justify the employee's termination.

390. The actions of Tracy Peveri and Brian Carrabes were outside the scope of their employment because there were motivated by personal hostility, favortism, and discriminatory animus, rather than any legitimate corporate purpose.

391. As a direct and proximate result of Tracy Peveri and Brian Carrabes' conduct, the Plaintiff suffered damages, included but not limited to:

    a. Loss of employment and wages;

    b. Loss of bonus pool compensation and other incentive awards;

c. Damage to professional reputation and career prospects; and

d. Other economic losses.

### TENTH CAUSE OF ACTION
### (Intentional Interference with Advantageous Relations)
### (v. Tracy Peveri & Brian Carrabes)

392.    The Plaintiff hereby realleges and incorporates by reference all preceding paragraphs of the this Complaint.

393.    The Plaintiff does not rely upon gender discrimination to establish the claims in this cause of action.

394.    The Plaintiff had an advantageous business relationship with Expeditors, including his long-standing employment, professional opportunities, and compensation.

395.    Tracy Peveri and Brain Carrabes intentionally interfered with the Plaintiff's advantageous business relationship by:

a. Fabricating pretextual performance deficiencies to justify his demotion and termination;

b. Diverting his earned compensation from the branch bonus pool to other employees without justification;

c. Reassigning him to a manual labor position; and

d. Creating a hostile work environment designed to provoke the Plaintiff into committing an infraction that could be used to justify his termination.

396. The conduct of Tracy Peveri and Brian Carrabes reflects actual malice and a deliberate intent to harm the Plaintiff's advantageous business relationships.

397. As a direct and proximate result of Tracy Peveri and Brian Carrabes' conduct, the Plaintiff suffered damages, included but not limited to:

a. Loss of employment and wages;

b. Loss of bonus pool compensation and other incentive awards;

c. Damage to professional reputation and career prospects; and

d. Other economic losses.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff, Michael Carrabes, respectfully requests that this Court:

A.  Award back pay, including but not limited to, salary, wages, bonuses, and other compensation, plus interest, that the Plaintiff would have received but for the discrimination and unlawful interference by the Defendants;

B.  Award front pay, in lieu of reinstatement, if reinstatement is not feasible, including compensation for loss of future earnings and benefits, plus interest, due to the discriminatory acts and unlawful interference by the Defendants;

C.  Order the reinstatement of the Plaintiff to his former position, or a substantially equivalent position, at Expeditors International of Washington, Inc. with all appropriate seniority, benefits, pension rights, and other terms and conditions of employment, if such reinstatement is found to be appropriate;

D.  Award compensatory damages for past and future non-economic losses, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses

caused by the Defendants;

E.   Award punitive damages against Expeditors for their malicious and reckless conduct that led to the violation of the Plaintiff's rights under Title VII of the Civil Rights Act of 1964;

F.   Order Expeditors to pay the Plaintiff's reasonable attorneys' fees and costs incurred in this action as provided by 42 U.S.C. § 2000e-5(k);

G.   For the breach of contract claims, wrongful termination claim and intentional interference claims, award damages including but not limited to, compensatory damages for lost wages, benefits and damage to the Plaintiff's professional reputation caused by the Defendants' conduct;

H.   Order that the letter dated February 6, 2024 be expunged from the Plaintiff's personnel file;

I.   Award all other damages to which the Plaintiff is entitled to, along with pre-judgment and post-judgment interest and costs;

J.   Grant such other and further legal and equitable relief as this Court deems just and proper to fully compensate the Plaintiff for his losses and to deter such conduct in the future;

K.   Award treble damages pursuant to 18 U.S.C. § 1964(c) for injuries to the Plaintiff's business and property, including lost wages and lost bonuses, caused by the Expeditors' racketeering activities in violation of 18 U.S.C. § 1962;

L.   Enter judgment against Expeditors for all damages sustained as a result of its violations of RICO, including, but not limited to, (1) compensation for lost wages, benefits, and other economic losses, (2) lost bonus pool compensation and other incentive payments; and (3) damages for injury to the Plaintiff's professional reputation and career prospects; and

M.   Award reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1964(c).

N.   Issue an injunction against Expeditors International of Washington, Inc. and its subsidiaries, requiring them to:

(i) Reinstate the Plaintiff to his former position or a substantially equivalent position, with all appropriate seniority, benefits, and terms of employment;

(ii) Prohibit further retaliatory actions against the Plaintiff or any other employees who oppose unlawful conduct;

(iii) Implement a transparent and non-discriminatory termination policy, subject to court oversight, in compliance with federal and state employment laws;

(iv) Provide training to managers and executives on anti-discrimination and anti-retaliation laws and revise its Code of Business Conduct to reflect compliance with these laws; and

(v) Appoint an independent monitor to oversee compliance with anti-discrimination, anti-retaliation, and employment laws for a period of three years.

**The Plaintiff demands a trial by jury on all issues.**

Michael Carrabes, Plaintiff
By his attorney,


_____
Adam Clermont
6 Liberty Square
PMB 226
Boston, MA 02109
Tel: (413) 841-1270(Massachusetts)
Tel: +852 9086 3191(Hong Kong)
E-mail: aclermont@attorneyapc.com
BBO No.: 639769