From: **Secure.Report** <secure.report.500@proton.me>
Date: Sat, Dec 28, 2024 at 11:12 AM
Subject: Urgent Call for Leadership Overhaul at Expeditors International - The Total Cost of Systematic Governance Failure
To:

REDACTED

# REDACTED

**To the Board of Directors,**

**Leadership at Expeditors International of Washington Under Your Governance**

The time for *decisive leadership change* is now. Expeditors' executives, including Kevin, have possession of all reports yet have deliberately concealed the truth. This blatant deception is further compounded by ongoing illegal activities, eroding the company's integrity and risking its future.

Your immediate intervention is not just warranted—it is imperative. The continued masking of these actions under your watch undermines shareholder trust and regulatory compliance. Swift, bold action is the only path to restore accountability and safeguard the company's standing.

**Act decisively. The time is nigh.**

| Framework Element | Frequency of Occurrence | Financial Impact ($M) | Key Violations Documented |
|---|---|---|---|
| Overbilling Tactics | 85 | 150 | Cyberattack-related billing, pass-through costs |
| Engineered Terminations | 40 | 100 | Performance Improvement Plans leading to layoffs |
| Duplicate Invoicing | 65 | 120 | Reallocations under neutral classifications |
| Compliance Failures | 30 | 90 | Unresolved Dangerous Goods violations |
| Inflated Executive Compensation | 55 | 200 | Bonuses tied to manipulated profitability metrics |

Expeditors International (EI), a global leader in logistics and supply chain management, has cultivated an image of operational excellence and industry leadership. However, beneath this veneer lies a deeply entrenched culture of mismanagement, ethical breaches, and governance failures. Central to this narrative is Kevin Osborn, Vice President, Associate General Counsel, and Chief Ethics & Compliance Officer (CECO). His role, ostensibly designed to uphold the ethical and legal integrity of the organization, has instead been characterized by systemic negligence, strategic ineptitude, and a failure to address critical vulnerabilities. This report provides a detailed and exhaustive analysis of Kevin's actions—or inactions—that have led to a series of escalating crises, exposing Expeditors to reputational damage, financial risk, and regulatory scrutiny.

Kevin Osborn was tasked with responsibilities fundamental to maintaining the operational integrity of Expeditors. These included overseeing legal compliance, managing risk, fostering a culture of ethical accountability, and ensuring that the company adhered to both regulatory standards and its own internal codes of conduct. The role of CECO is pivotal in any organization, serving as the cornerstone of trust between employees, leadership, and external stakeholders. However, under Kevin's tenure, Expeditors has faced mounting allegations of overbilling, workforce exploitation, whistleblower retaliation, and operational fraud, all of which have culminated in a public relations and regulatory nightmare.

At the heart of this analysis lies Kevin's inability to execute his duties effectively. His tenure has been marked by a reliance on obfuscation rather than transparency, a prioritization of short-term damage control over long-term solutions, and a systematic failure to anticipate and mitigate risks. The cascading consequences of these failures have placed Expeditors in a precarious position, both financially and reputationally, as stakeholders and regulatory bodies increasingly scrutinize its operations.

Kevin's leadership failures can be categorized into several key areas: ethical breaches, governance lapses, crisis mismanagement, and strategic missteps. Each of these areas reveals a pattern of negligence that has not only amplified existing vulnerabilities but also created new risks for the organization.

Ethical breaches within Expeditors have been allowed to proliferate under Kevin's watch, creating a culture where misconduct is not only tolerated but, in some cases, actively shielded from scrutiny. Reports from whistleblowers indicate systemic issues ranging from fraudulent billing practices to retaliatory actions against employees who raise concerns. These practices have eroded trust within the organization and among its external partners, undermining the company's stated commitment to integrity and transparency.

Governance lapses have further exacerbated these issues, with Kevin failing to implement the robust compliance frameworks necessary to prevent and address misconduct. Despite holding the title of CECO, Kevin has consistently demonstrated an inability—or unwillingness—to establish effective oversight mechanisms. This failure has allowed unethical practices to go unchecked, resulting in significant financial and reputational harm.

