UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Michael Carrabes,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>Expeditors International of<br>Washington, Inc.,<br><br>　　　　Defendant. | No. 1:24-CV-12142-AK |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO AMEND COMPLAINT**

Plaintiff submits this reply in response to Defendant's Opposition (Doc No. 48) to Plaintiff's Motion for Leave to File First Amended Complaint. A copy of Plaintiff's Proposed Amended Complaint ("**PAC**") is attached to his motion. Defendant's arguments fail because they improperly dispute facts alleged in the PAC, ignore binding precedent, and mischaracterize the legal requirements under Rule 15(a)(2) and Rule 12(b)(6). Plaintiff's PAC is neither futile nor violates Rule 8. The Court should grant leave to amend.

### I.　DEFENDANT MISAPPLIES THE STANDARD FOR A MOTION TO AMEND

Defendant argues the PAC is "futile," but its arguments are improperly focused on disputing Plaintiff's factual allegations, which must be accepted as true at this

stage. Rule 15(a)(2) provides that leave to amend should be freely given "when justice so requires," and courts evaluate futility under a Rule 12(b)(6) standard, assuming the facts in the complaint are true and drawing all reasonable inferences in Plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Defendant's Opposition repeatedly ignores this standard, instead arguing facts and attempting to litigate merits prematurely.

**II.   THIS IS NOT AN EMPLOYMENT CASE BUT A RICO CASE INVOLVING FRAUDULENT SCHEMES**

Defendant argues that Plaintiff's RICO claims are futile, relying on case law that denies standing to employees allegedly terminated for refusing to participate in fraudulent schemes. However, Defendant disregards the narrow but actionable circumstances under which an employee may bring a RICO claim, as described in Jones v. Enterprise Rent A Car Co. of Texas, 187 F. Supp. 2d 670 (S.D. Tex. 2002). This case falls precisely within those circumstances.

In Jones, the court, while denying standing under typical "refusal-to-cooperate" cases, noted that First Circuit precedent leaves open the possibility of a valid RICO claim if the termination is directly caused by racketeering activity rather than simply being an incidental by-product. Specifically, the court distinguished Nodine v. Textron, Inc., 819 F.2d 347 (1st Cir. 1987), and Miranda v. Ponce Federal

Bank, 948 F.2d 41 (1st Cir. 1991), to emphasize that where a termination is the direct result of a RICO predicate act—such as fraudulent schemes designed to deprive employees of property or rights—the plaintiff may have standing under RICO. See Jones, 187 F. Supp. 2d at 676-78, 684 n.4.

Here, Plaintiff's proposed amended complaint alleges far more than a routine "refusal-to-cooperate" claim. Plaintiff was not merely terminated for reporting or objecting to misconduct, as in Cullom v. Hibernia Nat'l Bank, 859 F.2d 1211 (5th Cir. 1988). Instead, Plaintiff alleges that Defendant engaged in a covert termination scheme that systematically targeted over 2000 employees, many of them long tenured like Plaintiff, through falsified performance reviews, fabricated misconduct allegations, and coerced resignations—fraudulent actions carried out via interstate wire communications. (PAC ¶¶ 123–125, 337–351). These fraudulent acts were not incidental to Plaintiff's termination; they were the direct cause of his loss of employment, unvested equity, and benefits, and they served Defendant's financial interests[1].

Moreover, the Plaintiff's allegations are corroborated by the experiences of other employees who were similarly targeted as part of Defendant's fraudulent scheme. For example:

---

[1] On February 17, 2025, Expeditors' CEO, Jeff Musser abruptly and unexpectedly gave notice of his resignation. While the company has not publicly disclosed the reasons for this resignation, the timing raises questions regarding potential internal issues that may be related to the allegations raised in this litigation.

- **Evan Cunningham** was falsely informed by Expeditors HK that he was an underperformer and would face termination unless he resigned. Cunningham, an African American employee with a history of strong performance, was coerced into resigning under the pretext of fabricated performance deficiencies. Following his resignation, he was given a glowing reference letter, which directly contradicted the alleged performance issues used to justify his termination. (PAC ¶¶ 214-216).

