UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL CARRABES,

    Plaintiff,

    v.                                         CIVIL ACTION NO. 24-12142-AK

EXPEDITORS INTERNATIONAL
OF WASHINGTON, INC.,

    Defendant.


REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION TO AMEND COMPLAINT (#28)


KELLEY, U.S.M.J.

I. Introduction

       This case started as an employment discrimination case. Here, plaintiff Michael Carrabes moves to add claims, including claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and to add two defendants. Plaintiff first filed suit in August 2024, claiming that he was demoted from his position as district sales manager at defendant Expeditors International of Washington, Inc. ("Expeditors") and then fired because of his sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. At the time he allegedly was fired (defendant disputes that he was), Expeditors was in the process of reducing its workforce. Plaintiff alleged that Expeditors had a longstanding "no layoff policy" and so, rather than engaging in layoffs, Expeditors instituted a "covert termination program" which resulted in his being falsely accused of having "performance deficiencies" and ultimately terminated. (#1 ¶¶ 1-4.) In addition to his claim under Title VII (Count I), he brought claims for

breach of contract (Count II), breach of oral contract (Count III), wrongful termination (Count IV), and a claim under Mass. Gen. Laws ch. 149, § 52C (applying to the court to have a false record expunged from his personnel file) (Count V). *Id.* ¶¶ 127-61. Expeditors answered the complaint on November 21, 2024. *See* #14.

Plaintiff moved to amend the complaint in January 2025. (#28.) The proposed amended complaint ("PAC") (#28-1), which at 124 pages is more than double the length of the original, operative complaint, seeks to add five new claims and two new defendants: Tracy Peveri, plaintiff's former supervisor, and Brian Carrabes, an Expeditors vice president and his brother. Defendant opposes. *See* #54. The court held a hearing on this motion, among other matters, on March 5, 2025. (#52.)

For the reasons set out below, the court recommends that the motion be allowed with respect to proposed Count X, but denied with respect to proposed Counts V, VII, VIII, and IX.[1]

II. <u>Background</u>

A. <u>The Scope of the Record</u>

The facts, drawn from the PAC, are accepted as true for the purpose of assessing the futility of the proposed amendments. *See Efron v. UBS Fin. Servs. Inc. of P.R.*, 96 F.4th 430, 437 (1st Cir. 2024). Defendant attached the Expeditors Employee Handbook ("the Handbook") to his opposition, *see* #49-1; plaintiff attached the Expeditors Code of Conduct ("the Code"), which is

---

[1] On February 5, 2025, this case was referred for full pretrial case management and for reports and recommendations on any dispositive motions. (#38.) Motions to amend usually are not dispositive. *Pagano v. Frank*, 983 F.2d 343, 346 (1st Cir. 1993). However, where, as here, the court concludes that allowing amendment with respect to certain proposed new claims would be futile, it follows the practice of other courts in this circuit by issuing a report and recommendation. *See Sargent v. NorDx*, Civil Action No. 2:20-cv-00467-JAW, 2022 WL 17738711, at *4-5 (D. Me. Dec. 16, 2022) ("What emerges is a general rule that motions to amend are not dispositive except when denying a motion to amend would end[] a claim or defense.") (collecting cases) (additional citation and quotations omitted) (alterations in original).

part of the Handbook, to his reply, *see* #50-1, "Ex. A." The court considers the Handbook, including the Code, in deciding this motion.[2]

## B. Plaintiff Is Hired by Expeditors

Expeditors, a publicly traded, Fortune 500 company, offers a wide variety of services, including air and ocean freight forwarding, vendor consolidation, cargo insurance, distribution, and logistics solutions to meet the demands of global trade. (#28-1 ¶¶ 16-17.) Plaintiff, a Massachusetts resident, was hired by Expeditors in 2003 as an at will employee. *Id.* ¶¶ 12, 19. He worked at its Peabody, Massachusetts facility in sales. *Id.* ¶ 20.

## C. The Expeditors Code of Business Conduct

Plaintiff alleges that at the start of his employment, he was presented with a copy of the Code, which "applies to every employee, director, and officer of Expeditors and its subsidiaries worldwide[,]" "emphasizes honesty and integrity," and "functions as a sort of constitution for Expeditors." *Id.* ¶¶ 21-22. All Expeditors employees are required to review the Code, and they are tested on it annually. *Id.* ¶ 24. They have to certify that they complied with the Code and to acknowledge that violation of the Code could result in termination. *Id.* ¶ 25. Plaintiff understood that his employment with Expeditors depended on his accepting the terms of the Code, and he

---

[2] As explained *infra*, to evaluate whether the proposed claims are futile, the court applies the same standard as it would to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). On a Rule 12(b)(6) motion, without converting it to one for summary judgment, a court may consider facts alleged in the complaint and in the exhibits attached to it or documents expressly incorporated by reference. *See Douglas v. Hirshon*, 63 F.4th 49, 57 (1st Cir. 2023) (citing *Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013)) (additional citation omitted); *see also Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Under "certain 'narrow exceptions,'" extrinsic documents may be considered. *Douglas*, 63 F.4th at 57 (quoting *Freeman*, 714 F.3d at 36) (additional citation omitted). Such exceptions have been made "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3. Here, the authenticity of the Handbook is not disputed, it is central to plaintiff's claims, and the Code, which is part of the Handbook, is "sufficiently referred to" in the PAC.

"reasonably believed" that Expeditors agreed to be bound by the Code and that Expeditors treated it as a "binding contract" between it and its employees. *Id.* ¶¶ 26-27. The Code did not contain any "disclaimers . . . that indicated it was not legally binding" on the company. *Id.* ¶ 28.

The Code provided that employees were entitled to work in an environment "free from favoritism, harassment and intimidation[,]" and it listed "fundamental principles of ethical, complaint conduct" which Expeditors was "'absolutely committed to abiding by[.]'" *Id.* ¶¶ 29-30, 34. The Code stated that Expeditors would not permit retaliation against anyone who filed "a good-faith report of a potential violation of the Code[,]" and it obligated employees to report any violations. *Id.* ¶¶ 31-32. Under the Code, employees were to avoid conduct and situations that could "conflict, or appear to conflict, with the exercise of independent judgment" in their work at Expeditors. *Id.* ¶ 33.

D. Plaintiff's Role at Expeditors

In July 2010, plaintiff was promoted to district sales manager.[3] *Id.* ¶ 37. From 2008 until plaintiff's termination on February 5, 2024, Tracy Peveri, an Expeditors district manager, was his supervisor. *Id.* ¶ 40. From 2011 to 2022, Peveri conducted annual evaluations of plaintiff's job performance and placed the evaluations in plaintiff's personnel file after reviewing them with plaintiff and giving him a chance to comment. *Id.* ¶ 41. According to plaintiff, Peveri's reviews of his performance during this period were consistently positive, and he was never disciplined for

---

[3] Plaintiff was responsible for: leading and overseeing the District Sales Program across all offices in the district, developing and managing the District Sales Team, recruiting and training sales executives, implementing vision and strategy for the sales program, managing the Sales Department budget, facilitating weekly department meetings, and closing large business opportunities. *Id.* ¶¶ 38-39.

misconduct.[4] *Id.* ¶¶ 42, 54.

