UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:24-CV-12142

MICHAEL CARRABES,
Plaintiff,
v.

EXPEDITORS INTERNATIONAL OF WASHINGTON, INC., TRACY PEVERI AND BRIAN CARRABES,

Defendants.

**PLAINTIFF'S OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Introduction**

When the defendant, Tracy Peveri removed Michael Carrabes from his position of District Sales Manager for Expeditors International of Washington, Inc. she told him that, "A female would be a good person to have in this position, as they pose just different qualities that a guy doesn't on" -- "in communicating with the team." She also stated, "Oh, by the way, I believe a female would do better at your position." Michael Carrabes was replaced on the Expeditors' sales team by Nancy Bowie, a woman and friend of Tracy Peveri.

When Michael Carrabes later met with Tracy Peveri to ask about alleged complaints about him, Tracy Peveri replied, "Let's move on," and added, "Mike who really likes you at the branch?"

When Michael Carrabes met with Tracy Peveri and her boss, Brian Carrabes, in February 2024 to discuss alleged complaints about him, Tracy Peveri said to Michael Carrabes, "What have you really done at this company? Mike, you'll be fine. You don't have family." Tracy Peveri then left the meeting after ten to twenty seconds. Next, Michael Carrabes asked Brian Carrabes, his brother, whether there were any complaints in his personnel file to which Brian

Carrabes responded, "How dare you kind of come in here and ask questions?" He added, "Get the fuck out of here. You no longer have a job at Expeditors."

Tracy Peveri wrote on February 6, 2024, that Michael Carrabes's employment with Expeditors "is terminated immediately," due to unprofessional and threatening behavior.

The Plaintiff has established a prima facie case of sex discrimination and has raised questions of fact as to actual malice on the part of both Tracy Peveri and Brian Carrabes to support his claims of intentional interference with advantageous business relations. The Defendants' motion for summary judgment should be denied.

The Plaintiff provides with this opposition the *Affidavit of David W. Heinlein* ["*Heinlein Aff.*"] with Exhibits 1 through 10, which are incorporated by reference.

**Factual Background**

As of July 1, 2010, the Plaintiff, Michael Carrabes was employed by the Defendant, Expeditors International of Washington, Inc. ["Expeditors"] as a District Sales Manager ["DSM"]. *Heinlein Aff., Ex. 1*. He was selected for the position of DSM by the Defendant, Tracy Peveri ["Peveri"], the District Manager ["DM"], *Heinlein Aff., Ex. 2 (Deposition of Michael Carrabes ["MC"]),* p.38. He served in that position until he was fired by the Defendant, Brian Carrabes on February 5, 2024. *Id.,* pp. 178, 186. Peveri by letter dated February 6, 2024, told the Plaintiff that his "Employment at Expeditors is terminated immediately," *Heinlein Aff., Ex. 3, (Letter of Reprimand)* "[d]ue to your unprofessional and threatening behavior." *Id*.

During his tenue with Expeditors, the Plaintiff would receive annual performance evaluations. Peveri, as the Plaintiff's immediate supervisor, conducted these evaluations. When Peveri performed performance evaluations of the Plaintiff, she was accurate, *Heinlein Aff., Ex.4*

*(Deposition of Tracy Peveri, ["TP"]),* p. 209, honest, *id.*, and included the most salient information about his job performance. *Id.*, pp. 209-210.

For his 2020 Employee Performance Evaluation ["EPE"], Peveri wrote under "Exceptional Customer Service," "Michael has done a great job promoting customer development and champions customer engagement through meetings and training." *Heinlein Aff., Ex.5*. Under "Reliability," Peveri wrote, "Michael takes full ownership of his team." *Id*. For the category entitled, "Collaboration," Peveri wrote, "Michael works well with his peer (sic) and team." *Id*. Under communication, Peveri wrote, "Michael displays both professional verbal and written skills." *Id*. Within a "Peer Feedback," section, Brad Muller "(Stakeholder)" wrote,

> Mike is a great Sales Manager. He cares for his team and provides guidance that drives performance. He supports the network and is always willing to participate in projects. He supports our Sales program as it evolves and he is always open to change.

*Id*. Jenna Connors, a member of the Plaintiff's sales team, wrote,

> From my experience, Michael is readily available to support my requests and respects when I escalate concerns or challenges to him. We have a strong working relationship and he allows me independence in the Sales Operations role & we collaborate on many projects. He holds me accountable to expectations and yet allows me to be creative, which is greatly appreciated. His perspective is appreciated, as he shares experience and information learned on Sales program calls. I find all of these attributes to be strengths.

*Id*.