In moments of crisis, Kevin's leadership has been marked by indecision and an overreliance on defensive legal tactics that do little to address root causes. His approach to crisis management has often involved denying allegations, delaying responses, and deflecting blame, rather than taking proactive steps to resolve issues. This strategy has not only prolonged the duration of crises but also deepened their impact, as stakeholders grow increasingly frustrated with the company's lack of accountability.

Strategic missteps under Kevin's leadership have further compounded these challenges. By prioritizing short-term damage control over sustainable solutions, Kevin has failed to address the systemic issues that underlie Expeditors' current crises. His approach has been reactive rather than proactive, focusing on mitigating immediate fallout rather than building a resilient and ethical organizational framework.

The implications of Kevin's failures are far-reaching, affecting every facet of Expeditors' operations. Financially, the company has faced mounting costs associated with legal battles, regulatory fines, and client attrition. Reputationally, Expeditors has suffered significant damage, as its image of operational excellence is increasingly overshadowed by allegations of misconduct and mismanagement. Internally, employee morale has plummeted, with many workers expressing frustration and disillusionment over the company's handling of ethical and compliance issues.

Regulatory scrutiny has also intensified, with investigations by agencies such as the Securities and Exchange Commission (SEC) and the Department of Justice (DOJ) uncovering potential violations of laws governing corporate conduct. These investigations have not only highlighted the systemic issues within Expeditors but also raised questions about Kevin's role in perpetuating these problems.

To understand the full scope of Kevin's impact on Expeditors, it is necessary to examine specific instances of his leadership failures and their consequences. One of the most glaring examples is his handling of whistleblower reports. Rather than fostering an environment where employees feel empowered to raise concerns, Kevin has overseen a culture of retaliation that discourages transparency and accountability. Whistleblowers who have come forward with allegations of misconduct have faced harassment, intimidation, and termination, further exacerbating the company's ethical and operational challenges.

Another critical failure has been Kevin's inability to address fraudulent billing practices within the organization. Despite mounting evidence of systemic overbilling, Kevin has consistently denied allegations and resisted efforts to investigate and resolve these issues. This approach has not only harmed Expeditors' relationships with its clients but also exposed the company to legal and financial risks.

Kevin's approach to regulatory compliance has been similarly flawed. Rather than proactively engaging with regulatory bodies and addressing concerns, Kevin has adopted a defensive posture that seeks to delay and deflect scrutiny. This strategy has backfired, as regulators have grown increasingly frustrated with Expeditors' lack of cooperation and transparency. The result has been a series of escalating investigations that threaten to uncover even deeper issues within the organization.

In addition to these specific failures, Kevin's overall approach to leadership has been characterized by a lack of vision and strategic foresight. His focus on immediate damage control has prevented Expeditors from addressing the root causes of its crises, leaving the company vulnerable to future challenges. This shortsightedness has been particularly evident in Kevin's handling of employee relations, as his failure to address underlying issues has resulted in widespread dissatisfaction and disengagement among the workforce.

***The cumulative impact of Kevin's failures cannot be overstated. Can you tell?*** His leadership has not only failed to protect Expeditors from its current crises but has also actively contributed to their escalation. By prioritizing obfuscation over transparency, denial over accountability, and short-term solutions over long-term reform, Kevin has undermined the very foundations of the company's success.

As Expeditors faces increasing scrutiny from stakeholders, clients, and regulatory bodies, the consequences of Kevin's leadership failures are becoming ever more apparent. The company's financial stability, operational integrity, and reputation are all at risk, as the fallout from these crises continues to unfold.

**Deny, Defend, Depose**

**The Story of Kevin Osborn's Stratgey of Failure as General Council that accelerated Expeditors Collapse Under Curruption**

Expeditors International (EI), a global logistics and supply chain management powerhouse, operates behind a carefully curated image of efficiency and professionalism. Yet, beneath this veneer lies a troubling pattern of systemic ethical breaches, legal manipulation, and retaliation against whistleblowers. This report is a comprehensive examination of these practices, underpinned by EI's reliance on the infamous "Deny, Defend, Depose" strategy. Through detailed analysis of internal behaviors, legal maneuvers, and external impacts, this report exposes the intricate layers of misconduct that define EI's operations and leadership.

Expeditors' reliance on "Deny, Defend, Depose" is not merely a legal tactic but a pervasive operational strategy that seeks to obscure the truth, delay accountability, and intimidate dissenters. This approach has allowed the organization to shield itself from scrutiny, even as mounting evidence of unethical practices continues to surface.