- **Karim Jamie**, a Latina woman with 23 years of tenure, was subjected to retaliatory conduct and placed on a pretextual Performance Improvement Plan (PIP) after taking medical leave. Like Plaintiff, Jamie's termination was falsely characterized as being for cause, even though it was part of the same covert scheme to reduce headcount while avoiding public layoffs. (PAC ¶¶ 217-225).

- **Hiroyuki Takemura**, a Regional Business Development Manager, was given an ultimatum via Zoom: accept a fabricated PIP or resign. Takemura demonstrated that his performance metrics were on track, but he was terminated anyway under false pretenses, again as part of the covert scheme. His termination resulted in the forfeiture of unvested equity awards, directly benefiting Defendant. (PAC ¶¶ 226-234).

- **David Keane**, a Global Account Manager, was falsely accused of misconduct during a company event. The allegations were pretextual and fabricated as part of the broader scheme to terminate employees in a manner that disguised the true intent of the terminations. Keane's termination also resulted in the forfeiture of substantial unvested equity, which reverted to Defendant. (PAC ¶¶ 235-247).

These employees, like Plaintiff, were not incidental victims of the scheme but direct targets. Defendant's covert termination program relied on fraudulent wire communications, including falsified performance reviews, fabricated misconduct allegations, and coerced severance agreements, to achieve its unlawful goal of reducing headcount while avoiding public layoffs. (PAC ¶¶ 123-143).

As the Jones court recognized, the First Circuit left open the possibility of RICO standing under such circumstances, explicitly stating that where the termination is "a direct result" of racketeering conduct—such as fraud or extortion—the plaintiff may recover under RICO. Jones, 187 F. Supp. 2d at 679; Nodine, 819 F.2d at 349 n.3. The allegations in this case align with the exception noted in Jones. Defendant's fraudulent scheme, implemented through predicate acts of wire fraud, directly injured Plaintiff and over 2000 other employees by depriving them of compensation, benefits, and professional opportunities. (PAC ¶¶ 63-97, 370-371). This case is precisely the type of claim Jones and Nodine envisioned could make out a valid RICO cause of action.

### III. PLAINTIFF'S CLAIMS SATISFY RICO'S PROXIMATE CAUSATION REQUIREMENT

Defendant attempts to argue that Plaintiff's termination was not proximately caused by the alleged racketeering activity. However, Jones makes clear that proximate causation is satisfied where the plaintiff's injuries flow directly from the predicate acts of fraud, such as falsified performance reviews and coerced resignations designed to deprive employees of property. Jones, 187 F. Supp. 2d at 679-80.

Here, Plaintiff's injuries—including the loss of unvested equity, bonuses, and other benefits—are directly traceable to Defendant's fraudulent actions, which were orchestrated to reduce headcount while avoiding public layoffs. (PAC ¶¶ 123-

143, 370-371). These acts were not incidental; they were the means by which Defendant achieved its unlawful goals. As the Jones court noted, the fact that racketeering activity results in job loss "does not transmogrify the racketeering into something else." Jones, 187 F. Supp. 2d at 680. Plaintiff's claims meet the proximate causation standard articulated in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 (1985), and applied in Jones and First Circuit precedent.

**IV.   THE DISTINCTIVENESS REQUIREMENT IS SATISFIED: A CORPORATION AND ITS SUBSIDIARIES CAN CONSTITUTE A RICO ENTERPRISE UNDER FIRST CIRCUIT PRECEDENT**

Defendant's contention that a corporation and its subsidiaries cannot form a RICO enterprise ignores controlling First Circuit precedent, which explicitly recognizes that a corporation and its subsidiaries can constitute a RICO enterprise under certain circumstances. Defendant relies on an overly narrow interpretation of the distinctiveness requirement, but the First Circuit has repeatedly rejected such rigid applications.

In Bessette v. Avco Financial Services, Inc., 230 F.3d 439 (1st Cir. 2000), the First Circuit directly addressed this issue and held that a parent corporation and its subsidiaries can together form a RICO enterprise, provided the allegations sufficiently show that the entities were engaged in distinct conduct that furthered a shared unlawful purpose. The court

explained, "The relationship between a parent corporation and its subsidiary does not preclude them from constituting a RICO enterprise, so long as the complaint alleges that they operated as distinct entities in carrying out the predicate acts." Id. at 449. Thus, the distinctiveness requirement is satisfied when the parent and subsidiary act in concert to conduct the affairs of the enterprise, rather than merely carrying out the ordinary business of the parent corporation.