    E. <u>The Covert Termination Program and the Enterprise</u>

      1. <u>The Covert Termination Program</u>

Plaintiff alleges that beginning in early 2020, defendant hired approximately 2,000 new employees in response to an increased demand for global logistics services and increased ocean and air freight rates during the COVID-19 pandemic. *Id.* ¶¶ 98-100. In 2022 and continuing in 2023, however, defendant's revenue shrank as pandemic-era demand ebbed. *Id.* ¶¶ 102-04. At the same time, in February 2022, it suffered a devastating ransomware attack that "crippled" its operations and forced it to suspend certain services, resulting in the loss of many of its large clients. *Id.* ¶¶ 105-13.

As a result of these events, Expeditors found itself in "a difficult financial situation" as it entered 2023. *Id.* ¶ 114. Given the "severe misalignment" between its revenue and its headcount, Expeditors CEO Jeffrey Musser, along with other senior leaders and in coordination with its subsidiaries, "drew up a covert termination plan to immediately eliminate over 2,000 positions using unethical and illegal means." *Id.* ¶¶ 117, 122. According to plaintiff, to "prevent the public and its shareholders from discovering its poor financial condition[,]" the details of this planned workforce reduction were kept secret. *Id.* ¶ 118.

Plaintiff alleges that throughout his employment with Expeditors, the company had "publicly and prolifically promoted its steadfast commitment to a no lay-off policy[,] branding

---

[4] Peveri rated plaintiff's job performance as "meeting expectations" in certain categories in his 2012 review, as "exceeding expectations" in a certain category in a 2019 review, as "meeting expectations in all areas" in his 2011, 2013, 2015, 2016, 2017, and 2018 reviews, and as "meeting or exceeding expectations in all areas" in his 2019, 2020 and 2021 reviews. *See id.* ¶¶ 42-53. Peveri praised plaintiff's ability to work alongside his colleagues, his willingness to help others, and his success in building an effective sales team. *See, e.g.,* ¶¶ 43, 45, 47-53.

itself as a paragon of employee job security, particularly in economic downturns." *Id.* ¶ 119. Using external communications, its website, and annual proxy statements, Expeditors "consistently reinforced" this "no lay-off policy," and management touted its existence on social media. *Id.* ¶¶ 120-21.

Plaintiff cites an email that Musser sent to Expeditors' senior leadership on January 24, 2023, marked: "**STRICTLY CONFIDENTIAL - FOR INTERNAL USE ONLY - DO NOT FORWARD OR DISSEMINATE[.]**" *Id.* ¶ 122-25 (emphasis in original). Plaintiff claims that the email is evidence that the company was instituting the covert termination program.

The email read, in relevant part:

. . .

[W]e are now entering a year of new challenges. Rates are returning to pre-pandemic levels and demand is dropping as a result of the global economic environment. This is all happening much faster than we ever expected so it is imperative that we respond quickly.
.                                    .                                    .

Our two larges[t] expenses are direct transportation and personnel costs. Our direct transportation costs are being reduced simply based on the declining market. Our personnel costs do not and will not decline without action by you.

During the past two years we added roughly 2,000 new staff to our headcount. . . We were able to do this based on the increased rates and profitability. Unfortunately, the rates have now declined, and we can no longer support the expense        of        the        additional        headcount.
.                                    .                                    .

It is likely that we are overstaffed by more than the growth in staff over the last two years based on current volumes.

I continue to hear people say that we are a company that does not do layoffs. This is a true statement based on our history, but we've never been in a period where we were overstaffed by 2,000 employees and then experienced a significant drop in volumes.
. . .

My message to you as District Manager or leader in this company is this: while we

have never had a layoff in our company to date, we do not have a policy that states we will not do layoffs. We are significantly overstaffed based on our current volumes. We all know how we got here but we are all responsible for getting us back to a manageable level.

We will not hire any additional staff. If a person leaves, and their role is critical, you must back fill with an employee that is already on staff.

.                                .                                .

Additionally, you must begin the process of trimming your current underperforming staff. If you have team members who are not performing, do not meet our culture, or simply do not want to be part of our team, it is time to let them go. Of course, this must all be backed up with appropriate reviews and documentation showing that we have been working with these staff members.

.                                .                                .

Your job is to protect our employees. As difficult as it might be, letting poor performers go is in the best interest of protecting our employees.

. . .

I do not want to see a change in our history of layoffs but I simply can't make the necessary changes on my own. You have the ability to prevent a layoff and I am confident you will do the work to get our expenses/headcount/revenues back in line. Time is of the essence and this needs immediate attention and action.

*Id.* ¶ 125.

About three months after sending this email, Musser issued a press release, on May 2, 2023, which read:

[o]perating conditions during the first quarter of 2023 were very similar to what we experienced in the fourth quarter of 2022, when shippers swiftly adapted to increased consumer caution and slowing demand for their products, while also battling inflation and tighter financing. Our business continued to be impacted by the comparatively soft demand, along with significantly reduced buy and sell rates relative to what we experienced during the pandemic. We are adapting and working diligently to bring expenses in line with lower revenue by lowering headcount and payroll expenses ***without resorting to layoffs*.***"

*Id.* ¶¶ 126-27 (emphasis in original).

Plaintiff claims that pursuant to the covert termination program, defendant "engineered resignations" as certain employees were targeted, informed of their alleged poor performance, and

threatened with termination by the end of the month.[5] *Id.* ¶ 138. These employees were also presented with an alternative: resign voluntarily and receive a favorable reference, with the possibility of being rehired sometime in the future. *Id.* Defendant's rapid staff reduction and policy shifts "placed undue pressure on managers[,]" "dismantled critical safeguards[,]" and "creat[ed] an environment ripe for discriminatory practices." *Id.* ¶¶ 141-42.

Plaintiff alleges that Musser's January 24th email and May 2nd press release "are examples of how [Expeditors] used interstate and international wires to advance their fraudulent scheme[,]" as these communications, in addition to other communications and emails sent between Expeditors leadership and its subsidiaries, "led managers to create pretextual performance reviews, [and] fabricate documentation and false misconduct allegations"; these communications therefore "constitute predicate acts of wire fraud pursuant to 18 U.S.C. § 1343." *Id.* ¶ 128; *see id.* ¶¶ 209-13.