In his 2021 EPE, under "Exceptional Customer Service," Peveri wrote, "Michael and team are focused on delivering a great customer experience." *Heinlein Aff., Ex. 6*. Under "Job Execution," Peveri wrote, "Michael meets all job expectations." *Id*. For "Reliability," Peveri noted, "Michael is well organized and does not miss any deadlines." *Id*. For "Collaboration," Peveri wrote, "Michael works well with peers/customers and team." *Id*. Under "Communication," Peveri states, "Michael is always professional and timely with both written

and verbal communication." *Id*. Under "Employee Development," Peveri wrote, "Ensures team is receiving 1-1/reviews and training." *Id*.

In October 2022, Peveri told the Plaintiff that he was going to be removed from the DSM position. *MC*, p.127, *TP,* 17-18. She told the Plaintiff that she received complaints about him working with others on his team. *MC*, p.127. During the conversation, Peveri told the Plaintiff, "Hey, I think a female would be a good person to have" -- "A female would be a good person to have in this position, as they pose just different qualities that a guy doesn't on" -- "in communicating with the team," or things to that effect." *Id.*, p.128. When the Plaintiff asked what the complaints about him were, Peveri replied, "Mike don't say anything." *Id*.

> Q. What did you say when Tracy said she thought a female would be better in the position?
>
> A. At the time I really was more concerned with that I just lost my job than that she actually said a female would be better at this position. And so I was really focusing on more of what just happened, what are the complaints. And then it was just odd to me that, "Oh, by the way, I believe a female would do better at your position," which was odd to me.

*MC*, p.129.

Before this time, Peveri had never come to the Plaintiff to discuss anything he needed to improve upon as a DSM. *MC*, p.131. The Plaintiff did approach Peveri about her comment in October 2022 that she had received complaints about him as a DSM. Michael Carrabes had a call with Peveri in December-January, after his demotion. *Id.*, p. 141.

> Q. What exactly did you say to Tracy?
>
> A. "What did I do" -- along the lines of "What did I do wrong to get demoted? What were the complaints? Can you share the complaints." Because I don't know how to -- because I wanted to address it or try to fix it. And that's where I was confused or, like, "Okay, there was complaints, something that I'm not doing. What are they, and why didn't I get the opportunity to fix whatever those complaints were?"

Q. What did Tracy say when you asked what the complaints were?

A. "Let's move on."

Q. That's it?

A. That's it. "Let's move on." And then at one of the meetings it was, "Hey, let's move on, Mike. It is what it" -- like, "We've just got to move on."

At that point it started to get like, you know, comments of, like, "Mike, who really likes you at the branch?," which I was like, "Okay. I don't know how to answer that, like who likes me at the branch." And, you know, then soon after that, like during, like, a conversation it would be like, you know, "Nancy Bowie poses a lot of these attributes of collaborating with the team, building up the team, communication skills."

*Id.*, pp.141-142.

Peveri then met with the Plaintiff on November 21, 2022, to discuss his 2022 EPE. *TP*, p. 222, *Heinlein Aff., Ex. 7*. This review was conducted *after* Peveri told the Plaintiff that he was being removed from the DSM position. *See, TP*, pp. 17-18. In that review, for the first time, Peveri notes that "Michael needs to work on district engagement and organizing of the weekly sales meeting," *Ex. 7*, "Michael works well with district management team but would like to see better collaboration with his team," *id.*, and, "Michael is professional with his written communication – would like to see that he builds better communication with the sales team." *Id*. There was no "Peer Feedback" in the 2022 EPE as was present in other, prior reviews. Compare, *Ex. 5*.

Michael Carrabes then began working in the warehouse at Expeditors.

Q. What were you doing in the warehouse?

A. Moving boxes, taking one box and moving it to another area, sort and seg different Skus and POs. Whatever -- well, Jennifer Muise was the distribution manager at the time, and she had me work with one of her -- I believe it was the supervisor in the warehouse, so kind of reported, went to him. And he would be like, "Do this, Mike," or, "Hey, wait a couple of hours. We've got nothing at this time for you to help with." So he was kind of my go-to person to report to on what to do.

Q. Were you doing anything else other than working in the warehouse?

A. Did I do anything else?

Q. Yeah, at this time?

A. No.

*MC*, p.157.

After the first meeting during which Peveri demoted the Plaintiff from his DSM position there were more than five other meetings between Peveri and the Plaintiff. *Id.*, p.145. Peveri did not discuss any other positions within Expeditors, *id.*, and Peveri did not suggest that the Plaintiff apply for any other positions within Expeditors. *Id*. Further, Peveri never told the Plaintiff, "what any of the complaints were from the sales team." *Id*.

Tracy Peveri reports to Brian Carrabes, but she runs the branch. *Heinlein Aff., Ex.8 (Deposition of Brian Carrabes, ["BC"]),* p. 207. "She controls who she hires, who she fires, who she wants." *Id*.