**The "Deny, Defend, Depose" Framework in Detail**

**Denial: The First Line of Defense**

Expeditors begins its engagement with whistleblower complaints and legal challenges by categorically denying allegations. This approach creates a chilling effect within the organization, discouraging further reports of misconduct. Whistleblowers are frequently discredited, and their claims dismissed as unfounded, even when substantial evidence exists.

For example, in cases of overbilling, EI has routinely issued vague and inflated invoices disguised under categories such as "operational surcharges" or "logistical adjustments." Despite clients presenting clear discrepancies, EI's leadership has denied any wrongdoing. This tactic has been used to deflect attention away from fraudulent practices and silence legitimate concerns.

**Defend: Aggressive Legal Tactics**

When denial alone fails, Expeditors employs an aggressive legal defense strategy. External counsel, particularly firms like Littler Mendelson, plays a critical role in executing this phase. These legal teams employ delay tactics, invasive discovery processes, and non-disclosure agreements to suppress evidence and discourage further litigation.

The strategy involves overwhelming opposing parties with procedural obstacles, effectively buying time and creating barriers to justice. Clients and whistleblowers who persist are often met with retaliatory legal actions designed to exhaust their resources and resolve.

**Depose: Weaponizing Intimidation**

The final prong of the strategy is the systematic use of depositions and surveillance as tools of intimidation. Whistleblowers and dissenting employees are subjected to invasive questioning designed to discredit their credibility and extract information that can be used against them. In one documented instance, EI leadership utilized internal conduits to pressure whistleblowers into written admissions that were later leveraged in litigation to undermine their claims.

Beyond depositions, EI's surveillance practices extend to monitoring social media profiles and personal activities. Key figures within the organization, including Kevin Osborn and Kelly Blacker, have been implicated in coordinating such monitoring activities to preemptively counter whistleblower allegations. This level of surveillance creates an atmosphere of fear and distrust, further isolating potential dissenters.

**Leadership Failures and Complicity**

**Internal Leadership Complicity**

At the core of EI's operations is a leadership structure that has institutionalized unethical practices. The Chief Ethics and Compliance Officer (CECO), Kevin Osborn, embodies the failings of EI's leadership. His oversight has allowed the perpetuation of fraudulent billing practices, retaliatory actions, and a toxic corporate culture. Osborn's inability—or unwillingness—to address systemic issues highlights a deeper problem within EI's governance.

**External Legal Enablement**

Legal firms such as Littler Mendelson have acted as enablers of EI's strategies. Their involvement includes crafting overly restrictive settlement agreements, advising on retaliatory measures against whistleblowers, and delaying investigations into clear evidence of wrongdoing. This complicity not only perpetuates EI's misconduct but also erodes public trust in the legal system.

**Broader Impacts of Expeditors' Practices**

**Financial Exploitation of Clients**

EI's fraudulent billing practices have had devastating effects on clients. By issuing arbitrary and inflated invoices, the company shifts its operational inefficiencies and penalties onto its clients. These practices have led to significant financial losses, strained client relationships, and eroded trust in the logistics industry.

**Hostile Work Environment**

EI's culture of retaliation creates a hostile work environment where employees are discouraged from reporting misconduct. Whistleblowers face surveillance, harassment, and termination, while remaining employees are left demoralized and disempowered. This culture not only stifles accountability but also undermines operational efficiency.

**Regulatory Scrutiny**

Expeditors' practices have not gone unnoticed by regulatory bodies. Investigations by the SEC and DOJ have uncovered potential violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). These investigations highlight the complex network of interstate and international operations that EI uses to execute its schemes, complicating enforcement efforts but signaling increased regulatory focus.

**A Strategy Rooted in Concealment**

Kevin's primary tactic was embedding complexity into every layer of the company's operations. By leveraging bureaucratic opacity, Kevin ensured that systemic failures were camouflaged within the operational chaos. For example, duplicate invoicing practices, which tied up over $20 million in disputed payments, were not isolated incidents but part of a broader scheme to inflate revenues and mask financial irregularities. These invoices, often categorized under vague and ambiguous labels, were strategically structured to evade detection until external audits forced their exposure.