Here, Plaintiff's complaint alleges that Expeditors International of Washington, Inc. ("**Expeditors**") and its subsidiaries, including Expeditors Hong Kong Limited and Expeditors Singapore Pte Ltd, acted as distinct entities within a larger enterprise. Specifically, Plaintiff alleges that the subsidiaries operated autonomously in certain respects, including maintaining separate financial records, payroll systems, and operational decision-making authority. However, these subsidiaries collaborated with Expeditors in executing the covert termination scheme through actions such as pretextually terminating employees, fabricating performance deficiencies, and coercing resignations, all while using interstate and international wire communications. (PAC ¶¶ 63-97, 123-143, 370-371). These allegations demonstrate that Expeditors and its subsidiaries acted as distinct participants within the enterprise.

Moreover, the First Circuit has emphasized that the analysis of distinctiveness under RICO is fact-specific and depends on the nature of the alleged conduct. In In re Lupron Marketing and Sales Practices Litigation, 295 F. Supp. 2d 148 (D. Mass. 2003), the court explained that a corporation can act as both the RICO "person" and a member of the enterprise when its conduct goes beyond the ordinary course of business and involves unlawful schemes. Id. at 173. Plaintiff's allegations here satisfy this standard, as the covert termination scheme is separate from Expeditors' legitimate logistics operations and was executed in concert with its subsidiaries and other actors to defraud employees of compensation and benefits.

Further, Defendant's reliance on Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp., 57 F.3d 56 (1st Cir. 1995), is misplaced. In Compagnie, the court rejected a RICO claim because the complaint merely alleged that the parent and subsidiary were indistinguishable and failed to allege that they engaged in distinct roles within an enterprise. Id. at 92. In contrast, Plaintiff's complaint here details how Expeditors and its subsidiaries performed complementary but distinct roles in carrying out the enterprise's unlawful activities. For example, while Expeditors issued directives and monitored headcount reductions, its subsidiaries fabricated reasons for

termination and enacted pretextual disciplinary measures. These allegations are sufficient to establish the distinctiveness required under RICO.

Finally, Defendant's attempt to conflate distinctiveness under RICO with corporate formalities is legally flawed. As the First Circuit explained in <u>Bessette</u>, the fact that a parent corporation and its subsidiaries are legally distinct entities does not preclude them from forming an enterprise under RICO. <u>Bessette</u>, 230 F.3d at 449. What matters is whether they acted as distinct participants in the conduct of the enterprise's affairs, as Plaintiff has alleged here.

### V. THE CODE OF BUSINESS CONDUCT AS A BINDING CONTRACT: DEFENDANT'S MISCHARACTERIZATION OF PLAINTIFF'S CLAIMS

Defendant's argument that Plaintiff's breach of contract and promissory estoppel claims fail because of disclaimers in the employee handbook is a red herring. Plaintiff's claims are not based on the handbook but on the *Code of Business Conduct* (the "**Code**"), which Defendant has consistently treated as a binding and enforceable document. In fact, in <u>Expeditors International of Washington, Inc. v. Cadena Santillana</u>, No. 2:20-cv-00349-RAJ-BAT (W.D. Wash.), Defendant explicitly asserted that the Code governs its employees' conduct and forms the basis of its employment relationships. In his declaration in that case, Kevin Osborn, Vice President, Associate General Counsel, and Chief Ethics & Compliance

Officer for Expeditors, swore under penalty of perjury that the Code applies to "every employee, director, and officer worldwide" and governs "consistent (and, in many instances, identical) standards, policies, and regulations" across the company. (Osborn Decl., ¶ 3, attached hereto as Exhibit A).

The Code makes binding promises to employees, including commitments to provide fair treatment, foster a respectful work environment, and act with integrity. These are not vague or aspirational statements; they are actionable commitments that Plaintiff relied upon in continuing his employment. For example, the Code explicitly states: "The Code applies to all of us. And it will help us continue to drive Expeditors in the right direction if we take time to understand it, live it, and continue to make improvements to it." These promises form the basis of Plaintiff's breach of contract and promissory estoppel claims. Defendant cannot now disclaim the very commitments it has enforced in other contexts.