### 2. The Enterprise

Expeditors has subsidiaries located throughout the world. *Id.* ¶ 56. Each of them operates autonomously, with "full discretion over operational decision-making." *Id.* ¶¶ 57, 60. According to plaintiff, defendant and its subsidiaries operate as an enterprise within the meaning of 18 U.S.C. § 1961(4), formed for "the distinct purpose of covertly terminating employees while concealing this unlawful action from shareholders, employees, and the public, as well as to engage in questionable billing practices." *Id.* ¶ 62. "The Enterprise was formed to execute fraudulent schemes that violated Expeditors' own public commitments, such as its professed no-layoff policy, and circumvented legal obligations under federal and state laws." *Id.* "The Enterprise also

---

[5] Plaintiff lists six other employees whom he claims were also victims of the covert termination program. *See id.* ¶¶ 214-81.

consisted of an unidentified third party or third parties who was/were retained by Expeditors to train its employees on how to carry out terminations in furtherance of the covert termination scheme." *Id*. ¶ 63. The Enterprise "deliberately structured its operations" to deprive employees of certain benefits. *Id.* ¶ 68.

Plaintiff alleges that the Enterprise: conspired to protect bonus compensation for remaining employees despite declining revenue by eliminating "higher compensated employees" like plaintiff, thus "preserving the bonus pool," *id.* ¶ 94; triggered the forfeiture of unvested employee 401(k) plan contributions and unvested stock awards, *id.* ¶ 95; caused employees to cease participating in its employee stock purchase plan, "thereby depriving employees of significant compensation they had earned through their service to the company," *id.*; and "systematically defrauded [defendant's] customers through deceptive billing practices" that included "passing off costs . . . onto unsuspecting customers[,]" cloaking expenses as legitimate charges, inflating labor charges, and failing to allow the "correction of discrepancies between recorded and physical inventory, resulting in hundreds of thousands of dollars in erroneous storage fees" billed to clients. *Id.* ¶¶ 96-97.

F.  Events Leading to Plaintiff's Termination

1. Plaintiff Receives Negative Reviews

In December 2022, Peveri informed plaintiff that "she had been receiving complaints about his ability to work with others as a team." *Id.* ¶ 147. In his December 31, 2022 performance evaluation,[6] plaintiff received a rating of 2 out of 5 with respect to communication, with Peveri stating that she hoped to see plaintiff build "'better communication with the sales team.'" *Id.* ¶

---

[6] According to plaintiff, discussions about the covert termination program predated Musser's email, and he claims that Peveri was aware of Expeditors' plan to reduce its workforce at the time she conducted his December 31, 2022 performance evaluation. *Id.* ¶ 129.

148. Plaintiff was also rated 2 out of 5 with respect to reliability because, according to Peveri, he "'need[ed] to work on district engagement and organizing the weekly sales meeting.'" *Id.* ¶ 149. This review was the first notice plaintiff ever received of his supposed poor performance, and it did not "include any specifics."[7] *Id.* ¶¶ 150-51. Although it was Expeditors' practice to place an employee on a Performance Improvement Plan ("PIP") after "significant deficiencies in an employee's performance" had been identified, plaintiff never was placed on one. *Id.* ¶¶ 152, 154.

Plaintiff alleges that these ratings were a "pretext" and were "deliberately included" by Peveri as part of "a calculated move" intended to "establish a false narrative of underperformance" and "justify[] the impending adverse employment actions [she] planned to take against him based upon his sex[.]" *Id.* ¶¶ 158-59. These negative ratings, which occurred "just before" Mr. Musser's email about the covert termination scheme, "supports the inference of a discriminatory motive" and that plaintiff was targeted as part of the covert termination scheme. *Id.* ¶ 161.

### 2. Plaintiff Is Replaced as District Sales Manager

In late December 2022, Peveri told plaintiff that because of the complaints made about him, he would lose his position as district sales manager. *Id.* ¶ 165. In January 2023, plaintiff's share of the company's bonus pool, a significant source of his compensation, was reduced from 2% to 1%, and Peveri told him to look for another job internally.[8] *Id.* ¶¶ 168-69, 171, 175. Plaintiff was also tasked with training his replacement, Nancy Bowie, which he did. *Id.* ¶¶ 172-73.

Plaintiff knew that Bowie, a female employee and a member of his sales team since

---

[7] As alleged in the PAC, plaintiff's personnel file contains nothing about the complaints Peveri claims to have received. *Id.* ¶¶ 156-57. In addition, there is no record in his file of his demotion from district sales manager. *Id.* ¶ 167.

[8] According to plaintiff, although Peveri assured him that he could apply for another job internally, the nature of the company-wide, covert termination program "rendered such a transition highly improbable, if not impossible." *Id.* ¶ 176.

February 2017, had been making complaints about him to other employees and to Peveri. *Id.* ¶ 162. Peveri told plaintiff that the reason for his removal as district sales manager "related to the complaints she had received about his poor performance and that, in her opinion, having a female in that role would improve team collaboration and communication[.]" *Id.* ¶ 174. In December 2023 or January 2024, Bowie, whom plaintiff claims was less qualified than he was for the role, officially took over his position. *Id.* ¶¶ 164, 179, 327.

Meanwhile, Peveri assigned plaintiff to work at the Expeditors warehouse located in Peabody, Massachusetts, where he was required to perform manual labor, such as lifting heavy boxes. *Id.* ¶¶ 179-80. While it was defendant's policy and practice to require district managers to complete "Personal Action Forms" and place them in an employee's personnel file whenever there was a change to the employee's pay, title, department, schedule, or worksite, no such forms were generated for plaintiff. *Id.* ¶¶ 182-83.

3. Plaintiff Meets with Peveri and Brian Carrabes

As a result of the "unfair treatment" and the "indignity" of his reassignment to warehouse work despite his experience and past performance, plaintiff asked to meet with Peveri and Brian Carrabes ("Brian"), his brother, who is a regional vice president. *Id.* ¶ 185. According to plaintiff, he "was obligated to report his concerns" about Peveri to Brian, who was her supervisor, given that she was "acting in a dishonest manner, discriminating against [him] based upon his sex and treating her close friends more favorably" and thereby "engaging in behavior prohibited by the Code[.]"[9] *Id.* ¶ 186.

---

[9] Plaintiff claims that his "experiences of discrimination and retaliation" are not isolated incidents but are instead "part of a larger pattern of favoritism, discrimination, hostility, and improper and unethical conduct by Expeditors management[,]" *id.* ¶ 197, and that other Expeditors employees also "observed and experienced this toxic culture." *Id.* ¶ 198. For example, in a resignation email sent in July 2024, one employee "detailed instances of favoritism" by Peveri and Brian "based on

On February 5, 2024, plaintiff met with Peveri and Brian in Brian's office. *Id.* ¶ 187. Plaintiff asked, in "a calm and professional manner," about "an interview for a different role within the company" to which he had applied as a result of Peveri's instructions. *Id.* ¶¶ 187-89. According to plaintiff, Peveri immediately became defensive, crossed her arms, "and asked in a sarcastic tone, why don't you tell us." *Id.* ¶ 190.