As of December 23, 2022, Michael Carrabes was paid a bonus of $432,140.18 for the year 2022. *Heinlein Aff., Ex. 9.*

As of December 22, 2023, Michael Carrabes was paid a bonus of $166,707.25 for the year 2023. *Heinlein Aff., Ex. 10.*

Towards the end of 2023 or early 2024, the Plaintiff invited Peveri and Brian Carrabes to a meeting to discuss his treatment at Expeditors and to address the alleged complaints about his job as the DSM.

Q. Did you tell her why you wanted to meet together?

A. So we could get on the same page, why I was being treated this way, you know, so unfairly. And from the beginning of my demotion up until that point, I wanted to talk to them and see what was going on.

***

Q. So then what did you want to accomplish with this meeting?

> A. Because I wasn't getting answers from Tracy of some of the -- what I would bring up of why I'm being treated so unfairly, the comments, the complaints, what are the complaints. So I was asking Tracy for information on those types of questions that I had.
>
> Q. And why did you want your brother to be part of that meeting?
>
> A. He's the RVP. He's Tracy's boss. So he was kind of the next -- he oversees the Boston branch and the region, the Northeast Region. So he's my natural escalation point.

*MC*, pp.172-174. The meeting took place on February 5, 2024, in the office of Brian Carrabes. *Id.*, p.176. When the Plaintiff arrived at the meeting Peveri and Brian Carrabes were already in Brian Carrabess' office. *Id*. Michael opened the meeting and asked if they had any information about an aviation position in the company for which Michael Carrabes had applied. *Id*. Peveri "sat back in her chair, crossed her arms and said, 'Mike, why don't you tell us the status of your interview.'" *Id.*, p.177. Brian Carrabes responded, "I haven't heard anything, Mike." *Id.*, p.177. The Plaintiff then asked the group why he was being treated unfairly, "[w]hat did I do so terribly that I got demoted? I don't have a job." *Id*. Peveri responded, "What have you really done at this company? Mike, you'll be fine. You don't have family." *Id*. Peveri then left the meeting ten to twenty seconds after it began. *BC,* p.245.

The meeting continued between Michael Carrabes and Brian Carrabes. The Plaintiff asked Brian Carrabes, "What was that all about. This is crazy." *MC*, p.177. Brian Carrabes did not respond, *id.*, so Michael Carrabes added, "Hey, there's a Code of Conduct we all follow at Expeditors. We treat fairly, integrity, there's honesty. [Peveri] is not doing any of that, Brian. Like, what's going on?" *Id.*, pp. 177-178. The Plaintiff then asked Brian Carrabes, "What's in my personnel file? Are there complaints in my personnel file? Can I see my personnel file." *MC*, p.178. Brian Carrabes then gets mad and aggravated because the Plaintiff was asking questions. *Id*. Brian Carrabes replies, "How dare you kind of come in here and ask questions?" *Id.* And he

said, "Get the fuck out of here. You no longer have a job at Expeditors." *Id*. Brian Carrabes raised his voice when he said to the Plaintiff, “to get the fuck out and that "You no longer have a job at Expeditors." *Id.*, p.185.

> Q. And when he told you to get the fuck out because you no longer had a job at Expeditors, what did you say to him?
>
> A. Well, he got out of his seat, walked past me and pointed to the door and said, "Get the fuck out. You no longer work here." So it was getting up out of his seat, he opened the door, and then I walked out.

*Id.*, p.186.

In addition to the comment from his brother, Peveri also wrote the Letter of Reprimand dated February 6, 2024, which indicates that the Plaintiff’s employment with Expeditors was “terminated immediately,” due to his “unprofessional and threatening behavior.” *Ex.3*.

**Legal Standard**

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence "in the light most favorable to the nonmovant" and draw all reasonable inferences in Plaintiff's favor. Rodríguez-Cardí v. MMM Holdings, Inc., 936 F.3d 40, 46-47 (1st Cir. 2019).

This is "no less true in discrimination and retaliation cases where motive is at issue." Pina v. The Children's Place, 740 F.3d 785, 796 (1st Cir. 2014). At the summary judgment stage in employment discrimination cases, a plaintiff need only present "definite, competent evidence" sufficient to establish the elements of the claim. Id. at 795-96.

**Argument**

The Plaintiff has brought claims for discrimination based upon sex, for wrongful termination and for intentional interference with advantageous business relations. The

Defendants seek summary judgment for all claims, and the Plaintiff maintains that there exist genuine issues of material fact which warrant denial of the Defendants' motion and which allow the Plaintiff to proceed to trial.