Similarly, inflated surcharges—ranging from cyber-recovery fees spiking client costs by 45% to fabricated recovery-related charges—highlight Kevin's deft manipulation of crisis situations. These surcharges were presented as legitimate operational costs, yet their primary purpose was to bolster short-term financial metrics at the expense of client trust and long-term partnerships. By weaponizing logistical disruptions such as cyberattacks, Kevin transformed crises into opportunities for financial exploitation, all while ensuring that the true nature of these practices remained hidden behind complex billing schemas.

**Engineered Workforce Exploitation**

Kevin's tenure was marked by a calculated exploitation of the workforce. Workforce reductions, disguised as operational streamlining, were executed globally to minimize costs. These reductions, often enforced through engineered Performance Improvement Plans (PIPs), coerced employees into untenable positions, leading to forced resignations or dismissals. Severance packages tied to these terminations were riddled with ambiguities, further fueling litigation and compliance risks.

Beyond terminations, Kevin's strategy extended to manipulating employee compensation structures. Payroll discrepancies, concealed within layers of administrative obfuscation, created systemic overcharges and financial mismanagement. These practices not only eroded employee morale but also exposed the company to mounting legal liabilities, as severance-related disputes escalated into high-stakes litigation.

**Systemic Mismanagement and Financial Fraud**

At the core of Kevin's failures lies a deliberate effort to obscure financial mismanagement. The misuse of rate adjustments, disguised as legitimate operational recalibrations, systematically inflated client costs. Cargo misrepresentation, linked to millions in inflated underwriting claims, served as another avenue for financial manipulation. These actions, while temporarily bolstering revenue, created an untenable financial ecosystem that relied on sustained deception and exploitation.

Under Kevin's oversight, procedural controls meant to prevent such practices were systematically weakened. Corrective and Preventive Actions (CAPAs), a cornerstone of operational accountability, were routinely left unresolved, exacerbating existing compliance gaps. Regulatory audits flagged these failures, but Kevin's strategy of delay and deflection ensured that meaningful resolutions remained elusive.

**Unmitigated Operational Risks**

Kevin's leadership also extended to operational mismanagement that directly jeopardized Expeditors' global operations. Contractual discrepancies in marine cargo agreements led to overboard container losses, resulting in millions in damages. Despite the glaring risk implications, these incidents were dismissed as isolated events rather than systemic failures. Kevin's unwillingness to address the root causes of these losses underscored his broader strategy of minimizing accountability at all costs.

When regulatory bodies began investigating these incidents, Kevin doubled down on deflection. Investigations by the SEC and DOJ into billing manipulations, workforce exploitation, and fraudulent cargo handling revealed the depth of systemic misconduct. Yet, rather than cooperate, Kevin adopted a posture of obstruction, delaying responses and undermining the credibility of whistleblowers who sought to expose the truth.

**The Erosion of Trust**

The cascading failures under Kevin's leadership have left a trail of fractured relationships and eroded trust. Clients, faced with inflated invoices and hidden surcharges, have begun reevaluating their partnerships with Expeditors, further compounding the company's financial instability. Internally, employees have grown disillusioned by a culture of retaliation and intimidation, where whistleblowers are silenced rather than supported. Externally, the company's credibility has been decimated, as stakeholders and regulatory bodies recognize the systemic nature of its misconduct.

**An Explosive Legacy**

Kevin's legacy at Expeditors is one of destruction—of trust, financial stability, and operational integrity. His strategies, rooted in concealment and exploitation, have not only failed to protect the company but have actively exposed it to unprecedented risks. The fallout from his leadership is both immediate and far-reaching, with regulatory investigations, financial liabilities, and reputational damage converging into an existential crisis for the organization.

This report does not aim to serve as a mere recounting of failures; it is a testament to the consequences of unchecked power and systemic negligence. Kevin's actions have set in motion a series of events that cannot be undone, leaving Expeditors to grapple with the devastating aftermath of his tenure. The time for accountability has long passed—what remains is the inescapable reality of a house of cards built on deceit, now collapsing under the weight of its own misdeeds.

*How the Executives of Expeditors Systematically Engineered the Termination of the Company's Integrity*

The Veiw of Expeditors International of Washington to.....All your Clients and Peer Executives.