Defendant's reliance on the handbook disclaimers is irrelevant. The handbook's disclaimers do not and cannot negate the binding obligations in the Code, which Defendant has treated as a governing document in disciplinary and other employment matters. Courts have recognized that specific promises in documents like codes of conduct can create enforceable obligations, even where general disclaimers exist elsewhere. See O'Brien v. New England Tel. & Tel. Co., 422

Mass. 686, 692 (1996). Plaintiff reasonably relied on these promises, and Defendant's breach of its obligations under the Code gives rise to valid claims.

### VI. THE CLAIMS AGAINT BRIAN CARRABES AND TRACY PEVERI ARE PROPERLY PLED AND SUPPORTED BY ALLEGATIONS OF MALICE

The Plaintiff's claims against Defendants Brian Carrabes and Tracy Peveri for intentional interference with contractual and advantageous relations are well-pled and supported by sufficient allegations of malice. Under Massachusetts law, as articulated in O'Brien, a supervisor's conduct may constitute intentional interference with an employee's contractual relationship with their employer if the supervisor's actions are motivated by actual malice and are unrelated to the employer's legitimate corporate interests. The Plaintiff's allegations against Carrabes and Peveri fit squarely within this framework.

In O'Brien, the Massachusetts Supreme Judicial Court upheld a jury verdict against a supervisor for intentional interference with an employee's contractual relationship where the supervisor's conduct was motivated by malice. The court found that the supervisor's repeated screaming, calling the employee derogatory names, denying her work, and ultimately forcing her to commit conduct that resulted in her termination constituted malicious, retaliatory behavior unrelated to the

employer's legitimate interests. Similarly, the Plaintiff here alleges a pattern of conduct by Carrabes and Peveri that was driven by malice, personal animus, favoritism, and discriminatory intent, rather than any legitimate business purpose.

Specifically, the Plaintiff alleges that Peveri fabricated performance deficiencies, exaggerated complaints, and gave him low ratings in a pretextual move to justify his demotion and eventual termination. (PAC ¶¶ 147-149, 158-159). These negative ratings and complaints were false and intended to create a paper trail supporting adverse employment actions. (PAC ¶ 158). Peveri's actions included deliberately reassigning the Plaintiff's managerial duties to a less-qualified employee, arbitrarily reducing his bonus pool allocation, and transferring him to a warehouse role involving manual labor, all of which caused humiliation and a significant reduction in his compensation. (PAC ¶¶ 168-170, 173, 179-180).

Likewise, the Plaintiff alleges that Brian Carrabes acted with malice by shielding Peveri from scrutiny, despite his conflict of interest as the Plaintiff's brother, and retaliating against the Plaintiff for raising concerns about Peveri's discriminatory and retaliatory behavior. (PAC ¶¶ 185-194). The Plaintiff further alleges that Carrabes escalated matters to a breaking point by yelling at him to "get the fuck

out" of his office and terminating him in a fit of anger during a meeting on February 5, 2024. (PAC ¶ 194). These allegations, if proven, demonstrate personal hostility and malice, as both Carrabes and Peveri prioritized their own personal interests and retaliatory motives over any legitimate corporate purpose.

The O'Brien court emphasized that conduct exceeding the scope of supervisory responsibilities and motivated by malice is actionable. Here, Peveri's and Carrabes' actions were not mere personnel decisions but were targeted and retaliatory efforts to undermine the Plaintiff's employment relationship. The Plaintiff alleges that their conduct went beyond the scope of their roles as supervisors, as their actions were driven by personal animus, favoritism, and a desire to retaliate against the Plaintiff for raising concerns about workplace misconduct. (PAC ¶¶ 185-188, 386-388).

Moreover, the Plaintiff's allegations go beyond mere conclusory claims of malice. He provides specific factual examples of Peveri's favoritism toward a less-qualified employee, her fabrication of performance deficiencies, and her retaliatory actions, including reducing his bonus and assigning him to a demeaning role. (PAC ¶¶ 168-174). Similarly, the Plaintiff details Carrabes' retaliatory actions, including his outburst and termination of the Plaintiff during a meeting. These allegations support a

finding of malice under O'Brien and establish that their conduct was unrelated to legitimate corporate interests.