Plaintiff then asked Peveri and Brian "in a calm tone" the reasons for his demotion and his poor treatment. *Id.* ¶ 191. Peveri left the meeting. *Id.* ¶ 192. Plaintiff claims that he asked Brian "what was going on" and what he had done to deserve such treatment. *Id.* ¶ 193. Plaintiff told Brian that Peveri was violating company policy and the Code, "as he had not received anything in writing detailing Expeditors' justifications" for its actions towards him. *Id.* According to plaintiff, "[a]t some point, [Brian] became extremely angry and said you no longer have a job at Expeditors" and "yelled" at plaintiff, "get the f[-]ck out of my office." *Id.* ¶ 194.[10]

4. The Allegedly False Termination Letter, and the EEOC Charge

The next day, February 6, 2024, Peveri put a letter in plaintiff's personnel file in which plaintiff claims she made four false statements:

(1) that plaintiff violated sections 4.1(5) and 4.1(9) of the Expeditors Employee Handbook "by yelling and using obscene and threatening language toward her" during the February 5 meeting;

(2) that Brian only told plaintiff to "leave his office and that he did not tell [plaintiff] he no longer had a job";

(3) that, as a result of his conduct, plaintiff was terminated "immediately"—as opposed to by Brian; and

---

personal relationships rather than qualifications, retaliation against those who spoke up or fell out of favor, and efforts by upper management to hide misconduct." *Id.*

[10] Plaintiff maintains that he was terminated by Brian on February 5, 2024, an allegation which defendant denies. *Id.* ¶ 201. Plaintiff alleges, in the alternative, that he was constructively discharged on that date as a result of Brian and Peveri's conduct. *Id.*

(4) that a copy of the letter had been handed to plaintiff during a February 6, 2024 meeting, a meeting which plaintiff claims never occurred. *Id.* ¶¶ 202-05.

On August 12, 2024, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), asserting that Expeditors had "engaged in discriminatory practices against [him] on the grounds of sex" in violation of Title VII. *Id.* ¶¶ 320-21. He received a Notice of Right to Sue on August 20, 2024. *Id.* ¶ 322.

G. <u>The Proposed New Claims and New Defendants</u>

As noted above, plaintiff seeks to add five claims and to add Peveri and Brian as defendants. Proposed Count V asserts a promissory estoppel claim against Expeditors,[11] *id.* ¶¶ 355-60; proposed Counts VII and VIII assert civil RICO claims, under 18 U.S.C. § 1962(c) (Count VII) and 18 U.S.C. § 1962(d) (Count VIII), against Expeditors, *id.* ¶¶ 365-79; proposed Count IX asserts an intentional interference with contractual relations claim against Peveri and Brian, *id.* ¶¶ 380-91; and proposed Count X asserts an intentional interference with advantageous relations claim against Peveri and Brian, *id.* ¶¶ 392-97.

Plaintiff argues that the PAC builds on his original claims "by adding detailed allegations of misconduct related to the covert termination scheme and fraudulent billing practices" and additional, related causes of action. (#29 at 2.) Defendant characterizes the PAC as "a convoluted attempt to distort [a] routine employment discrimination claim into a sprawling amalgamation of

---

[11] Plaintiff has renumbered his claim under Mass. Gen. Laws ch. 149 § 52C, which was Count V in his original complaint, as Count VI. *See id.* ¶¶ 361-64. Aside from this renumbering, the five counts of plaintiff's original complaint are unchanged.

other unfounded and futile claims."[12] (#54 at 1.)

III. <u>Legal Standards</u>

      Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave [to amend a complaint] when justice so requires[,]," unless the amendment "would be futile, . . . or reward, *inter alia*, undue or intended delay[.]" *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994) (additional citations omitted).[13] Futility "means that 'the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 40 (1st Cir. 2022) (quoting *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)). Thus, futility is "'gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6).'" *Id.* (quoting *Juarez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 276 (1st Cir. 2013)). In evaluating a motion to dismiss, the court assumes the truth of well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013).

      When a plaintiff moves to add new defendants, their joinder must satisfy the requirements of Federal Rule of Civil Procedure 20(a)(2). *See Roussel v. Mayo,* Civil Action No. 1:22-00285-JAW, 2023 WL 5017006, at *1 (D. Me. Aug. 7, 2023) (citing *Spencer v. Lewis,* Civil Action No. 13-11528-MMB, 2014 WL 1364791, at *1 (D. Mass. Apr. 4, 2014)). That rule provides that:

      [p]ersons. . . may be joined in one action as defendants if:

---

[12] Expeditors argues that the claims in plaintiff's original, operative complaint "also fail as a matter of law." (#54 at 1.) Given that this report and recommendation concerns a motion to amend, the court will not address the claims in the original complaint. Defendant is free to file a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

[13] The timing of plaintiff's motion to amend does not raise any red flags, as the complaint was first filed in August of 2024 (#1), Expeditors filed an answer in November 2024 (#14), and at the scheduling conference, held in January 2025 (#23), plaintiff informed the court he intended to file a motion to amend and then did so within about two weeks (#28).

(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2).

Rules governing the joinder of parties "are construed liberally for the sake of convenience and economy," *see Cruz v. Bristol-Myers Squibb Co.*, 699 F.3d 563, 569 (1st Cir. 2012) (additional citation omitted); the decision whether to permit joinder rests within the court's discretion. *See Wilmington Trust, Nat'l Ass'n. v. Howe,* Civil Action No. 2:21-00278-NT, 2022 WL 1522247, at *2 (D. Me. May 13, 2022).

IV. <u>Discussion</u>

A. <u>The Proposed New Claims</u>

1. <u>Proposed Count V (Promissory Estoppel)</u>

In proposed Count V, plaintiff alleges, "[i]n the alternative" to his breach of contract theories, that defendant, "through its policies, practices, public statements, and conduct, including but not limited to its widely publicized no lay-off policy, made clear and definite promises to [him] and other employees" that: (1) it "would not engage in layoffs, even during economic downturns" (#28-1 ¶ 356(a)); (2) it would "provide fair and equal treatment to all employees, including following its disciplinary procedures such as Performance Improvement Plans (PIPs) before terminating any employee for performance reasons," *id.* ¶ 356(b); and (3) it would "act in accordance with [the] Code" and honor "its commitment to honesty, integrity, and fairness in its dealings with employees," *id.* ¶¶ 356(c). Plaintiff alleges that he "reasonably and foreseeably relied" on defendant's promises through his decision to remain with Expeditors and forgo "alternative employment" because he "reasonably believed his job was secure" and expected that

his employment "would not be unjustly terminated[.]" *Id.* ¶ 357.

To make out a claim of promissory estoppel under Massachusetts law, "'a plaintiff must allege that (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.'" *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004) (quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 242 (1st Cir. 2002)) (additional citation omitted). "'An essential element under [this] theory is that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation.'" *Rhode Island Hosp. Trust Nat'l Bank v. Varadian,* 647 N.E.2d 1174, 1178 (Mass. 1995) (quoting *Pappas Industrial Parks, Inc. v. Psarros*, 511 N.E.2d 621, 623 (Mass. App. Ct. 1987)). "Where reliance is unreasonable, such as where the subject promises are vague or indefinite, no claim for promissory estoppel will lie." *Rodden v. Savin Hill Enters., LLC*, No. SUCV2015-03194-C, 2016 WL 1688688, at *5 (Mass. Super. Ct. Apr. 21, 2016) (collecting cases).