**A. The Plaintiff's Sex Discrimination Claims**

> Title VII of the Civil Rights Act of 1964 forbids a covered employer from 'discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.'

Burns v. Johnson, 829 F.3d 1, 8 (1st Cir. 2016) "A plaintiff may demonstrate a sex discrimination claim with circumstantial evidence through the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)" Id.

> Under *McDonnell Douglas,* the burden falls initially to a plaintiff to set forth a *prima facie* case of discrimination. 411 U.S. at 802. A properly-established *prima facie* case gives rise to an inference of discrimination. *See Ingram v. Brink's, Inc.,* 414 F.3d 222, 230 (1st Cir.2005). The burden then shifts to an employer to provide a legitimate, nondiscriminatory reason for its decision. *Id.* 'If the employer does so, the burden of production reverts to the plaintiff, who must then prove that the employer's neutral reasons were actually a pretext for the alleged discrimination.' *Id.*

Laporte v. Lab'y Corp. of Am. Holdings, No. CIV. 13-12084-FDS, 2014 WL 2818591, at *8 (D. Mass. June 20, 2014).

> The plaintiff then must have an opportunity to prove by a preponderance of the evidence that the defendant's proffered reason was merely a pretext for discrimination. If she successfully demonstrates that such a pretext exists, she has proven defendant's commission of a Title VII violation; if she fails to do so, the presumption of discrimination drops from the case. [internal citations omitted] Plaintiff's burden of persuasion, retained throughout, would then 'merge [ ] with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Burdine,* 450 U.S. at 256, [], citing *McDonnell Douglas,* 411 U.S. at 804-05, [].

Fields v. Clark Univ., 966 F.2d 49, 51–52 (1st Cir. 1992).

In this case, there is no dispute based upon the evidence that Michael Carrabes suffered an adverse employment action based upon his sex. Tracy Peveri, the Plaintiff's direct supervisor told him that he was being removed as the District Sales Manager "because a female would be a good person" to "have in this position, as they pose just different qualities that a guy doesn't on" -- "in communicating with the team," or things to that effect." *MC*, p. 128. When the Plaintiff asked a follow-up question, he was told by his boss, "Mike don't say anything." *Id*. When asked at his deposition by Ms. Peveri's lawyer, "What did you say when Tracy said she thought a female would be better in the position?," *id.*, he answered:

> At the time I really was more concerned with that I just lost my job than that she actually said a female would be better at this position. And so I was really focusing on more of what just happened, what are the complaints. And then it was just odd to me that, 'Oh, by the way, I believe a female would do better at your position,' which was odd to me.

*MC*, p. 129. When Plaintiff later asked Peveri what the complaints about him were, she responded only with "Let's move on." *Id.*, p. 142. When Plaintiff persisted, Peveri began making comments such as "Mike, who really likes you at the branch?," *id.*, p. 142, and praising Nancy Bowie's attributes: "Nancy Bowie poses a lot of these attributes of collaborating with the team, building up the team, communication skills." *Id*. Michael Carrabes was, in turn, replaced with a female District Sales Manager, Nancy Bowie.

This is evidence of discriminatory animus from the decisionmaker who removed Plaintiff from his position. A supervisor's statement that a woman would be better suited for a position, made in the direct context of removing a male employee and replacing him with a female employee, is powerful evidence that the adverse action was motivated by sex. Here, Peveri's own words establish that sex was part of her calculus. See, *Desert Palace, Inc. v. Costa*, 539 U.S. 90

(2003) (affirming use of conventional rules of civil procedure in Title VII cases including use of direct and circumstantial evidence to prove case by a preponderance of the evidence).

The Defendants' efforts to provide a non-discriminatory reason for the Plaintiff's demotion and subsequent firing are pretextual on their face. First, prior to being removed as the DSM by Peveri on October 7, 2022, the Plaintiff only received positive performance evaluations and Peveri never told the Plaintiff about any alleged complaints about his management style. It was not until Peveri authored his performance evaluation after meeting with the Plaintiff on November 21, 2022, that she began to fabricate complaints about "engagement," "organizing," and "communication." *Ex. 7*. In 2022, the Plaintiff received bonuses in excess of $430,000.00 as opposed to the following year bonuses of approximately $166,000.00. Compare, *Exs. 8 & 9*.

It is only since the inception of this lawsuit that the Defendants' have conjured job-related issues as the justification for their actions. Tracy Peveri was asked whether she had any notes of conversations she had with members of the Plaintiff's sales team and she stated that she kept notes in composite notebooks. *TP*, pp. 155-158. She has not produced any. The only document which the Defendants have produced is the "Letter of Reprimand," *Ex. 3*, in which Peveri writes, "Due to your unprofessional and threatening behavior, your employment at Expeditors is terminated immediately." *Ex. 3*. Peveri, in her February 2024 letter, unlike in this motion and unlike in the affidavit she submits in support of the motion (and prepared after he deposition was taken), says nothing of complaints by co-workers, lack of engagement with his team, poor organizational skills or a lack of communication.