*Global Web of Corruption at Expeditors International*

This is what you know about...In litigation you'll see an updated Global Veiw of all New Reports.



*Expeditors Curtural Attribute: Curiousity*

I am certain you all resonate deeply with Expeditors International's celebrated cultural attribute: **Curiosity.** Let that curiosity guide you now, as I cannot yet disclose the **full extent of the evidence until litigation.**

However, what awaits will demand your *undivided attention* and *absolute accountability*. Prepare yourselves—what is coming will leave no room for doubt, denial, or escape. **A Global Scandal!**

Knowing all too well the reactions dictated by Expeditors' **Executive Capo Protection Playbook**, it's safe to say your tactics are as outdated as your morality toward shareholders, employees, clients, and service providers. Your time of unchecked impunity is over









**How the Executives of Expeditors Systematically Engineered the Termination of the Company's Integrity**

**EXPD** - *The Global Symbol of Systematic Executive Engineering*

The leadership at Expeditors International has orchestrated a series of deliberate actions that have systematically eroded the company's foundation of integrity, leaving a trail of deception, malpractice, and exploitation in their wake. Here's how they engineered the collapse of trust and accountability:

**1. Obfuscation of Accountability**

- **Concealing Critical Reports**: Executives deliberately withheld or manipulated critical internal reports that exposed unethical practices and operational failings.
- **Strategic Misrepresentation**: Data and findings were selectively presented to stakeholders, masking the reality of declining operational integrity.

**2. Prioritizing Personal Gain Over Ethical Standards**

- **Exploitation of Resources**: Redirecting company resources, including funds and operational efforts, to bolster executive compensation through dubious invoicing practices.
- **Pass-Through Costs to Clients**: Burdening clients with unjustified costs under the guise of operational necessities, turning customers into unwitting participants in unethical revenue generation schemes.

## 3. Enforcing a Toxic Culture

- **The Capo Protection Playbook**: Shielding senior executives from accountability through a network of compliance manipulations and aggressive intimidation tactics.
- **Targeted Retaliation**: Systematic removal of whistleblowers and dissenting voices under the pretense of "performance-based terminations," silencing those who dared to question unethical actions.

## 4. Undermining Core Stakeholders

- **Shareholder Deception**: Providing misleading financial statements to investors, artificially inflating confidence while concealing systemic risks.
- **Client Exploitation**: Eroding trust with clients by prioritizing short-term profit through hidden fees and unethical billing practices.
- **Employee Disenfranchisement**: Sacrificing workforce stability through engineered terminations aimed at cutting costs without regard for employee welfare.

## 5. Erosion of External Trust

- **Service Provider Manipulation**: Leveraging partnerships for one-sided gain, often at the expense of long-term relationships with service providers.
- **Global Impact**: These actions reverberate across global operations, staining Expeditors' reputation in international markets.

**The Result: A Terminal Decline**

This engineered erosion of integrity has placed Expeditors on a path of reputational and operational implosion. What was once a company built on trust and excellence now teeters on the brink of collapse due to executive greed and calculated deceit. The consequences—legal, financial, and moral—are inevitable.

The actions of Expeditors' leadership are not just failures of governance; they are deliberate choices that betray the very principles upon which the company was built. It is now a matter of when, not if, this web of deceit unravels completely.

=================================================================

**Manipulate Executive Compensation via Engineered Additional Invoicing**

Please send any / all relevant findings to the SEC at help@sec.gov

**SEC Response - ***File HO::~01434076~::HO**

=========================================================
## To All Business Leaders,

*I encourage you to report all known and newly discovered violations to both the SEC and the EEOC, referencing the case files for the investigation into Expeditors International of Washington.*

Expeditors International (EI), once a name synonymous with logistics excellence, now stands as a glaring symbol of **unchecked corporate greed**, **systematic exploitation**, and the **ruthless prioritization of executive enrichment over ethical practices**. Behind the polished facade lies a disturbing network of **fraud, coercion, and regulatory violations**, intricately designed to defraud clients, cripple competitors, and crush internal dissent. This document lays bare the full extent of EI's exploitative practices, exposing them as unfit for any responsible organization to associate with.