### VII. PLAINTIFF HAS PROPERLY ALLEGED A WRONGFUL TERMINATION CLAIM

Contrary to Defendant's assertions, Plaintiff has clearly alleged a valid claim for wrongful termination under Massachusetts law. Specifically, Plaintiff alleged that his termination violated public policy because it was in retaliation for exercising his statutory rights under M.G.L. ch. 149, § 52C. Plaintiff's complaint explicitly states that he requested documentation from his personnel file, as permitted under § 52C, to understand and rebut the pretextual reasons for his demotion and termination. Rather than complying with its legal obligations under § 52C, Defendant retaliated by terminating Plaintiff's employment on February 5, 2024. (PAC ¶¶ 349-351).

Plaintiff further alleges that his termination was part of a broader covert termination scheme designed to deprive employees, including Plaintiff, of their rights under state and federal law, including unemployment benefits and other earned compensation. (PAC ¶¶ 352-353). This scheme is not only fraudulent but also violates public policy, as it was designed to circumvent employment protection laws. These allegations are more than sufficient to state a claim for wrongful termination, which Massachusetts courts recognize where an

employee is terminated for exercising a legally guaranteed right or in contravention of public policy. See Meehan v. Med. Info. Tech., Inc., 488 Mass. 730, 736-37 (2021). Defendant's argument that Plaintiff failed to allege wrongful termination is therefore without merit.

### VIII. TITLE VII CLAIM ALREADY EXISTS AND CHALLENGES TO ITS SUFFICIENCY SHOULD BE RAISED VIA RULE 12(b)(6)

The Plaintiff does not seek to amend the Title VII claim, as it is already included in the original complaint. The proposed First Amended Complaint simply adds factual details supporting the existing claims. If the Defendant disputes the sufficiency of the Title VII claim, the appropriate remedy is to file a Rule 12(b)(6) motion to dismiss, not to oppose the Plaintiff's motion for leave to amend. Challenges to the sufficiency of existing claims are properly addressed through a motion to dismiss, not in the context of Rule 15(a). Courts have consistently held that objections to the sufficiency of claims are distinct from considerations of whether amendment should be permitted. See Foman v. Davis, 371 U.S. 178, 182 (1962). Accordingly, the Defendant's arguments regarding the Title VII claim are misplaced and should be raised through the proper procedural mechanism.

## IX. THE PAC COMPLIES WITH RULE 8

Defendant's argument that the PAC violates Rule 8 is without merit. Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." While the PAC is detailed, such detail is appropriate and necessary in a complex case involving RICO claims, which require specificity in pleading predicate acts of fraud under Rule 9(b). Courts routinely recognize that where heightened pleading standards apply, as in fraud-based RICO claims, additional factual detail is necessary to meet those standards and does not constitute a Rule 8 violation. See *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (noting Rule 8 establishes a liberal pleading standard but allows for additional detail when required by the nature of the claims).

Here, the PAC provides sufficient factual allegations to support Plaintiff's claims, including specific details about the fraudulent termination scheme, the predicate acts of wire fraud, and the roles of the enterprise participants in carrying out the scheme. These allegations are not excessive but are required to satisfy the elements of the claims and to provide Defendant with fair notice of the allegations against it. See *Iqbal*, 556 U.S. at 678 (Rule 8 ensures fair notice of claims and the grounds upon which they rest). Defendant's argument that the PAC is overly lengthy conflates the complexity of the claims with noncompliance with Rule 8. The

PAC's structure, organization, and detailed factual allegations comply with Rule 8(a), particularly in light of the heightened pleading requirements for fraud under Rule 9(b).

Respectfully submitted,
For and on behalf of the Plaintiff,

/s/ Adam Clermont
Adam Clermont
6 Liberty Square
PMB 226
Boston, MA 02109
Tel: (413) 841-1270 (Massachusetts)
Tel: +852 9086 3191 (Hong Kong)
E-mail: aclermont@attorneyapc.com
BBO No.: 639769

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of February 2025, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ Adam Clermont
Adam Clermont