"Promissory estoppel is an equitable doctrine." *Malden Police Patrolman's Association v. Malden,* 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017). Under Massachusetts law, "'[w]here an enforceable contract exists, a claim for promissory estoppel will not lie.'" *Damilare Sonoiki v. Harvard Univ.,* 37 F.4th 691, 717 (1st Cir. 2022) (quoting *Malden Police*, 82 N.E.3d at 1064); *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 864 N.E.2d 518, 533 n.33 (Mass. App. Ct. 2007).

a. The Promise to Never Lay Off Employees

Neither the Handbook nor the Code contain any mention of a "no layoff policy." No doubt understanding this, plaintiff pleads that in the alternative to his contractual claims, defendant,

16

through its "policies, practices, public statements, and conduct," made "clear and definite promises" that "it would not engage in layoffs, even during economic downturns." (#28-1 ¶ 356.)

Plaintiff's reasoning is somewhat convoluted. One might say that according to the facts alleged in the PAC, plaintiff was not laid off in violation of a no layoff policy, but rather was fired because the company wanted to avoid laying anyone off, so he was wrongly targeted for termination on the basis of his sex, and a trumped-up allegation that he was not doing a good job. Thus, the no layoff promise was not broken, and plaintiff has no claim on this basis. *See Vacca v. Brigham & Women's Hospital, Inc.*, 156 N.E.3d 800, 810 (Mass. App. Ct. 2020) (affirming entry of summary judgment and dismissal of plaintiff's promissory estoppel claim where defendant "did not commit a breach of [the] [alleged] promise").

Even if one accepts plaintiff's argument that he was somehow fired in violation of a no layoff policy, however, the claim still fails. A promise to never engage in layoffs is precisely the type of vague promise of future conduct that courts have rejected as a basis for a claim of promissory estoppel. *See Hinchey v. NYNEX Corp.*, 144 F.3d 134, 143-44 (1st Cir. 1998) (no reasonable reliance on general promise of future pension crediting); *Santoni v. Federal Deposit Ins. Corp*, 677 F.2d 174, 179 (1st Cir. 1982) (promise "must be definite and certain so that the promisor should reasonably foresee that it will induce reliance by the promisee or a third party"); *Dexter v. Dealogic, LLC*, 390 F. Supp. 3d 233, 245 (D. Mass. 2019) (plaintiff's conclusory assertions that employer made promises of promotions, compensation, and benefits were not specific enough); *AthenaHealth, Inc. v. May*, 290 F. Supp. 3d 108, 112 (D. Mass. 2018) (employer's vague promise that employee "would have absolutely nothing to worry about in the transition" too ambiguous to support promissory estoppel claim); *Treadwell v. John Hancock Mutual Life Ins. Co*, 666 F. Supp. 278, 286 (D. Mass. 1987) (promise of "secure and continued

employment" was "simply too vague to be enforceable under the doctrine of promissory estoppel" and did not alter fact that plaintiff was employee at will); *Upton v. Jwp Businessland*, 682 N.E.2d 1357, 1360 (Mass. 1997) (no reasonable reliance on promise of regular work hours); *O'Brien v. Analog Devices*, *Inc.,* 606 N.E.2d 937, 939 (Mass. App. Ct. 1993) (employee's assertion "that she was instructed several times that if she performed her duties, she would always have employment with [defendant]" was too vague, as "explicit expressions of intent are required to bind an employer to an employment contract of extraordinary duration").

### b. The Promise to Follow Disciplinary Procedures

Plaintiff claims that defendant promised to follow certain disciplinary procedures when terminating employees, which it did not follow in plaintiff's case. (#28-1 ¶ 356(b).) For instance, he asserts that "[i]t was ostensibly the practice and policy of Expeditors" to place poorly-performing employees on PIPs before termination. *Id.* ¶¶ 152, 356. This argument fails, however, because it is based on conclusory and unsupported assertions about Expeditors' policies. There are no facts pled in the PAC that support plaintiff's claim that Expeditors was obligated to put him on a PIP, or do anything else, before terminating him, as he was an at will employee.

### c. The Promise to Act in Accordance with the Code

Plaintiff asserts that the Code was a "promise" that defendant generally would act with integrity, which it violated by carrying out the covert termination program. *Id.* ¶ 356(c). But whether plaintiff is arguing that the Code was an enforceable contract—which could not support a claim of promissory estoppel—or that the Code was an enforceable "promise" does not matter here, because the values of "honesty, integrity, and fairness" are too vague. For the same reasons set out above with regard to part (a), the alleged promise to never engage in layoffs, this claim fails.

18

In sum, plaintiff fails to state a claim on the first element of promissory estoppel, namely, that Expeditors made any promise to him on which he reasonably could have relied. The court need not consider any other elements of the claim. The court recommends that the promissory estoppel claim be dismissed.

2. <u>Proposed Count VII (RICO Violation - 18 U.S.C. § 1962(c))</u>

In proposed Count VII, plaintiff alleges that defendant and its subsidiaries "formed an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c)" and "conducted and participated in the conduct of the [e]nterprise's affairs through a pattern of racketeering activity consisting of numerous acts of wire fraud in violation of 18 U.S.C. § 1343[.]" *Id.* ¶¶ 367-68. According to plaintiff, these acts included "[t]he January 24, 2023 email from Musser directing the implementation of the covert termination scheme[,]" and other "[i]nterstate and international electronic communications" which: (1) "contain[ed] manufactured negative performance reviews and disciplinary actions"; (2) "coordinat[ed] the implementation of the termination scheme across different offices and regions"; (3) "coerc[ed] employees into signing separation agreements under false pretenses"; and (4) "contain[ed] false statements about the nature and circumstances of employee separations." *Id.* ¶ 368.

Plaintiff alleges that through these acts, defendant executed its "fraudulent scheme to terminate employees while maintaining the façade of performance based separations and the company's no-layoff policy," and at the same time "engag[ed] in fraudulent billing practices[,]" *id.* ¶ 369, "defraud[ed] its employees . . . of their property interests" in direct compensation and other employment rights and benefits, *id.* ¶ 370, and thereby "directly and proximately caused injury to [p]laintiff's business and property interests[.]" *Id.* ¶ 371. Defendant argues that plaintiff's proposed RICO claim is futile where he fails to allege the requisite predicate acts, causation, or

distinctiveness, requirements which are necessary to make out the claim. (#54 at 3, 5, 7.)

The court agrees that the claims are futile because plaintiff fails to allege predicate acts under RICO.

18 U.S.C. § 1964, the "civil companion" to the RICO statute's "primary criminal provision" of 18 U.S.C. § 1962(c), provides a civil remedy to "'[a]ny person injured in his business or property by reason of a violation of section 1962[.]'" *Lerner v. Colman*, 26 F.4th 71, 77 (1st Cir. 2022) (quoting 18 U.S.C. § 1964(c)). Plaintiff's RICO claim is based on § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce," from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). "Accordingly, the four key elements of a RICO claim (which also constitute the underlying substantive offense for a RICO conspiracy claim) are: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Efron*, 96 F.4th at 437 (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)).