Further, the Defendants submit the affidavit of Jenna Connors, *Doc. No. 123*, in support of their motion who states, "During this time, each member of the sales team came to me and

complained about Mike's treatment of the team." *Doc No. 123*, ¶19.[1] This is the same Jenna Connors who in connection with the Plaintiff's 2020 performance evaluation wrote:

> From my experience, Michael is readily available to support my requests and respects when I escalate concerns or challenges to him. We have a strong working relationship and he allows me independence in the Sales Operations role & we collaborate on many projects. He holds me accountable to expectations and yet allows me to be creative, which is greatly appreciated. His perspective is appreciated, as he shares experience and information learned on Sales program calls. I find all of these attributes to be strengths.

*Ex. 5*.

Plaintiff's positive performance evaluations in 2020 and 2021 are inconsistent with the claim that his management was so deficient that removal was warranted. The first negative evaluation appeared only after Peveri had already decided to remove him. *TP*, p. 222 (met with Plaintiff for performance review on November 21, 2022); *TP*, pp.18-19 (removed Plaintiff as DSM on October 7, 2022). This is the definition of a pretextual paper trail: the negative documentation was created to justify a decision already made, not to address a pre-existing performance deficiency. A reasonable jury could credit the years of positive evaluations over a single post-hoc negative review.

The Plaintiff was paid over $432,000.00 in performance bonuses in 2022 at the conclusion of which he was removed as DSM. *Ex. 9*.

Further, Peveri never gave Plaintiff an opportunity to address the alleged complaints before removing him. Before October 2022, Peveri had never come to Plaintiff to discuss anything he needed to improve upon as DSM. *MC*, p.131 When Plaintiff asked what the complaints were, Peveri told him, "Mike don't say anything" and later "Let's move on." *MC*, p.

---

[1] The Plaintiff has filed a *Motion to Strike Portions of Affidavits Submitted in Support of the Defendants' Motion for Summary Judgment*, Doc. No. _____, including this specific paragraph on hearsay grounds.

128, 142. In more than five subsequent meetings, Peveri never disclosed what the complaints were, never discussed other positions within Expeditors, and never suggested Plaintiff apply for other roles. *Id.*, p. 145.

Next, the Defendants argue that the Plaintiff was not "subjected to an adverse action." *DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT* ["*Def. Memo*."], p. 14. This quoted phrase from the defendants is pretextual. Peveri admits she removed the Plaintiff from the DSM position. His bonus was then reduced the next year by approximately 62% when he was moved to the warehouse. It would be reasonable for a jury to infer on the record submitted here by the Plaintiff, which must be taken as true, that Peveri wanted her female friend to replace the Plaintiff as DSM but rather than fire him in October, 2022, she placed the Plaintiff in the warehouse position with the hope that he would quit. But when the Plaintiff persevered despite an enormous reduction in job responsibilities and pay, Peveri and Brian Carrabes then decided to fire the Plaintiff during the meeting of February 5, 2024.

Conspicuously, the Defendants make little reference to the meeting of February 5, 2024, and do not even mention the letter of February 6, 2024, except to say that it was not delivered to the Plaintiff. Both the meeting and letter are strong evidence of pretext for the Defendants' proffered job-related reason for his termination.

At the outset of the meeting on February 5, 2024, Michel Carrabes told Peveri and his brother that he wanted to discuss why he felt as though he was being treated unfairly and to discuss complaints about him for which Peveri had provided no answers. Peveri then left the meeting after ten to twenty seconds. It is reasonable to infer that she did not have any answers for his unfair and discriminatory treatment, and she had no facts to support her comments to the

Plaintiff. She previously had told the Plaintiff on two separate occasions, "Mike, don't say anything," when he asked about the complaints, and later told him, "Let's move on."

Next during the meeting, Brian Carrabes told the Plaintiff, "Get the fuck out of here. You no longer have a job at Expeditors," *MC*, p. 185, and as the Plaintiff was leaving his office repeated, "Get the fuck out. You no longer work here." *MC*, p. 186. The Defendants write off this outrageous behavior as "at most, an off-the-cuff comment during a heated argument, not that Brian Carrabes actually terminated Plaintiff's employment." *Def. Memo*, p. 14. A jury should be permitted to determine whether Brian Carrbes fired Mike Carrabes at that meeting, not his lawyers.