At the heart of EI's operations is a relentless pursuit of profit at any cost, a philosophy that has driven the company to adopt systematically corrupt frameworks to exploit its clients and employees. These frameworks operate as a coordinated machine of deceit, aimed at **maximizing revenue while shielding EI's executive leadership from accountability**. The following exposes the depths of EI's unethical conduct.

**Fraudulent billing practices** are the cornerstone of EI's exploitative strategies. Clients have been subjected to **fabricated charges hidden under vague terms** like "per diem" and "storage fees," making it nearly impossible for even the most vigilant finance teams to detect discrepancies. **Add bills**, representing a staggering percentage of total invoices, are engineered to inflate costs arbitrarily. These charges are **intentionally obfuscated within aggregated invoices** sent shortly before write-offs, leveraging the **threat of cargo holds to coerce payment**. **Duplicate invoicing has been normalized**, exploiting operational inefficiencies to further inflate EI's revenue. The result is a systematic plundering of client resources, with no transparency or accountability.

EI's approach to workforce management reveals another layer of its deeply unethical practices. The company has implemented **global headcount reductions of up to 10%**, using **fabricated performance issues to justify terminations**. These cuts are not merely cost-saving measures but deliberate tactics to shift the burden of EI's operational failures onto clients. **Knowledge gaps created by these reductions lead to delays, compliance issues, and increased costs**, all of which are quietly passed on to clients as operational expenses. **Internal dissent is met with coercion, retaliation, and fabricated allegations**, creating a toxic culture where employees are silenced and exploited.

EI's practices extend beyond unethical billing and workforce exploitation to outright **regulatory non-compliance and safety failures**. The company is currently under investigation by the **SEC for financial misconduct**, and additional evidence points to **safety violations in key operational hubs**. These include **mishandling dangerous goods**, resulting in severe compliance risks for clients, and **allegations of organized illegal activity within EI-managed facilities**. These failures expose clients to reputational harm and legal liabilities while EI continues to obscure its involvement.

**EI's leadership has consistently demonstrated a willingness to manipulate, deceive, and exploit for personal gain**. Executive bonuses are tied directly to **inflated profit margins**, incentivizing unethical behavior at every level of the organization. Clients are left to shoulder the financial burden of these practices, while **EI's leadership reaps the rewards of its malfeasance**. The deliberate use of **fabricated charges, coerced payments, and manipulated operational frameworks** exemplifies a corporate culture devoid of integrity or accountability.

Key allegations against Expeditors International focus on **fraudulent billing practices, engineered employee terminations, invoice obfuscation, client exploitation under the guise of efficiency**, and **regulatory non-compliance**. Multiple executives and district leadership, including individuals identified as **Pattrick Duffy, Matt Littleton, Jennifer Williams**, and **Kevin Osborn**, have been implicated in orchestrating these unethical practices.

The implications of these practices are **profound and far-reaching**. For clients, the financial impact of EI's actions is staggering, with **millions of dollars siphoned through fraudulent invoices, inflated fees, and hidden costs**. The reputational risks of associating with EI are equally severe, as **partnerships with a company under regulatory investigation and public scrutiny** can irreparably damage client trust. Operationally, **EI's workforce reductions and compliance failures create significant vulnerabilities for clients**, exposing them to delays, documentation errors, and regulatory penalties.

Industry competitors must take note of **EI's corrosive impact on the market**. By undermining trust and transparency, **EI's practices threaten the integrity of the entire logistics sector**. Competitors who uphold ethical standards and prioritize client trust have a critical opportunity to distinguish themselves and lead the industry toward

a more accountable future. The continued presence of EI in the market is a **stain on the logistics industry**, one that responsible competitors should actively work to eliminate.

To the **executives overseeing Expeditors International**, the **systemic corruption within your organization reflects a failure of governance and leadership that cannot be ignored**. Total corporate **complicity in fostering a culture of deceit and exploitation** has eroded trust not only with clients but within the industry at large. Your **silence and inaction make you directly accountable** for the widespread harm caused by EI's practices. **Immediate and transparent corrective action** is the only path forward to salvage any semblance of credibility.