As stated above, plaintiff alleges that the racketeering activity consisted of violations of the criminal wire fraud statute, 18 U.S.C. § 1343. A complaint which "rais[es] RICO claims predicated on mail and wire fraud must satisfy Rule 9(b)'s particularity requirements" in that it "'must state the time, place and content of the alleged mail and wire communications perpetrating that fraud.'" *Efron,* 96 F.4th at 437 (quoting *Douglas*, 63 F.4th at 55 n.7 (1st Cir. 2023)). The First Circuit has emphasized that RICO claims resting on mail or wire fraud predicates "must be particularly scrutinized" given the "relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000); *Efron*, 96 F.4th at 437.

To establish wire fraud, plaintiff must show "(1) 'a scheme to defraud using false pretenses,' (2) 'the defendant's knowing and willing participation in the scheme with the intent to defraud,' and (3) 'the use of [wires] in furtherance of that scheme.'" *Humana Inc. v. Biogen, Inc*., 126 F.4th 94, 103 (1st Cir. 2025) (quoting *United States v. Simon*, 12 F.4th 1, 33 (1st Cir. 2021)); *see* 18 U.S.C. § 1343. "In particular, 'the scheme <u>must be intended to deceive</u> another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct.'" *Efron*, 96 F.4th at 438 (quoting *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990)) (emphasis in original).

Only two wire fraud allegations in the PAC comport with Rule 9(b)'s time, place, and content particularity requirements: Musser's January 24, 2023 internal email and the May 2, 2023 press release.[14] *See* #28-1 ¶ 128. Musser's January 24, 2023 email does not constitute wire fraud. The email to Expeditors' senior leadership draws attention to the company's overstaffing and calls on company management to quickly reduce personnel costs by "trimming [their] current underperforming staff" so as to "prevent" any future layoffs. *Id.* ¶ 125. There is no "intent to

---

[14] Conclusory allegations in the PAC, such as defendant "engaged in a pattern of racketeering activity through the repeated use of interstate and international wires[,]" its managers triggered "communications containing manufactured negative performance reviews" and "contrived misconduct allegations and related disciplinary proceedings[,]" *id.* ¶¶ 4, 212*,* or plaintiff's "belie[f] that additional emails and communications were sent between [defendant's] leadership and its subsidiaries . . . to coordinate the scheme globally[,]" *id.* ¶ 128, are too vague to meet the pleading standards which govern civil RICO claims based on wire fraud. *Lerner*, 26 F.4th at 85 (affirming dismissal where complaint's conclusory, nondescript allegations could not support a viable RICO claim predicated on mail and wire fraud).

In addition, plaintiff's allegations concerning the "fraudulent billing scheme" defendant allegedly perpetrated cannot serve as predicate acts. (#28-1 ¶¶ 96, 301.) While he claims that defendant transmitted "fraudulent and improper charges . . . via interstate wires and/or mail" to clients in violation of 18 U.S.C. § 1343, plaintiff acknowledges that this scheme was "not directly related to the covert termination scheme," and he does not allege to have suffered any harm from it. *Id.* ¶¶ 300-01.

deceive" in the email. *Efron,* 96 F.4th at 438.[15] Musser does not outline the details of an illicit scheme to defraud employees of certain employment benefits; in fact, his email makes clear that any management decisions "must all be backed up with appropriate reviews and documentation[.]" (#28-1 ¶ 125.) The same holds true for the alleged May 2, 2023 press release, in which Musser represented that defendant was "adapting and working diligently to bring expenses in line with lower revenue by lowering headcount and payroll expenses ***without resorting to layoffs***." *Id.* ¶ 127.

The RICO statute "provides no cause of action to individuals injured by acts other than criminal RICO violations." *Nodine v. Textron, Inc.*, 819 F.2d 347, 349 (1st Cir. 1987). Because these two emails, the only allegations in the PAC that satisfy Rule 9(b)'s requirements of particularity, do not sufficiently constitute a violation of the wire fraud statute, the RICO claim is futile. *See Efron,* 96 F.4th at 438 (holding that proposed civil RICO claim properly dismissed as futile, where other than "conclusory allegations as to [defendant's] fraudulent intent," the proposed complaint "d[id] not credibly suggest that [defendant] acted with specific intent to deceive"); *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 156 (D. Mass. 2023) ("Courts have routinely held that generalized statements concerning mailings or wire communications are not sufficient to satisfy the pleading requirements [of mail and wire fraud predicates in civil RICO actions]"), *aff'd,* 126 F.4th 94 (1st Cir. 2025); *Norfe Grp. Corp. v. R.Y. Espinosa Inc.*, Civil Action No. 19-1897 (BJM), 2021 WL 5235119, at *5 (D.P.R. Nov. 9, 2021) (dismissing RICO claim where, even accepting plaintiff's allegations as true, the email communication he claimed amounted to a predicate act of wire fraud in fact "suggest[ed] no continuing plan or scheme to defraud [him]");

---

[15] The fact that in the email, Musser states that the company has never had a policy of not laying people off does not transform the email into a fraudulent one. Whether the company had such a policy does not matter, as Musser is not advocating laying any employees off.

*Grassick v. Holder,* Civil Action No. 09-587-PB, 2012 WL 1066691, at *6 (D.R.I. Mar. 28, 2012)

("That [plaintiff's] supervisors used mail and email and made statements she believe[d] untruthful

d[id] not turn [her] employment claims into mail and wire fraud criminal offenses.").[16]

The court need not reach any other issue concerning the proposed RICO count. The RICO

count should be dismissed.

### 3. Proposed Count VIII (RICO Conspiracy Violation - 18 U.S.C. § 1962(d))

Plaintiff's proposed Count VIII alleges that defendant, its subsidiaries, and other

individuals conspired to violate 18 U.S.C. § 1962(c). (#28-1 ¶¶ 374-75.) Because the proposed

substantive RICO claim in Count VII fails, so too does the RICO conspiracy claim. *See Embassy*

*Suites (P.R.), Inc.*, 223 F.3d at 21 ("[I]f the pleadings do not state a substantive RICO claim upon

which relief may be granted, then the conspiracy claim also fails[.]") (additional citations omitted).

This count should be dismissed.