And when the jurors do evaluate whether Mike Carrabes was fired, they can also consider the letter of February 6, 2024, in which Tracy Peveri writes that the Plaintiff's employment is "terminated immediately," after recounting her version of what occurred on February 5, 2024, and determining that the Plaintiff's behavior was "unprofessional and threatening." *Ex. 3*. The Plaintiff denies any unprofessional or threatening behavior and a jury will need to assess the credibility of everyone who attended that meeting to determine what was said and the consequences.

A trier of fact would be warranted in finding that Michael Carrabes was fired on February 5, 2024, a fact confirmed by the February 6, 2024 letter written by the Defendant, Peveri.

**B. Intentional Interference with Advantageous Relations**

> A claim for interference with advantageous relations depends upon the presence of four criteria: "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." *Comey v. Hill,* 387 Mass. 11, 438 N.E.2d 811, 816 (1982); *see also Speen v. Crown Clothing Corp.,* 102 F.3d 625, 634 (1st Cir.1996).

James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1250 (1st Cir. 1997). In this case, Michael Caarrabes must demonstrate that Tracy Peveri and Brian Carrabes acted with malice to prevail on his claims against them.

One avenue a plaintiff can travel to demonstrate malice is by proving discrimination. See, *Comey v. Hill*, 387 Mass. 11, 19 (1982)(age discrimination as basis for finding of malice); *Bray v. Cmty. Newspaper Co.*, 67 Mass. App. Ct. 42, 48 (2006) ("Discrimination constitutes an improper means or motive for purposes of an interference claim, and constitutes actual malice that, if proved, would defeat the defendants' conditional privilege.").

As argued, supra, the Plaintiff alleges that Tracy Peveri discriminated against the Plaintiff on the basis of sex. Peveri removed the Plaintiff from the DSM position because she wanted a woman in the position and the Plaintiff was, in fact, replaced by a woman.

However, even if the court is not persuaded that there exists a question of material fact on the Plaintiff's discrimination claim, he can still prove malice, as defined by the courts, through Peveri's conduct and Brian Carrabes's actions.

> Malice may be shown by the proof of facts from which a reasonable inference of malice may be drawn. The line between a proper inference and unwarranted conjecture is not easily drawn. The answer depends on the evidence in each case and on what the trier of fact may reasonably infer from that evidence. The fact that there is no direct evidence that [the defendants] acted with malice to obtain [the plaintiff's] discharge is not dispositive.

*Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 664 (1981). We must, of course, consider the evidence collectively in deciding whether an inference of malice was warranted. *Id.*, at 665. See, *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 634–35 (1st Cir. 1996), as amended (Jan. 22, 1997), in accord.

The courts have also taken the opportunity to define "malice" as used in the employment context. In *Blackstone v. Cashman,* 448 Mass. 255, 260–261 (2007), the Massachusetts Supreme Judicial Court defined "actual malice" as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." The First Circuit wrote, "Stated otherwise, there must be a showing that the individual defendants 'acted with actual malice, in the sense of malevolence, spite or ill will.'" *Evans v. Certified Eng'g & Testing Co.*, 834 F. Supp. 488, 498 (D. Mass. 1993), citing, *Charles River Data Systems, Inc. v. Oracle Complex Systems Corporation,* 788 F.Supp. 54, 60 (D.Mass.1991).

Even if Tracy Peveri's conduct is not viewed as discriminatory, a conclusion with which the Plaintiff disagrees, then her conduct independently demonstrates actual malice towards Michael Carrabes. Michael Carrabes had glowing performance evaluations though his 2021 EPE. In the comments by his peers in the EPE's, the Plaintiff was described as a great sales manager and greatly appreciated. In 2022, his bonus pay exceeded $432,000.00 which demonstrates excellence in his job performance. It was not until after he met with Tracy Peveri in October that Peveri began to include less than favorable comments in his performance evaluations. Despite self-serving affidavits now presented to the court, there are no mentions of employee complaints in the performance evaluations pre-dating his 2022 performance review in November 2022. When the Plaintiff asked Peveri about the alleged complaints, she first said, "Let's move on." *MC*, p. 142. She asked the plaintiff, "Mike, who really likes you at the branch?" *Id*. The Plaintiff had at least five other meetings with Peveri to try and learn more about the alleged complaints and no information was provided. Peveri did not discuss any other positions within Expeditors and Peveri did not suggest that the Plaintiff apply for any other positions within Expeditors. Further, Peveri never told the Plaintiff, "what any of the complaints

were from the sales team." *MC*, p. 145. Finally, the Plaintiff requested a meeting approximately fifteen months later with Peveri and her boss, Brian Carrabes to discuss, *inter alia*, the alleged complaints against him and why he was being treated unfairly, Peveri responded, "What have you really done at this company? Mike, you'll be fine. You don't have family." *MC*, p. 177. Peveri then left the meeting within ten to twenty seconds and provided no information to the Plaintiff. The next day, Peveri signed a letter stating that the Plaintiff's employment was terminated immediately due to his conduct in the prior day's meeting. In that letter, *Ex. 3*, she makes no mention of this recently contrived reason for his termination relating to job performance. What Tracy Peveri did was demote Mike Carrabes so she could give his job to her female friend and then had him assigned to the warehouse, reduced his bonus by 62% and waited for him to resign. When Mike Carrabes did not resign, she finally decided to fire him for reasons she will not even acknowledge now. It served no corporate interest to demean the Plaintiff and to make inflammatory remarks about his value or contribution to the company when asked questions about who had allegedly complained.