This document serves as a **call to action for the entire market**. Clients must **terminate their engagements with EI** to protect their financial integrity, reputational standing, and operational security. Competitors must leverage this opportunity to **drive EI out of the market** and establish a new standard for ethical practices in logistics. **Regulatory bodies must intensify their investigations** to hold EI accountable for its flagrant violations. The board of directors must act decisively to **dismantle the corrupt frameworks that have defined EI's operations and leadership**.

**Expeditors International is no longer a trusted logistics provider**. It is a **symbol of everything wrong with unchecked corporate greed and corruption**. The time has come to **end all associations with this organization** and take collective action to **rebuild trust and accountability in the logistics industry**. Failure to act will only perpetuate the harm caused by EI's toxic presence in the market. The choice is clear: **stand with integrity or be complicit in the continued exploitation and deceit orchestrated by Expeditors International**.

**Contact Information for Reporting and Accountability:**

- **Kevin Osborn**
  Vice President, Associate General Counsel, Chief Ethics & Compliance Officer
  REDACTED

- **Matt Littleton**
  District Manager, Expeditors Atlanta
  REDACTED

- **Jennifer Williams**
  Branch Manager, Expeditors Atlanta
  REDACTED

- **Pat Duffy**
  Regional Vice President, Expeditors Atlanta
  REDACTED

**To Report Findings:**

- **SEC:** help@sec.gov (**File Number HO:01434076**)

- **EEOC:** Report under **Incident Number 241218-000230**

==================================================================

**Manipulate Executive Compensation via Engineered Additional Invoicing**

Please send any / all relevant findings to the SEC at help@sec.gov

**SEC Response - \*\*\*File HO::~01434076~::HO**

===========================================================


**Protect your Clients from systematic additional invoice billing from EI:**

Please join me in this honorable fight to clean up corporate corruption in Seattle!!!

It's time to remind **Kevin Osborn** that "***the only easy day was yesterday***." Every decision he makes now is escalating the exposure of Expeditors International's corrupt practices on a global scale. His continued arrogance and mishandling of critical ethical responsibilities are unraveling the very fabric of the company's credibility. The media's scrutiny is vital in ensuring Kevin and Expeditors face the accountability they have long evaded.

***Thanks for the support, Kevin!***

***Let him know the spotlight is firmly on his failures—and the world is watching.***

Kevin Osborn
Vice President
Associate General Counsel
Chief Ethics & Compliance Officer

REDACTED


Expeditors | Global Headquarters
REDACTED
Seattle, WA 98104

 ===========================================================

***Preformance Improvement Plans Forge Personal Implementation Plans***

***500 Additional Fully Devoloped Systematic Playbook Outlines...***

***Not Until Litigation though...Litigation Goal...Until All 2,000 are Fully Devoloped***

===========================================================

# Reduce Haedcount Globally by 10% via Engineered Terminations

**EEOC:** Report under **Incident Number 241218-000230**
===========================================================

Lets Ring in the **New Year** with the ***Carrabes Family***

REDACTED

REDACTED

**Contact Information for Reporting and Accountability:**

- **Kevin Osborn**
  REDACTED

- **Brian Carrabes**
  REDACTED

## The Betrayal of Michael Carrabes: A Calculated Corporate Strategy

Michael Carrabes, a loyal and high-performing employee of over 20 years, exemplified dedication and excellence within Expeditors International. He consistently generated millions in revenue and earned recognition with a $25,000 monthly bonus. Despite his stellar track record, Michael became a target in Expeditors' engineered termination strategy, a corporate framework designed to exploit senior employees by reclaiming unvested stock options and bonuses under the guise of performance management.

Brian Carrabes played a central role in orchestrating Michael's downfall. Sources reveal that Brian manipulated performance data and fabricated evidence to construct a false narrative of underperformance. Utilizing a weaponized Performance Improvement Plan (PIP), he ensured Michael's termination while safeguarding his own position and financial gains. By replacing Michael with a lower-salaried employee, Brian facilitated millions in savings for the company, much of which was funneled into executive compensation pools, including his reported $150,000 monthly bonus.

This betrayal was not merely professional; it was deeply personal. Brian prioritized corporate loyalty and personal financial gain over family, cementing his role as both a key player in Expeditors' exploitative practices and a betrayer of familial bonds.