### 4. Proposed Count IX (Interference with Contractual Relations)

In proposed Count IX, plaintiff alleges that Peveri and Brian, who were aware of his "valid

and enforceable" contractual relationship with Expeditors, intentionally interfered with it and

"acted with malice, outside the scope of their employment, and in violation of the Code." (#28-1

¶ 382.) They did so by, among other things, "[f]abricating performance deficiencies and

exaggerating complaints" about him "without providing specifics"; "[s]tripping [him] of his

---

[16] Even assuming that Musser's email and his direction that managers trim underperforming staff set in motion a series of wrongful terminations, nothing in the email plausibly suggests a scheme to deceive or cheat in the manner contemplated by the criminal wire fraud statute. *See Subramanian v. Tata Consultancy Servs.*, 352 F. Supp. 3d 908, 918 (D. Minn. 2018) (dismissing civil RICO claim premised on alleged wire fraud predicate; even if defendant's alleged conduct, which involved the use of wire communications "to facilitate a scheme to avoid liability under state and federal employment laws by devising and communicating a false pretext for [plaintiff's] termination," in fact subjected it to liability under these laws, it did not "fall within the scope of criminal liability required for mail or wire fraud").

managerial responsibilities" and replacing him with a less qualified employee "based on favoritism and discriminatory intent"; reducing his compensation "without cause or justification"; "accusing [him] of misconduct and fabricating a disciplinary letter containing false statements about his behavior"; and taking other actions intended to "undermine [his] employment relationship with [E]xpeditors . . . , for reasons unrelated to the company's legitimate business interests." *Id.* ¶¶ 380-91.

To assert a claim of intentional interference with contractual relations, a plaintiff must sufficiently allege that 1) he had a contract with a third party, 2) defendant knowingly induced that third party to violate the contract, 3) the interference was intentional and improper in motive or means and 4) plaintiff was harmed by defendant's actions. *Kahalas v. Schiller*, 164 F. Supp. 3d 241, 245 (D. Mass. 2016) (citing *G.S. Enters., Inc. v. Falmouth Marine, Inc.,* 571 N.E.2d 1363, 1369 (Mass. 1991)).

Plaintiff's proposed claim fails because he does not sufficiently allege that he had a contract with Expeditors. There is no question that plaintiff was hired as an at will employee. (#28-1 ¶ 19.) Plaintiff alleges, however, that the Code, insofar as it obligated Peveri and Brian to act "in good faith, with honesty, integrity, fairness, and objectivity in their dealings with other employees . . . [and] prohibited retaliation, favoritism, and discriminatory behavior," constituted an employment contract that modified the terms of his at will employment. *Id.* ¶¶ 335, 384.

In *Hinchey v. NYNEX Corp.*, the First Circuit explained that "[t]here is no explicit test or 'rigid list of prerequisites' to aid in ascertaining if a personnel manual comprises a binding contract under Massachusetts law." *Hinchey,* 144 F.3d at 141 (citing *O'Brien v. New England Tel. & Tel. Co.,* 664 N.E.2d 843, 847 (Mass. 1996)). Instead, courts consider the non-dispositive factors articulated by the Massachusetts Supreme Judicial Court ("SJC") in *Jackson v. Action for Boston*

*Community Development, Inc.,* 525 N.E.2d 411, 415-16 (Mass. 1988). *Id. Jackson* held that a personnel manual did not create an implied contract where: "1) the employer retained the right to unilaterally modify terms; 2) the terms of the manual were not negotiated; 3) the manual stated that it provided only guidance regarding the employer's policies; 4) no term of employment was specified in the manual; [and] 5) the employee did not sign the manual to manifest assent." *Hinchey*, 144 F.3d at 141 (citing *Jackson,* 525 N.E.2d at 415-16*)*.

In *O'Brien*, decided eight years after *Jackson*, the SJC adopted a "functional approach" to the analysis, looking beyond the *Jackson* factors to consider the totality of the facts. *Sylvain v. Spaulding Rehab. Hosp. Corp.*, No. 15-5475-D, 2016 WL 1125940 at *4 (Mass. Super. Mar. 23, 2016). For example, the *O'Brien* court found that where the defendant company had a "robust history of adhering to the terms of its handbook's grievance procedure," it had not reserved the right to modify the manual's provisions unilaterally, and it had not specified that it could discharge employees without cause, the plaintiff could reasonably have relied on the handbook as granting contractual rights. *Id.* (citing *O'Brien*, 664 N.E.2d at 848-49).

Here, the Handbook, of which the Code is a part, states that the company has the right to "amend, change or terminate any policy or benefit plan without the consent of any employee"; the Handbook does not "purport to cover all situations and circumstances"; policies and guidelines in the Handbook do not "create any contract or employment rights"; Expeditors and its employees may terminate employment at any time without cause or notice; and the at will employment relationship may not be changed except by written agreement. (#49-1 at 3.) These statements and disclaimers are written in plain English and are featured prominently on the first page of the Handbook.

The court considers the fact that not one of the *Jackson* factors supports a finding that the

Handbook, or the Code contained in it, constitutes a binding contract. *See Sylvain*, 2016 WL 1125940, at *6 (while not dispositive, *Jackson* factors "inform whether a reasonable employee could view the terms of a handbook as embodying contractually enforceable promises"). There are no additional facts alleged which support a finding that the Handbook constitutes a contract. The court notes that the Handbook contains unequivocal disclaimers that are prominently displayed. *See id.* (holding that employee handbook did not constitute contract where none of *Jackson* factors were satisfied and complaint set out no other basis for finding that handbook created contractual commitments); *Bell v. Rinchem Co., Inc.*, Civil Action No. 4:14-40177-TSH, 2014 WL 11290899, at *14 (D. Mass. Feb. 11, 2016) (holding that handbook was not a valid employment contract where all but one of the *Jackson* factors militated against it and no other facts supported finding the handbook was an employment contract); *compare Ferguson v. Host Int'l., Inc.*, 757 N.E.2d 267, 272 (Mass. App. Ct. 2001) (holding that where disclaimer was limited in substance and buried in "fine print" of handbook, employee could reasonably expect defendant company to adhere to system that was set out for progressive discipline and guarantee of fair treatment). Plaintiff's allegations that company officials referred to the Code as the "constitution" of the company and that the Code was followed do not mean that the Code altered the at will employee relationship that the Handbook clearly sets out. (#28-1 ¶¶ 22, 36).

In sum, because the PAC does not sufficiently plead that there was any enforceable contract, this claim should be dismissed.

5. Count X (Interference with Advantageous Relations)

In proposed Count X, plaintiff alleges that Peveri and Brian intentionally interfered with his "advantageous business relationship" with Expeditors. *Id.* ¶¶ 392-94. Plaintiff claims that Peveri and Brian, through "actual malice" and their "deliberate intent to harm [his] advantageous

26

business relationships[,]" fabricated "pretextual performance deficiencies to justify his demotion

and termination"; reduced his compensation without justification; and created a "hostile work

environment designed to provoke [him] into committing an infraction that could be used to justify

his termination." *Id.* ¶¶ 395-97. Defendant argues that the proposed count is futile where plaintiff

has failed to sufficiently allege that either Peveri or Brian acted with actual malice, a necessary

element. (#54 at 15-17.)

> Success on this claim requires that a plaintiff prove that:
>
> (1) he had an advantageous relationship with a third party . . . ; (2) the defendant
> knowingly induced a breaking of the relationship; (3) the defendant's interference
> with the relationship, in addition to being intentional, was improper in motive or
> means; and (4) the plaintiff was harmed by the defendant's actions.