A jury would be warranted in finding that Tracy Peveri acted maliciously towards Michael Carrabes even in the absence of a discriminatory animus.

Brian Carrabes fares no better. It is malicious and beyond the norms of human decency to engage in ad hominem, profanity-laced attacks when an employee asks about complaints which have allegedly been lodged against him and asks to see his personnel file to determine if any such complaints have been documented. It does nothing to promote the business interests of Expeditors to get mad and aggravated and say, ""How dare you kind of come in here and ask questions?" "Get the fuck out of here. You no longer have a job at Expeditors." *MC*, p. 178. And it serves no corporate purpose to say to the employee who has received no answers and is leaving

your office, to say, “"Get the fuck out. You no longer work here." *Id.*, p. 186. When Michael Carrabes dropped off his keys and laptop at the front desk immediately after being verbally attacked by the Regional Vice President, that act is evidence of the Plaintiff’s belief that he had been fired, not the act of a person who is resigning as the Defendants now claim.

Brian Carrabes said that he would support whatever decision Tracy Peveri makes as she runs the branch and decides whom to fire and hire. *BC*, p. 207. Brian Carrabes testified that he did nothing relating to Michel Carrabes’s employment once Tracy made her decision to remove him from his position as the DSM. He testified, “I was told there was going to be a change,” *BC*, p. 83-84, and that, “I did not have a voice in that decision.” *Id.*, p. 84. But now that he feels compelled to conjure a defense to the Plaintiff’s claims, he submits an affidavit to this court which the plaintiff is confident he wants the court to reply upon. In that affidavit, *Doc. No. 121*, he states under oath in paragraph 12, “I never did anything to interfere with the other people who were trying to find a position for Mike within the company ***after I removed him from the DSM position***.” *Doc. No. 121 (emphasis added)*. Now that he needs to defend his actions, he fabricates an affidavit which directly contradicts his other testimony under oath. He continues to hold so much animosity and spite towards Michael Carrabes that he feels the need to create a story no one has ever told. When Brian Carrabes removed Michael Carrabes from the DSM position, which he now admits, he was acting maliciously, with spite and outside of the scope of any authority he says he held with the company. He was interfering with Michael Carrabes’s well-earned position in the company. This is precisely the type of evidence a jury should be allowed to consider.

### C. The Time-Barred Events Are Admissible as Background Evidence

Defendants argue that Plaintiff's removal from the DSM position (December 2022) and his bonus reduction (January 2023) are time-barred because they occurred more than 300 days before his EEOC charge. *Def. Memo*, p. 13. The Supreme Court has held that discrete discriminatory acts are not actionable if time barred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). However, the Supreme Court in *Morgan* also held that the statute does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.*, at 113.

Accordingly, while Plaintiff does not assert the December 2022 demotion or the January 2023 bonus reduction as independent bases for his Title VII claim, they are admissible and highly relevant as background evidence to support his timely claim arising from his February 5, 2024 termination. Peveri's October 2022 statement about preferring a woman for the DSM role, the circumstances of the demotion, and the absence of documentation all provide the context from which a jury could infer that the termination, too, was motivated by sex. The background evidence also supports an inference of actual malice to support his tortious interference claims.

D. **Plaintiff's Wrongful Termination Claim Is Not Barred**

Defendants argue that Plaintiff's wrongful termination claim under Count 4 is barred because it merely restates his Title VII claim. The Supreme Judicial Court in *Meehan v. Med. Info. Tech., Inc.*, 488 Mass. 730, 735-38 (2021), recognized a common-law wrongful termination claim when a plaintiff was allegedly terminated for exercising rights under the personnel file statute, M.G.L. c. 149, § 52C, because the statute did not provide a private cause of action and there was no other statutory basis for relief related to the exercise of those specific rights.