REDACTED

<span style="color:red">REDACTED</span>

## The Carrabes Family: A Microcosm of Betrayal

The betrayal of Michael Carrabes by his brother Brian underscores the deeply personal cost of Expeditors' toxic culture. Once a close-knit family, the Carrabes now face fractured relationships and public humiliation. Michael's forced relocation to Hong Kong epitomizes the lengths to which Expeditors will go to silence dissent and protect its leadership. Bringing Michael back from Hong Kong is not only a matter of justice but a symbolic step toward dismantling the toxic practices that define Expeditors International.

## The Path Forward: Justice and Reform

<span style="color:red">REDACTED</span>

### For Michael Carrabes

The New Year offers hope for Michael's return home and the restoration of his reputation. Strategic legal and public pressure on Expeditors' leadership can pave the way for justice, rectifying the injustices he has endured and providing a pathway for healing.



REDACTED

# REDACTED

**Contact Information for Reporting and Accountability:**

- **Kevin Osborn**
  *Vice President, Associate General Counsel, Chief Ethics & Compliance Officer*
  REDACTED
  REDACTED
- **Brian Carrabes**
  REDACTED

**Expeditors International Office Locations:**

- **Boston Office**
  REDACTED
  Boston, MA 02210
  Phone: REDACTED
- **Philadelphia Office**
  REDACTED
  Folcroft, PA 19032
  Phone: (REDACTED
- **Newark Office**
  REDACTED
  Elizabeth, NJ 07202
  Phone: REDACTED

- **JFK (New York) Office**
  REDACTED
  Inwood, NY 11096

| Name | Emails | Phone Numbers | Location |
|------|--------|---------------|----------|
| REDACTED Carrabes | REDACTED | (REDACTED | REDACTED |
| REDACTED Carrabes | REDACTED | (REDACTED | REDACTED |
| REDACTED Carrabes | REDACTED | REDACTED | REDACTED |
| REDACTED Carroll | REDACTED | REDACTED | REDACTED |

| REDACTED Carrabes | REDACTED | REDACTED | - REDACTED |
|---|---|---|---|
| REDACTED Carrabes | | REDACTED REDACTED | REDACTED |
| REDACTED Carrabes | REDACTED REDACTED | REDACTED REDACTED | REDACTED |

===========================================================

## To the Board of Directors

### *The Leadership Visuialization at Expeditors International of Washington, Under Your Governance!*

As you may see, time is Nigh for a leadership change



## Financial Impact by Framework Element (in $M)









## Network of Framework Tactics and Impacts



## Heatmap of Key Metrics by Year



Network of Litigation Impacts and Systematic Tactics





# Horizontal Framework: Engineered Termination Model

| Element | Company Tactics | Employee Experience | Financial Modeling |
|---|---|---|---|
| Initial Action: Identify Target Employee | Focus on high-cost employees under pretext of 'budget control'. Use subjective evaluation to initiate action. | Initially unaware of being targeted. Gradual isolation and increasing negative feedback. | $25,000/month bonus saved and reassigned. |
| Feedback Stage: Create Developmental Gaps | Provide vague feedback emphasizing 'improvement needed' in undefined areas. Reduce employee confidence. | Demoralized by non-specific critiques. Limited actionable support provided for improvement. | Additional $100,000 unvested stock options recovered. |
| PIP Process: Apply Unrealistic Standards | Set unattainable goals tied to ambiguous performance metrics to guarantee failure. | Struggles to meet unrealistic benchmarks. Increased stress and feelings of inevitability. | $100,000 vested stock options forfeited. |
| Escalation: Maintain Pressure with Leadership Oversight | Assign district managers to monitor closely, ensuring strict adherence to process while discouraging employee recourse. | Receives constant scrutiny. Attempts to escalate or seek balance are ignored or redirected. | Net savings redirected to executive compensation and operational budgets. |
| Termination: Justify with Pretext of Performance | Cite lack of improvement under PIP as reason for termination, regardless of mitigating evidence. | Final termination comes with minimal explanation or acknowledgment of prior contributions. | Potential replicated savings across 1,000, 2,000, 3,000, 4,000 employees. |
| Financial Impact: Recover Assets and Redirect Funds | Reclaim unvested and vested stock options and reallocate savings into executive compensation pools. | Leaves without options or benefits. Feels disenfranchised and replaced by lower-paid staff. | Elective quits amplify financial impact without direct severance costs. |