*Bresler v. Muster*, --- N.E.3d ---, No. SJC-13576, 2025 WL 1521578, at *4 (Mass. May 29, 2025).

An employee may not sue his employer for interfering with its own business relations.

*Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 632-33 (Mass. 2001). A supervisor, however, "may

be personally liable if he tortiously interferes with a subordinate's employment relationship."

*Zimmerman v. Direct Fed. Credit Union,* 262 F.3d 70, 76 (1st Cir. 2001) (additional citation

omitted). To make out such a claim, a plaintiff must show, as to improper motive or means, "that

'actual malice' was the controlling factor in the alleged interference[.]" *Bresler*, 2025 WL

1521578, at *4 (quoting *Weber v. Cmty. Teamwork, Inc.*, 752 N.E.2d 700, 715 (Mass. 2001));

*Chacon v. Brigham & Women's Hosp.*, 99 F. Supp. 3d 207, 218 (D. Mass. 2015).

Actual malice means something more than "mere hostility[,]" *Zimmerman*, 262 F.3d at 76,

or "personal dislike[.]" *King v. Driscoll*, 638 N.E.2d 488, 495 (Mass. 1994). It is defined as "a

'spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" *Cariglia v. Hertz

Equip. Rental Corp.*, 363 F.3d 77, 88 (1st Cir. 2004) (quoting *Shea v. Emmanuel College,* 682

N.E.2d 1348, 1351 (Mass. 1997)). "[T]he elements underlying a claim for unlawful discrimination

may be used to demonstrate malice" in this context. *Zimmerman,* 262 F.3d at 77 (citing *Comey v. Hill*, 438 N.E.2d 811, 817 (Mass. 1982)).

Defendant maintains that plaintiff's allegations against Peveri do not "rise to the level of severity or specificity required to establish actual malice" and fail to show that her actions "were driven by spite or malevolence" rather than "routine employment decisions[.]" (#54 at 16.) Similarly, as to Brian, defendant argues that plaintiff's "only specific allegation" against him— that he "'became extremely angry and said you no longer have a job at Expeditors and yelled get the f[-]ck out of my office'"—falls "well short" of that standard. *Id.* at 17 (quoting #28-1 ¶ 194).

While conceding that this is a very close question with regard to both Peveri and Brian, the court disagrees. Plaintiff's allegations against Peveri set out the actions she allegedly took against him: telling him she had received complaints about him without providing any specifics; fabricating negative performance reviews; discriminating against him because of his sex by telling him a woman would do a better job in his position than he did and then replacing him with a woman who was less qualified than he was; demoting him and assigning him to work in a warehouse doing manual labor; failing to put him on a PIP or give him any chance to redeem himself; and failing to document any of his negative job changes in his personnel file. Plaintiff further alleges that in his meeting with Peveri and Brian, Peveri responded sarcastically when he tried to discuss applying for a new position and then abruptly left the room. After the meeting, Peveri allegedly generated a letter which falsified the basis for his termination and mischaracterized the events of their February 5, 2024 meeting.

Taken in their entirety, these allegations plausibly suggest that "actual malice" was the controlling factor in Peveri's conduct in unfairly targeting plaintiff, making up performance issues, putting false documents in his personnel file, failing to document negative employment actions in

his file, and taking unwarranted adverse actions against him. *See Lawrence v. Next Ins., Inc.*, ---
F. Supp. 3d. ---, 2025 WL 815066, at *16 (D. Mass. Mar. 13, 2025) (allegations which supported
plaintiff's sex-based discrimination and retaliation claims supported her interference claim, along
with other facts suggesting malice which were "considered collectively," and which helped
plaintiff "clear[] the low plausibility bar" and demonstrate that her motion to amend was not futile)
(cleaned up) (additional citation omitted); *Mailhiot v. Liberty Bank & Trust Co*., 510 N.E.2d 773,
776 (Mass. App. Ct. 1987) (fabricated allegations supported inference of malice). Actions such as
falsifying documents concerning employee discipline cannot be said to be related to any legitimate
corporate interest of Expeditors. *Compare Kelleher v. Lowell Gen. Hosp*., 152 N.E.3d 126, 133-
34 (Mass. App. Ct. 2020) (holding that allegations did not support an inference that defendants
had "malignant purpose" unrelated to any "corporate interest" where supervisor's interactions with
plaintiff were animated by concerns "about the quality or usefulness of the plaintiff's work").

Plaintiff's allegations against Brian are more sparse and allowing the motion to add this
count against him is an even closer call. Brian, however, was Peveri's supervisor and one may
infer from the PAC that he knew what actions Peveri had taken against plaintiff. At the meeting,
as alleged, Brian watched while Peveri left and then he swore at and fired plaintiff. It is reasonable
to infer that as alleged in the PAC, his conduct, in failing to help plaintiff and acting in tandem
with Peveri, ending with his abruptly terminating plaintiff's employment, "was not merely
negligent or misguided, but driven by actual malice." *Bresler*, 2025 WL 521578, at *6 (citing, and
then quoting, *Gram v. Liberty Mut. Ins. Co.*, 429 N.E.2d 21, 24-25 (Mass. 1981) for the proposition
that "[t]here might be sufficient proof that spite or ill will was the controlling factor . . . derived
from a rational inference of probabilities from established facts") (additional quotation and citation
omitted). The court finds that this claim is sufficiently pled against Brian.

Plaintiff has plausibly alleged an interference with advantageous business relations claim against both Peveri and Brian, and the court recommends that the motion to amend be allowed on this Count.[17]

B. Fed. R. Civ. P. 8

Defendant contends that the PAC violates Fed. R. Civ. P. 8's requirement of a "short and plain statement" of the relief that plaintiff seeks. (#54 at 20.) As this argument mainly concerns the 148 paragraphs of the PAC that support the RICO claims, and this court recommends that those claims be dismissed, the court will not address defendant's Rule 8 arguments.

V. Conclusion

For the above reasons, the court recommends that plaintiff's motion to amend (#28) be allowed with respect to proposed Count X, but denied with respect to proposed Counts V, VII, VIII, and IX.[18]

June 12, 2025                                              /s/ M. Page Kelley
                                                          M. Page Kelley
                                                          United States Magistrate Judge

---

[17] The court finds that joining Peveri and Brian under Rule 20(a)(2) is appropriate as the factual and legal issues underlying proposed Count X overlap with existing claims. *See APB Realty v. Lebanon & Blue Mt. Ry., LLC,* Civil Action No. 21-11347-MLW, 2023 WL 4562960, at *5 (D. Mass. Apr. 11, 2023).

[18] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to this Report and Recommendation must file specific written objections with the Clerk within fourteen (14) days of receipt of this Report and Recommendation. The objections must specifically identify the portion of the Report and Recommendation to which objections are made and state the basis for such objections. A party's failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review. *See Santos-Santos v. Torres-Centeno*, 842 F.3d 163, 168–69 (1st Cir. 2016).