Here, Plaintiff's wrongful termination claim is based on his termination for requesting access to his personnel file and asking whether it contained the complaints that Peveri cited as

the basis for his demotion. *MC*, p. 178. During the February 5, 2024 meeting, Plaintiff asked Brian Carrabes: "What's in my personnel file? Are there complaints in my personnel file? Can I see my personnel file." *Id*. Immediately after this request, Brian Carrabes became "mad and aggravated" and said to the Plaintiff, “How dare you kind of come in here and ask questions?” *Id*. He then added, "Get the fuck out of here" and that he "no longer [had] a job at Expeditors." *Id*.

The record now reveals precisely why Plaintiff's request to review his file provoked such an explosive reaction. Peveri's deposition establishes that Plaintiff's personnel file contained: (a) years of positive performance evaluations, *Ex.* 5, 6, that Peveri herself completed in "good faith" and described as "honest and generous" *TP*, pp. 218:13-223:15; (b) no documentation of the alleged complaints that Defendants now rely upon as the basis for his removal, *id*., pp. 69, 154-155, 171-173, 175, 179, 181, 184; and (c) after the termination, a letter of reprimand containing the false statement that it had been "handed" to Plaintiff "during our meeting" when no such meeting ever occurred. *Id*., pp. 163-167. Had Plaintiff been permitted to review his file, he would have discovered that there was nothing in it to support the alleged performance complaints, and after his termination, that a letter containing false statements had been placed in it without his knowledge. A reasonable jury could infer that Defendants terminated Plaintiff, at least in part, to prevent him from discovering the absence of documentation supporting the alleged complaints and to avoid the embarrassment of a long-tenured employee exposing the pretextual nature of his removal.

Plaintiff's right to review his personnel file under M.G.L. c. 149, § 52C is a distinct statutory right that is not encompassed by Title VII's anti-discrimination or anti-retaliation provisions. Title VII prohibits discrimination and retaliation for opposing discrimination. The

personnel file statute protects a separate right: the right of an employee to inspect documents that an employer maintains about him. When an employee is terminated for exercising that right, the wrongful termination claim is not duplicative of Title VII because it vindicates a different public policy. See, *Meehan*, supra, at 735-38.

Even if this Court were to find some overlap with Title VII's retaliation protections, the personnel file statute does not provide a private cause of action for damages. See M.G.L. c. 149, § 52C. The wrongful termination claim therefore fills a remedial gap that Title VII does not address.

On the merits, a reasonable jury could find a causal connection between Plaintiff's request to see his personnel file and his termination. The two events occurred within seconds of each other. *MC*, p. 178. This temporal proximity, combined with the other evidence of pretext, is sufficient to survive summary judgment.

E. **Plaintiff's Personnel File Claim Should Not Be Dismissed**

Plaintiff's claim under Count 5 seeks removal of the February 6, 2024 termination letter from his personnel file because it contains false information, specifically, the characterization that Plaintiff's behavior was "unprofessional and threatening." The record shows that Plaintiff's account of the February 5 meeting is materially different from Defendants' account. Plaintiff testified he was calm and never raised his voice. SUMF ¶ 111. Whether the letter's characterization of Plaintiff's conduct is accurate is a disputed fact.

The termination letter also contains the provably false statement that Plaintiff was "handed a copy today during our meeting." *Ex. 7*. Peveri confirmed under oath that the meeting "never occurred" and the letter was "never handed" to Plaintiff. *TP*, pp.164-167. She never corrected the letter, and it remains in Plaintiff's file with her signature. *Id.*, pp.164, 166. Additionally, the letter

states Plaintiff was terminated for "unprofessional and threatening behavior," but Peveri herself initially testified that Plaintiff was terminated because "he left his laptop and his badge," not because of his behavior. *TP*, p. 19. A document containing false statements of fact should not remain in an employee's permanent record.

**Conclusion**

Based upon the factual record presented by the Plaintiff and the arguments advanced herein, the Defendants' Motion for Summary Judgment should be denied in its entirety, and the case should proceed to trial as scheduled in June 2027.

Respectfully submitted,
Michael Carrabes,
By His Attorney,

*/s/ David W. Heinlein, Esq.*

David W. Heinlein (BBO#550598)
HEINLEIN BEELER MINGACE
& HEINEMAN, P.C.
276 Union Avenue
Framingham, MA 01702
(508) 626-8500
dheinlein@hbmhlaw.com

**CERTIFICATE OF SERVICE**

I, David W. Heinlein, Esquire, attorney for the above-named Plaintiff, do hereby certify that on September 8, 2026, I caused a copy of the within to be served upon each named party to each party's counsel of record, by emailing a copy of same to:

Asha A. Santos, Esq.
asantos@littler.com
Matthew J. Lynch, Esq.
mlynch@littler.com
LITTLER MENDELSON, P.C.
One International Place
Suite 2700
Boston, MA 02110

/s/ David W. Heinlein, Esq.

David W. Heinlein, Esq.